1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION FOR A SUSTAINABLE DELTA, *et al.*, <br><br> Plaintiffs, <br><br>          v. <br><br> JOHN CARLSON, JR., in his official capacity as Executive Director of the California Fish and Game Commission, *et al.*, <br><br> Defendants, <br><br> CENTRAL DELTA WATER AGENCY, *et al.*, <br><br>          Defendant-Intervenors, <br><br> CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, *et al.*, <br><br>          Defendant-Intervenors. | 1:08-CV-00397 OWW GSA <br><br> **MEMORANDUM DECISION AND ORDER RE STATE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. 24).** |

I.   <u>INTRODUCTION</u>

Plaintiffs in this case are a coalition of agricultural water users in the San Joaquin Valley that contract for State Water Project ("SWP") water deliveries from the Delta; an umbrella organization, the Coalition for a Sustainable Delta, purporting to represent these water users (collectively the "Coalition"); and one individual, Dee Dillon, who uses and enjoys

1  the Delta for recreational and aesthetic purposes.  On January

2  29, 2008, Plaintiffs filed a lawsuit pursuant to 16 U.S.C. §

3  1540(g)(3)(A), the citizen suit provision of the Endangered

4  Species Act ("ESA"), seeking declaratory and injunctive relief,

5  against John Carlson, Jr., in his official capacity as Executive

6  Director the California Fish and Game Commission (the

7  "Commission"); Richard Rogers, Cindy Gustafson, Jim Kellogg, and

8  Michael Sutton, in their official capacities as Members of the

9  Commission; and John McCamman, in his official capacity as

10  Interim Director of the California Department of Fish and Game

11  ("CDFG").  (*See* Doc. 1.)[1]

12      Before the court for decision is State Defendants' motion

13  for judgment on the pleadings.  (Doc. 24, filed May 5, 2008.)

14  State defendants argue that:  (1) neither the Coalition nor Dee

15  Dillon have standing to sue; (2) the individual defendants named

16  in their official capacities as Members of the Commission are

17  absolutely immune from suit by virtue of the legislative immunity

18  doctrine; and (3) the Eleventh Amendment otherwise bars suit

19  against the Commission's Members and Executive Director.

20                      II.   BACKGROUND

21      The crux of the Coalition's Complaint is that the

22  Commission's promulgation and CDFG's maintenance and enforcement

23  of striped bass fishing regulations cause the unlawful "take" of

24  four species of ESA "listed" fish, including the Sacramento River

25

26      [1]   The Commission and CDFG were originally named as
   defendants, but were dismissed by stipulation of the parties,
27  (Doc. 12), leaving only officials of these two agencies as
   defendants.
28

                              2

1   winter-run Chinook salmon ("winter-run"), the Central Valley

2   spring-run Chinook salmon ("spring-run"), the Central Valley

3   steelhead ("steelhead"), and the Delta smelt (collectively,

4   "Listed Species").   Through the adoption and enforcement of the

5   striped bass fishing regulations, which include bag and size

6   limitations, the Complaint alleges that the Commission and CDFG

7   have allowed and encouraged the population of the non-native

8   striped bass to thrive in the Delta.   According to the Complaint,

9   the striped bass prey upon and consume the Listed Species, and

10  this is one of several causes of the population declines of the

11  Listed Species.

12                      **III.   <u>STANDARD OF REVIEW</u>**

13       A Rule 12(c) motion challenges the legal sufficiency of the

14  opposing party's pleadings after the pleadings are closed.

15  Judgment on the pleadings is appropriate when, even if all

16  material facts in the pleading under attack are true, the moving

17  party is entitled to judgment as a matter of law.   *Honey v.*

18  *Distelrath*, 195 F.3d 531 (9th Cir. 1999).   The court must assume

19  the truthfulness of the material facts alleged in the complaint.

20  All inferences reasonably drawn from these facts must be

21  construed in favor of the responding party.   *Westlands Water*

22  *Dist. v. Firebaugh Canal*, 10 F.3d 667 (9th Cir. 1993).

23       As with a motion to dismiss pursuant to Rule 12(b)(6), if

24  matters outside of the pleadings are presented to and not

25  excluded by the court on a motion for judgment on the pleadings,

26  the motion shall be treated as one for summary judgment.   Fed. R.

27  Civ. P. 12(c).   Nevertheless, a court may take judicial notice of

28  matters of public record, including "records and reports of

                                  **3**

administrative bodies" without converting the motion to one for summary judgment.  *See Mack v. South Bay Beer Distribs., Inc.,* 798 F.2d 1279, 1282 (9th Cir. 1986) (applying Rule 12(b)(6)).

## IV.   DISCUSSION

**A.   Standing**.

**1.   General Legal Standard**.

Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III.  *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001).  "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision."  *Iron Arrow Honor Soc. v. Heckler*,  464 U.S. 67, 70 (1984).  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The doctrine of standing "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."  *Allen v. Wright*, 468 U.S. 737, 752 (1984).  The court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing. *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990); *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 U.S. 817, 821 (9th Cir. 2002).

To have standing, a plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in
> fact"--an invasion of a legally protected interest
> which is (a) concrete and particularized and (b) actual

**4**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> or imminent, not conjectural or hypothetical. Second,
> there must be a causal connection between the injury
> and the conduct complained of-- the injury has to be
> fairly traceable to the challenged action of the
> defendant, and not the result of the independent action
> of some third party not before the court. Third, it
> must be likely, as opposed to merely speculative, that
> the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)

(internal citations and quotations omitted).

The Supreme Court has described a plaintiff's burden of

proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading
> requirements but rather an indispensable part of the
> plaintiff's case, each element must be supported in the
> same way as any other matter on which the plaintiff
> bears the burden of proof, i.e., with the manner and
> degree of evidence required at the successive stages of
> the litigation.  At the pleading stage, general factual
> allegations of injury resulting from the defendant's
> conduct may suffice, for on a motion to dismiss we
> presume that general allegations embrace those specific
> facts that are necessary to support the claim.   In
> response to a summary judgment motion, however, the
> plaintiff can no longer rest on such "mere
> allegations," but must "set forth" by affidavit or
> other evidence "specific facts," Fed. Rule Civ. Proc.
> 56(e), which for purposes of the summary judgment
> motion will be taken to be true. And at the final
> stage, those facts (if controverted) must be supported
> adequately by the evidence adduced at trial.

*Id*. at 561; *see also Churchill County v. Babbitt*, 150 F.3d 1072,

1077 (9th Cir. 1998).

2.   <u>Standing of the Coalition</u>.

a.   <u>Injury in Fact</u>.

State defendants do not challenge the Coalition's ability to

satisfy the injury in fact element.   (Doc. 39 at 2-3, filed July

7, 2008.)   Nevertheless, the district court has a *sua sponte* duty

to address the requirements of standing.   *Bernhardt v. County of

Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002).   Here, the

5

1   Complaint alleges that:

2               Plaintiff Coalition for a Sustainable Delta
                ("Coalition") is comprised of agricultural water users
3               in the San Joaquin Valley.  Coalition members depend on
                State Water Project ("SWP") deliveries from the Delta
4               to the San Joaquin Valley for their water supply.  The
                continued operation of the SWP is, in turn, dependent
5               on the overall health of the Delta and its ecosystem,
                which includes the maintenance of viable populations of
6               species living in the Delta and protected by the ESA,
                such as the Sacramento River winter-run chinook salmon,
7               Central Valley spring-run chinook salmon, Central
                Valley steelhead, and delta smelt.  In 2007, a federal
8               district court ruled that deliveries of SWP water to
                parties with water contracts, such as the Coalition
9               members, must be reduced substantially to protect the
                delta smelt.  *NRDC v. Kempthorne*, 2007 U.S. Dist. LEXIS
10              48261 (E.D. Cal. 2007).  Recently, the California
                Department of Water Resources reported that in an
11              average water year, the court's order in *NRDC v.
                Kempthorne* would reduce water exports from the Delta by
12              22 to 30 percent.  Department of Water Resources
                Advisory, DWR Releases Water Delivery Impact Estimates
13              Following [the] Wanger Decision (Dec. 24, 2007).
                Violations of the ESA by defendants, including the take
14              of the Federally-Protected species, contribute to a
                decline in the health of the Delta ecosystem.
15              Furthermore, such violations contribute to declines of
                the populations of species in the Delta protected by
16              the ESA.  The illegal and unmitigated take of the
                Federally-Protected species, including the delta smelt,
17              by defendants injures the Coalition because it reduces
                the population of the Federally-Protected species
18              thereby worsening the baseline status of the species,
                which must be taken into account by FWS and NMFS when
19              they determine whether proposed SWP exports from the
                Delta comply with the ESA.  Therefore, defendants' ESA
20              violations threaten deliveries of SWP water to members
                of the Coalition.  In sum, because the CFGC and CDFG
21              have contributed to the decline of the delta smelt
                population by violating the ESA, they have contributed
22              to the reduction in SWP water deliveries to members of
                the Coalition.  Reduced deliveries of SWP water have an
23              economic impact on members of the Coalition.  Thus,
                Coalition members have been, and will continue to be,
24              harmed by defendants' violations of the ESA.

25   (Doc. 1 (Compl.) at ¶40.)  The complaint also alleges that each

26   of the Coalitions' members, Belridge Water Storage District

27   ("BWSD"), Berrenda Mesa Water District ("BMWD"), Lost Hills Water

28   District ("LHWD"), and Wheeler-Ridge Maricopa Water Storage

District ("WRMWSD"), all of which are California Water Storage Districts, "depend[] on SWP deliveries from the Delta to the San Joaquin Valley for their water supply," and are injured as described above in the paragraph concerning the Coalition as a whole.  (*Id*. ¶ 41-44.)

These allegations are sufficient to satisfy the injury in fact requirement, as the Coalition and its members are arguably injured by reduced water deliveries caused, in part, by actions undertaken to protect the Listed Species.  *See Bennet v. Spear*, 520 U.S. 154, 168 (9th Cir. 1997)(injury in fact test satisfied where petitioner alleged that agency action reduced the amount of water available and, as a result, adversely affected plaintiffs' water supply).

### b.   Causal Connection.

Constitutional standing requires a showing of "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560-561.  More specifically, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal quotations omitted).

"When the suit is one challenging the legality of government action or inaction, [and] plaintiff is himself an object of the action (or forgone action) at issue... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id*. at 561-62.  This is not the case here, as Plaintiffs are not in any way the object of the challenged striped bass regulations.

1    Where, in contrast, "plaintiff's asserted injury arises from

2 the government's allegedly unlawful regulation (or lack of

3 regulation) of *someone else*, much more is needed."

4          In that circumstance, causation and redressability
           ordinarily hinge on the response of the regulated (or
5          regulable) third party to the government action or
           inaction—and perhaps on the response of others as well.
6          The existence of one or more of the essential elements
           of standing "depends on the unfettered choices made by
7          independent actors not before the courts and whose
           exercise of broad and legitimate discretion the courts
8          cannot presume either to control or to predict,"
           (Citations omitted.) and it becomes the burden of the
9          plaintiff to adduce facts showing that those choices
           have been or will be made in such manner as to produce
10         causation and permit redressability of injury.

11   *Id*. at 562 (emphasis in original).

12       Nevertheless, a "chain of causation [may have] more than one

13 link," so as long as the connection between the injury and cause

14 is not "hypothetical or tenuous." *Nat'l Audubon Soc. v. Davis*,

15 307 F.3d 835, 849 (9th Cir. 2002).  In *Davis*, the Ninth Circuit

16 found that the Audubon Society, an organization dedicated to

17 protection and observation of birds, had standing to challenge a

18 regulation that forbade the use of a certain type of game trap

19 because "[r]emoval of the traps leads to a larger population of

20 predators, which in turn decreases the number of birds and other

21 protected wildlife."  *Id*.  The Ninth Circuit reasoned:  "This

22 chain of causation has more than one link, but it is not

23 hypothetical or tenuous; nor do appellants challenge its

24 plausibility."  *Id*.

25       Similarly, in *Ocean Advocates v. U.S. Army Corps of

26 Engineers,* 402 F.3d 846 (9th Cir. 2005), the Ninth Circuit found

27 that an environmental organization had standing to challenge the

28 issuance by the Corps of Engineers of a permit to construct an

**8**

extension to an existing oil refinery dock.  It was undisputed that the extension would be built if permitted; that its construction would increase traffic to the dock over time; and that, when considered alone or in tandem with other industrial projects in the area, the increased traffic would contribute to the risk of an oil spill.  *Id*. at 860.  While acknowledging that "other factors may also cause additional tanker traffic and increase the attendant risk of an oil spill," the Ninth Circuit found there was a sufficient causal connection between the issuance of the permit and plaintiffs' injuries, reasoning that the link between the new platform and increased traffic was not tenuous or abstract.  *Id*.  "The causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of litigation as to demonstrate that the plaintiffs would succeed on the merits."  *Id*.; *see also Loggerhead Turtle v. County Council of Volusia County, Florida*, 148 F.3d 1231, 1249 (9th Cir. 1998)(environmental organization showed sufficient causal connection to challenge county's decision to exempt certain municipalities within its boundaries from artificial beachfront lighting regulations designed to protect sea turtles; the fact that the municipalities had supplemental authority to enact more onerous lighting standards did not sever the "fairly traceable" connection between the county's regulatory actions and the alleged harm).

State Defendants argue that the Ninth circuit applies a strict "but for" test when evaluating causation in cases involving independent action by third parties, citing *Idaho*

1  *Conservation League v. Mumma*, 956 F.2d 1508 (9th Cir. 1992).  In
2  *that case*, the Ninth Circuit examined whether an environmental
3  organization had standing to challenge whether an agency's
4  decision to recommend against designating a certain area as
5  wilderness.  956 F.2d at 1518.  The Ninth Circuit held that, in
6  contrast to cases in which the injury was not "fairly traceable"
7  to the challenged action or resulted from the "independent action
8  of some third party not before the court," the injury to the
9  plaintiff would not have occurred "but for" the agency's decision
10  to recommend against wilderness designation.  *Id*.  However, the
11  Ninth Circuit did not indicate that a "but for" causal connection
12  was necessary to achieve standing, only that it was sufficient.
13  Subsequent case law, including *Ocean Advocates,* 402 F.3d 846, and
14  *Loggerhead Turtle*, 148 F.3d at 1249, make no mention of a "but
15  for" test.

16      Nor does another case relied upon by State Defendants,
17  *Prescott v. County of El Dorado*, 298 F.3d 844, 846 (9th Cir.
18  2002), in which county employees challenged a union's improper
19  notice of a fee deduction from their paychecks under a labor
20  agreement.  Among other things, plaintiffs sought to invalidate
21  an employer indemnification clause within the agreement.  *Id*.
22  Notwithstanding the stipulated fact that the employer would not
23  have entered into the agreement without the indemnification
24  clause, the Ninth Circuit held that the plaintiffs lacked
25  standing to contest the clause because the "causal relationship"
26  between the clause and the plaintiffs' claimed injury was "too
27  remote."  *Id*.  According to the Ninth Circuit, the plaintiffs'
28  lacked standing because their alleged "injury was not caused by

the employer's entry into the collective bargaining agreement; it was caused by the unions' inadequate notice of the expenditures on which the agency fees were based." *Id*. This case merely supports the proposition that where a causal connection is too tenuous, standing does not exist.

Plaintiffs cite *Massachusetts v. EPA*, 127 S. Ct. 1438 (2007), for the proposition that an injury should be considered "fairly traceable" even though it merely contributed to the alleged injury. In *Massachusetts v. EPA*, numerous environmental organizations, states, and local governments challenged a decision by the EPA not to adopt a rule regulating greenhouse gas emissions from new motor vehicles. Massachusetts argued that it was injured by EPA's decision, because the decision resulted in greater quantities of greenhouse gases being emitted into the atmosphere, thereby exacerbating the problem of climate change and contributing to the possibility that rising sea levels would permanently or temporarily inundate parts of Massachusetts. *Id*. at 1455-56. In challenging this chain of causation, the EPA asserted that "its decision not to regulate greenhouse gas emissions from new motor vehicles contribute[d] so insignificantly to [the alleged] injuries that the agency [could not] be haled into federal court to answer for them." *Id*. at 1457. While the Supreme Court conceded that any decrease resulting from an EPA issued regulation would more than likely be offset by increases in greenhouse gas emissions from developing nations, it held that Massachusetts' injury was fairly traceable to the EPA's decision. *Id*.

However, *Massachusetts v. EPA* was premised on "the special

1  position and interest of Massachusetts."   The Court reasoned:

2  "[i]t is of considerable relevance that the party seeking review

3  here is a sovereign State and not, as it was in *Lujan*, a private

4  individual."   *Id*. at 1453-1454.   Massachusetts, the Court said,

5  has an "independent interest in all the earth and air within its

6  domain."   *Id*. at 1454.   The Court noted that, although a

7  sovereign state, upon joining the Union, Massachusetts

8  relinquished some of its sovereign prerogatives and thus "cannot

9  invade Rhode Island to force reductions in greenhouse gas

10  emissions, it cannot negotiate an emissions treaty with China or

11  India, and in some circumstances the exercise of its police

12  powers to reduce in-state motor-vehicle emissions might well be

13  pre-empted."   *Id*.

14     These sovereign prerogatives are now lodged in the
   Federal Government, and Congress has ordered EPA to

15     protect Massachusetts (among others) by prescribing
   standards applicable to the "emission of any air

16     pollutant from any class or classes of new motor
   vehicle engines, which in [the Administrator's]

17     judgment cause, or contribute to, air pollution which
   may reasonably be anticipated to endanger public health

18     or welfare."   42 U.S.C. § 7521(a)(1).   Congress has
   moreover recognized a concomitant procedural right to

19     challenge the rejection of its rulemaking petition as
   arbitrary and capricious.   § 7601(b)(1).   Given that

20     procedural right and Massachusetts' stake in protecting
   its quasi-sovereign interests, the Commonwealth is

21     entitled to special solicitude in our standing
   analysis.

22

23  *Id*. at 1454-1455 (emphasis added).   Because standing in

24  *Massachusetts v. EPA* was premised on this "special position and

25  interest," it is of limited relevance to this case, brought by

26  private citizens.

27     Here, the Coalition and its members assert that they are

28  being harmed because the striped bass regulations protect striped

1  bass, which prey upon listed species, which predation, in turn,

2  affects the "baseline" condition of those species.  This less

3  robust baseline, according to the Complaint, "must be taken into

4  account by FWS and NMFS when they determine whether proposed SWP

5  exports from the Delta comply with the ESA.  Therefore,

6  defendants' ESA violations threaten deliveries of SWP water to

7  members of the Coalition."  (Doc. 1 at ¶40.)  "In sum," the

8  Complaint alleges, "because the [the Commission] and CDFG have

9  contributed to the decline of the delta smelt population by

10  violating the ESA, they have contributed to the reduction in SWP

11  water deliveries to members of the Coalition.  Reduced deliveries

12  of SWP water have an economic impact on members of the

13  Coalition."  (*Id.*)

14      Although "this chain of causation has more than one link, []

15  it is not hypothetical or tenuous," *Davis*, 307 F.3d at 849, nor

16  do state defendants "challenge its plausibility."  *Id*.  Instead,

17  State Defendants make several arguments in the context of the

18  causation element, e.g., that the invalidation of the striped

19  bass regulations would have no direct effect on the *Kempthorne*

20  interim remedies order nor would it necessarily alter future

21  biological opinions (Doc. 25 at 9), that are more relevant to the

22  issue of redressibility and are addressed below.

23      The Coalition's economic injuries are fairly traceable to

24  the enforcement of the striped bass regulations.

25              c.   <u>Redressibility</u>.

26      Constitutional standing also requires a showing that it is

27  "likely, as opposed to merely speculative, that the injury will

28  be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561

(internal citations and quotations omitted).  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  Where the "redress[]" of injury "depends on the unfettered choices made by independent actors not before the courts," a court should "have much less confidence in concluding that relief is likely to follow from a favorable decision." *Asarco, Inc. v. Kadish*, 490 U.S. 605, 614-615 (1989).

The Ninth Circuit has explored the issue of redressibility in many cases.  In *Glanton v. AdvancePCS, Inc.*, 465 F.3d 1123, 1225 (9th Cir. 2006), plaintiffs were company employees who participated in company-sponsored prescription drug plans.  The plaintiffs contended that the drug benefits management company that administered the plans on behalf of their employers had overcharged their employers for drugs, forcing the employees to pay higher co-payments or contributions to their employers than appropriate.  *Id*.  The Ninth Circuit dismissed plaintiffs' claims for lack of standing because there was no reason to believe that the employing companies would actually have reduced employee co-payments or contributions, even if the plaintiffs had prevailed in their action against the drug benefits management company:

> There is no redressability, and thus no standing, where (as is the case here) any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict.

*Id*. at 1125.

In *Nuclear Information & Research Service v. Nuclear*

**14**

1   *Regulatory Commission ("NRC")*, 457 F.3d 941, 955 (9th Cir. 2006),

2   plaintiffs challenged the NRC's decision to revise regulations

3   governing the exemption standards for the transportation of

4   radioactive material, claiming that NRC failed to comply with its

5   obligations under the National Environmental Policy Act (NEPA).

6   NRC argued that plaintiffs failed the redressability prong of

7   *Lujan* because radioactive material is subject not only to the NRC

8   rules, but also to the related rules of another agency, the

9   Department of Transportation ("DOT").  *Id.* at 955.  NRC argued

10  that because the DOT rules were not properly before the Ninth

11  Circuit, plaintiffs injury would not be redressed by having the

12  NRC rules invalidated.  *Id.*  Plaintiffs countered that they need

13  only show that if NRC is required to conduct an appropriate

14  environmental analysis, such analysis could result in a different

15  exemption rule or no exemption, and noted that because NRC's

16  environmental analysis was the basis for both NRC and DOT's

17  rulemakings, setting aside NRC's NEPA investigation would remedy

18  NIRS's substantive challenge to the DOT rule.  The Ninth Circuit

19  sided with the agency:

20          Redressability depends on whether the court has the
            ability to remedy the alleged harm. *Hall*, 266 F.3d at
21          975. In most NEPA cases, a petitioner "who asserts
            inadequacy of a government agency's environmental
22          studies ... need not show that further analysis by the
            government would result in a different conclusion. It
23          suffices that ... the [agency's] decision could be
            influenced by the environmental considerations that
24          [the relevant statute] requires an agency to study."
            *Id.* at 977 (emphasis added) (citation omitted).
25          However, this is not the usual NEPA case. The parties
            agreed at oral argument that NRC licensees are required
26          to follow DOT's regulations for the transportation of
            nuclear material. 10 C.F.R. § 71.5(a) ("Each licensee
27          who transports licensed material outside the site of
            usage, as specified in the NRC license, or where
28          transport is on public highways, or who delivers

                                    15

1
2
3
4
5
6
7
8
9
10
11

> licensed material to a carrier for transport, shall comply with the applicable requirements of the DOT regulations in 49 CFR parts 107, 171 through 180, and 390 through 397, appropriate to the mode of transport."). <u>Thus, even if we were to set aside the current NRC rule and remand to NRC with instructions that it prepare an EIS, nothing requires DOT to revisit its identical exemption standards, which govern the universe of NRC licensees.</u> *See Lujan*, 504 U.S. at 568, 112 S.Ct. 2130 (holding there was no redressability because the Secretary could be ordered to revise his regulation "[b]ut this would not remedy respondents' alleged injury unless the funding agencies were bound by the Secretary's regulation, which is very much an open question"). <u>As NRC pointed out at oral argument, the DOT rule would control even if the NRC rule was wiped off the books.</u> And the DOT regulation is not before us. We cannot see how an order remanding to NRC would remedy the asserted injury from the IAEA exemption standards because DOT would be under no obligation to reconsider its own, identical rule.

12   *Id.* (emphasis added).

13        Here, for the injury allegedly suffered by the Coalition and

14   its members to be redressed, those water deliveries that have

15   been reduced as a result of actions taken to protect the Delta

16   smelt would need to be restored, at least in part.   The

17   *Kempthorne* interim remedies expired on June 20, 2008, and the new

18   Delta smelt BiOp is due out in September 2008.   It is total

19   speculation to predict that the district court will be requested

20   to modify or impose any interim operational restrictions on the

21   CVP or SWP.   In the ongoing litigation over the winter-run and

22   spring-run Chinook Salmon and Central Valley steelhead, the

23   interim remedies phase of the case has not been reached and no

24   operational changes have been ordered.   If any interim remedies

25   were to be imposed, a revised BiOp for those species is due to be

26   issued March 2, 2009.

27        Similarly, even assuming, *arguendo*, that Plaintiffs are

28   entirely successful in this lawsuit and that the striped bass

16

regulations are invalidated as a result, it is speculative to assume that the FWS and/or NMFS would materially alter their conclusions regarding the status of the Listed Species and the measures required to prevent jeopardy and adverse modification to their habitat.  Although the district court may be asked to review the agencies' revised biological opinions, the agencies are "independent actor[s] [that] retain[] broad and legitimate discretion the courts cannot presume either to control or to predict."  *Glanton*, 465 F.3d at 1225.  This case is similar to *Glanton*, in that there is no way to know whether the agencies would provide more water to the Coalition and its members if even if Plaintiffs prevail.  This is especially so because there are multiple causes affecting the species unrelated to the striped bass.

The Coalition argues that "if the Court invalidates Defendants' striped bass regulations, the Coalition and Water Districts' injury would be redressed, as the Defendants' <u>would no longer be contributing to the reduction</u> in water deliveries via the adoption and enforcement of striped bass sport fishing regulations."  (Doc. 36 at 16 (emphasis added).)  In support of this assertion, the Coalition again cites *Massachusetts v. EPA*, 127 S. Ct. at 1458, in which the Supreme Court explained that "[w]hile it may be true that regulating motor-vehicle emissions will not by itself reverse global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to slow or reduce it."  The Supreme Court also found that the fact that developing countries were "poised to increase greenhouse gas emissions substantially over the next century" was

1  not dispositive on the issue.  *Id*.  Instead, the Court held that
2  the injury could be redressed because the risk of harm "would be
3  reduced to some extent if petitioners received the relief they
4  [sought]."  *Id*.

5      Plaintiffs argue that, as in *Massachusetts v. EPA*, "even
6  though the remedy sought would not right the entire wrong, the
7  relief sought would reduce the injury – Defendants would no
8  longer be contributing to the reduction in water deliveries.
9  Therefore, the injury can be redressed."  (Doc. 36 at 17.)
10 However, because this holding was premised on the special role of
11 Massachusetts as a sovereign, it is of questionable applicability
12 to the present case.

13     Plaintiffs also cite *Ocean Advocates*, 402 F.3d 846, the oil
14 platform extension project case, where the claimants requested an
15 injunction to restrict tanker traffic to the existing platform
16 and to require the agency to complete appropriate NEPA analyses
17 before permitting the project.  The Ninth Circuit reasoned that
18 the injunction would "alleviate [plaintiff's] concern about
19 increased traffic" and that a plaintiff "who asserts inadequacy
20 of a government agency's environmental studies under NEPA need
21 not show that further analysis by the government would result in
22 a different conclusion.  It suffices that, as NEPA contemplates,
23 the [agency's] decision could be influenced by the environmental
24 considerations that NEPA requires an agency to study."  *Id*. at
25 860.  Unlike *Ocean Advocates*, Plaintiffs do not seek injunctive
26 relief that would redress their injury (nor could they, as
27 injunctive relief in this case would be confined to the present
28 parties, and the CVP operator is not a party).  This is not a

18

NEPA case, nor is a procedural statute challenged, in which correction of the procedural violations effectively redresses the harm.

Here, the Coalition lacks standing to sue because, even if it were to prevail in this case, its injury would not necessarily be redressed.  If the regulations were invalidated, even if the striped bass population were reduced to a level that measurably protected salmonid species on which they prey, there are other predators (the pikeminnow) and other causes: operation of the Projects, toxics, in-Delta diverters, alien invasive species, all of which contribute to the species' jeopardy.  The present Delta smelt and salmonids jeopardy findings are based on drought conditions and Project operations, as primary causes.  The extent to which all other cooperative causes will continue to operate is unknown.  There remains total uncertainty whether reduction in the threat of some predators will have more than minimal effect on the protected species.  The State Defendants motion for judgment on the pleadings that the Coalition lacks standing is GRANTED, WITH LEAVE TO AMEND.

### d.  Associational Standing.

The Coalition also must satisfy the requirements of associational standing.  "[A]n association has standing to bring suit on behalf of its members when":

> (a) its members would otherwise have standing to sue in their own right;
>
> (b) the interests it seeks to protect are germane to the organization's purpose; and
>
> (c) neither the claim asserted not the relief requested requires the participation of individual members in the lawsuit.

1

2  *United Food & Commercial Workers v. Brown Group*, 517 U.S. 544,

3  553 (1996).  As the members of the Coalition do not satisfy the

4  redressibility requirement, the Coalition does not have standing

5  to bring suit on their behalf.

6         3.  <u>Standing of Dee Dillon</u>.

7         a.  <u>Injury in Fact</u>.

8      Dee Dillon is the only individual plaintiff in this case.

9  His claims of injury are unrelated to reductions in water

10  deliveries.  According to the Complaint:

11          In the last six years, Mr. Dillon and his family have
   visited the Delta approximately 200 times.  Mr. Dillon
12          and his family engage in recreational boating,
   swimming, fishing, and wildlife viewing in the Delta.
13          Mr. Dillon is deeply concerned about the health of the
   Delta ecosystem as he has personally witnessed its
14          decline over the last six years.  Mr. Dillon has
   engaged in boating for most of his adult life, in both
15          the ocean and in inland waters, and it is his view that
   the Delta provides a freshwater boating and recreating
16          experience that is different than any other in the
   western United States.  Mr. Dillon is concerned about
17          the continued survival of species in the Delta,
   including the Sacramento River winter-run chinook
18          salmon, Central Valley spring-run chinook salmon,
   Central Valley steelhead and the delta smelt.  Mr.
19          Dillon derives aesthetic, recreational, and
   conservation benefits from the overall health of the
20          Delta ecosystem, including the fish species that live
   in the Delta.

21  (Doc. 1 at ¶ 45.)

22      State Defendants argue that these allegations are

23  insufficient because they do not contain "concrete allegations

24  that the defendant's allegedly unlawful actions have actually

25  altered the plaintiff's enjoyment of the environment."  (Doc. 25

26  at 12.)  *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 182-183

27  (2000), upheld a claim of standing in a Clean Water Act case

28

1  where plaintiffs established that the alleged discharge of

2  pollution actually stopped the plaintiffs from fishing in and

3  otherwise recreating on the water body in question. *Id.* at 182.

4      State Defendants argue that in environmental injury cases,

5  the Ninth Circuit requires a plaintiff to show that defendant's

6  conduct has "curtailed," "limited," or "deterred" a plaintiff's

7  actions, citing *Nuclear Information*, 457 F.3d at 953, and

8  *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d

9  1141, 1150 (9th Cir. 2000). State Defendants read these cases

10 too narrowly. In *Nuclear Information*, the Ninth Circuit started

11 with the principle set forth in *Citizens for Better Forestry v.*

12 *U.S. Dept. of Agriculture*, 341 F.3d 961, 971 (9th Cir. 2003),

13 that provides "environmental plaintiffs must allege that they

14 will suffer harm by virtue of their geographic proximity to and

15 use of areas that will be affected by the [agency's] policy."

16 The *Nuclear Information* court then examined the record for any

17 evidence of a "geographic nexus" between the plaintiffs and the

18 area where the alleged impact will occur:

19         To show a "geographic nexus," petitioners claiming a
   violation of NEPA must allege that they will suffer

20         harm as a result of their proximity to the area where
   the alleged environmental impact will occur. We have

21         defined the geographic nexus requirement broadly to
   permit challenges to actions with wide-reaching

22         geographic effects where the petitioners properly
   allege, and support with affidavits, that they use the

23         impacted area, even if the impacted area is vast. See
   Citizens for Better Forestry, 341 F.3d at 971 (holding

24         that "Citizens need not assert that any specific injury
   will occur in any specific national forest that their

25         members visit," where they "properly alleged, and
   supported with numerous affidavits" their members' use

26         and enjoyment of a "vast range of national
   forests")....

27

28         None of declarations submitted by members of NIRS,
   Committee to Bridge the Gap, Public Citizen, or Redwood

> Alliance explain in any way how their health may be affected by this regulation. They have not alleged with any specificity what geographic areas are most likely to be affected, other than to assert that the regulations impact highways nationwide. Nor have they alleged that they will be exposed to increases in radiation or that they will <u>curtail</u> their use of public highways as a result of the regulation.

*Id.* at 952.   Hence, only in the context of searching for any evidence of a "geographic nexus" did the Ninth Circuit ask whether plaintiffs would "curtail" their use of the area in question.

In *Ecological Rights Foundation*, 230 F.3d at 1149-50, the Ninth Circuit reviewed the status of the law regarding injury in fact:

> Under Laidlaw...an individual can establish "injury in fact" by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable-that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction-if the area in question remains or becomes environmentally degraded. Factors of residential contiguity and frequency of use may certainly be relevant to that determination, but are not to be evaluated in a one-size-fits-all, mechanistic manner.
>
> Daily geographical proximity, for instance, may make actual past recreational use less important in substantiating an "injury in fact," because a person who lives quite nearby is likely to notice and care about the physical beauty of an area he passes often. *See Laidlaw*, 120 S.Ct. at 704 (FOE member alleged injury in fact because "he lived a half-mile from Laidlaw's facility;...he occasionally drove over the North Tyger River, and...it looked and smelled polluted"); *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985) (affiant who passed the Hudson River regularly and found its pollution "offensive to his aesthetic values" stated injury in fact). On the other hand, a person who uses an area for recreational purposes does not have to show that he or she lives particularly nearby to establish an injury-in-fact due to possible or feared environmental degradation. Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively

infrequent, to demonstrate that environmental degradation of the area is injurious to that person. *Id*. at 705 (finding that an individual who has canoed in the river and would do so again, closer to the discharge point, were it not for the discharges has made a sufficient "injury-in-fact" showing). An individual who visits Yosemite National Park once a year to hike or rock climb and regards that visit as the highlight of his year is not precluded from litigating to protect the environmental quality of Yosemite Valley simply because he cannot visit more often.

This flexible approach is the only one consistent with the nature of the aesthetic and recreational interests that typically provide the basis for standing in environmental cases. As the Supreme Court has explained, "[a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society." *Sierra Club*, 405 U.S. at 734.  Yet, aesthetic perceptions are necessarily personal and subjective, and different individuals who use the same area for recreational purposes may participate in widely varying activities, according to different schedules. Laidlaw confirms that the constitutional law of standing so recognizes, and does not prescribe any particular formula for establishing a sufficiently "concrete and particularized," *Defenders of Wildlife*, 504 U.S. at 560, aesthetic or recreational injury-in-fact.

Evaluating the record in this case in accord with Laidlaw, there is no doubt that both plaintiff organizations have come forward with sufficient factual averments to survive summary judgment on the standing issue. Both Hinderyckx, a member of Mateel, and Evenson, a member of ERF, stated longstanding recreational and aesthetic interests in Yager Creek, the specific place at issue in this case. Both have used the creek for recreational activities several times in the past, and both have alleged that Pacific Lumber's conduct has impaired their enjoyment of those activities. <u>Hinderyckx, like the affiants in Laidlaw, testified that he is deterred from fully enjoying Yager Creek because of his concerns about pollutants discharged from Pacific Lumber's facilities adjacent to the creek; although he likes to fish, he refrains from fishing in the creek because of concerns about pollution, and he is less likely to swim at some places along the creek than he used to be</u>. And both Hinderyckx and Evenson, like the affiants in Laidlaw, expressed an interest in participating in recreational activities in and around Yager Creek in the future, and in continuing to enjoy the beauty of the area.

23

*Id.* (emphasis added).  State Defendants emphasize that the
plaintiffs in *Ecological Rights Foundation* and *Laidlaw* both
claimed to be deterred from using the resource in question as a
result of the agency action in question.  But, nothing in this
jurisprudence suggests that "deterrence" from or "curtailment" of
use of a resource is a necessary requirement.

Nevertheless, these cases do stand for the proposition that
even injuries to aesthetic or recreational enjoyment of an area
must be "concrete and particularized."  Here, Mr. Dillon merely
expresses "concern[] about the continued survival of species in
the Delta, including the Sacramento River winter-run Chinook
salmon, Central Valley spring-run Chinook salmon, Central Valley
steelhead and the delta smelt..." because he "derives aesthetic,
recreational, and conservation benefits from the overall health
of the Delta ecosystem, including the fish species that live in
the Delta."  The allegation that "Defendants' violations of the
ESA harm Mr. Dillon's aesthetic, recreational, and conservation
interests in the Delta" are conclusory and do not explain in a
"concrete and particularized" manner how the striped-bass
regulations impact and interfere with his aesthetic and
recreational interests.[2]  Such allegations need not be detailed
at the pleadings stage, but they must be reasonably inferred from
factual allegations in the complaint.  Here, the Complaint
contains only conclusory allegations of injury which do not
explain how Mr. Dillon is actually injured by the striped bass

---

[2]    If Mr. Dillon were, for example, an avid recreational
salmon angler, whose enjoyment of fishing was impaired by the
striped-bass regulations.

regulations.

### b.   Causation.

State Defendants argue that Mr. Dillon cannot satisfy the causation requirement, because he fails to allege any causal connection between the State Defendants' enforcement of the striped bass regulations and the "decline" of the "Delta ecosystem" allegedly "witnessed" by Mr. Dillon.  The reasons why the Coalition's standing allegations satisfy the causation requirement are equally applicable here.  The causal chain is long, but is not "hypothetical or tenuous."

### c.   Redressibility.

State Defendants contend that the complaint does not contain any claim that the invalidation of the striped bass regulations will halt or materially reverse this claimed "decline" in the "Delta ecosystem."  Moreover, the State Defendants maintain that even if the striped bass regulations are invalidated by this litigation, the Complaint does not explain how reversal of those regulations would redress Mr. Dillon's claimed injury as other causes have been held responsible for decline of the species, all of which will be invalidated by a favorable outcome in this case.

In support of this argument, State Defendants cite *Nuclear Info.,* 457 F.3d at 953-955, in which the Ninth Circuit held that causation and redressibility were not shown:

> [Plaintiffs] fail[ed] to show that its members' concrete interest is threatened by the <u>challenged regulation</u>, rather than by "unregulated transportation of radioactive material" in the abstract. The declarations simply express undifferentiated "concerns"-the same concerns about nuclear hazards shared by the public at large-and speculate that unregulated transportation of radioactive material in general- not this regulation in particular-may present

1        unspecified threats to their health.

2  *Id* at 954.   According to the State Defendants, this language

3  establishes the proposition that Plaintiffs must allege that the

4  regulation being challenged is "in particular" responsible for

5  the plaintiffs' claimed injury.   *Id*. at 954.   Just such an

6  allegation is reasonably inferred from the complaint.   There is

7  no requirement that he use particular words, let alone the words

8  "in particular."

9

10       State Defendants' motion for judgment on the pleadings that

11  Dee Dillon lacks standing is GRANTED, because he has not

12  satisfied the injury in fact requirement.   Mr. Dillon is GRANTED

13  LEAVE TO AMEND his complaint.

14       B.   <u>Legislative Immunity of Commission Members</u>.

15       State Defendants also move to dismiss the claims against

16  Defendants Rogers, Gustafson, Kellogg, and Sutton, who are

17  Officers or Members of the Commission, on the grounds that they

18  are immune from suit under the doctrine of legislative immunity.

19  The doctrine of legislative immunity provides officials with

20  absolute immunity when they perform legislative or quasi-

21  legislative functions.   *Supreme Court of Va. v. Consumers Union*

22  *of United States, Inc.*, 446 U.S. 719, 731-34 (1980).   This

23  "privilege of legislators to be free from arrest or civil process

24  for what they do or say in legislative proceedings has taproots

25  in the Parliamentary struggles of the Sixteenth and Seventeenth

26  Centuries."   *Id*.   The immunity is absolute.   *Eastland v. U.S.*

27  *Servicemen's Fund*, 421 U.S. 491, 501-503 (1975); *Spallone v.*

28  *United States*, 493 U.S. 265, 278 (1990).   The immunity prohibits

                                    26

claims for damages and declaratory and injunctive relief. *Spallone*, 493 U.S. at 278; *Supreme Court of Va.,* 446 U.S. at 732. The doctrine has no application when an official is acting in an administrative or executive capacity. *Tenney v. Brandhove*, 341 U.S. 367, 379 (1951).

Individuals who are not members of legislative bodies may nonetheless claim the immunity where they have been delegated legislative powers. In *Lake County Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 394, n.4 and 405 (1979), the Supreme Court held that members of the Tahoe Regional Planning Agency could assert legislative immunity in an action challenging the agency's adoption of a land use ordinance, where the ordinance's adoption was based upon delegated powers from the California and Nevada legislatures. Similarly, *Supreme Court of Virginia*, 446 U.S. at 733-734, held that the Virginia Supreme Court could claim legislative immunity in a challenge to certain state bar rules, where the Virginia court was "merely exercising a delegated power to make rules." In affirming the immunity, the U.S. Supreme Court held that "the Virginia Court is exercising the State's entire legislative power with respect to regulating the Bar, and its members are the State's legislators for the purpose of issuing the Bar Code." *Id*.

In *Bogan v. Scott-Harris*, 523 U.S. 44, 49-54 (1998), the Ninth Circuit analyzed whether a vote for an ordinance eliminating a city official's office was entitled to "legislative" immunity. Among other things, the Ninth Circuit reasoned that the ordinance "in substance, bore all the hallmarks of traditional legislation:"

27

> It reflected a discretionary, policymaking decision implicating the city's budgetary priorities and its services to constituents; it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office; and, in eliminating respondent's office, it governed in a field where legislators traditionally have power to act...

*Id.* at 55.

Here, the legal authority to promulgate the contested striped bass regulations is based upon specific authority delegated to the Commission by the California Legislature. Section 200 of the California Fish and Game Code states, in part, that "[t]here is delegated to the Commission the power to regulate the taking or possession of...fish...to the extent and in the manner prescribed in this article."  Section 202 provides that "[t]he commission shall exercise its powers under this article by regulations made and promulgated pursuant to this article."  Cal. Fish and Game Code, § 202.  Section 205 expressly grants the Commission the authority to "[e]stablish, change or abolish bag limits, possession limits, and size limits" for fish species.  Cal. Fish and Game Code, § 205.  Based upon this delegated authority, the Commission has adopted regulations setting bag limits and size limits for striped bass.  Cal. Code Regs., tit. 14, § 5.75.

Plaintiffs assert that "on its face," Cal. Fish & Game Code Section 200 "appears to delegate to the Commissioners <u>both</u> legislative and executive functions," citing the American Heritage Dictionary of the English Language 1471 (Joseph P. Pickett *et al.*, eds., 4th ed. 2000), for its definition of "regulate" as "to control or direct according to rule, principle,

1   or law."  Plaintiffs argue that the word "regulate" should be

2   read broadly at this stage of the litigation to encompass both

3   legislative and executive (i.e., enforcement) powers.

4        However, the language of the Complaint characterizes the

5   Commission's role with respect to striped bass in

6   quasi-legislative terms.  The complaint describes the Commission

7   as having "regulatory authority" to adopt striped bass

8   regulations; as having adopted such regulations; and as having

9   approved a "striped bass policy." (Complaint at ¶¶ 30 and 33.)

10  The complaint contains no allegations that the Commission or the

11  individual Commission members have taken any steps to enforce or

12  otherwise implement the striped bass regulations.  Section 200's

13  language, "giving permission to "regulate the taking or

14  possession of...fish" is amplified by section 202, which

15  specifies that "[t]he commission shall exercise its powers under

16  this article by <u>regulations made and promulgated</u> pursuant to this

17  article."  (Emphasis added).  Section 202 mentions nothing about

18  enforcement.

19       The Commission's rule-making by regulations, as alleged in

20  the complaint, have "all the hallmarks of traditional

21  legislation." *Bogan*, 523 U.S. at 55.  The Commission's adoption

22  or amendment of a striped bass regulation or policy is a

23  "discretionary, policymaking decision," distinctively legislative

24  in character.  *Id*.  As the Ninth Circuit has observed,

25  "statewide...policymaking for the community at large" constitutes

26  the "quintessential legislative acts." *Chappell v. Robins*, 73

27  F.3d 918, 921 (9th Cir. 1996); *see also Yakus v. United States*,

28  321 U.S. 414, 424 (1944) ("The essentials of the legislative

1    function are the determination of the legislative policy and its

2    formulation and promulgation as a defined and binding rule of

3    conduct.").

4        State Defendants' motion for judgment on the pleadings that

5    the doctrine of legislative immunity bars Plaintiffs' claims

6    against the Commission Members and the Commissions' Executive

7    Director is GRANTED.  State Defendants do not dispute that the

8    doctrine of legislative immunity does not extend to or bar the

9    claims against John McCamman, named in his official capacity as

10   Interim Director of CDFG, because CDFG is responsible for

11   enforcing, rather than promulgating, the striped bass

12   regulations.

13       Initially, Plaintiffs requested the opportunity to propound

14   limited discovery to ascertain the responsibilities of the

15   Commission before the Court rules on the issue of legislative

16   immunity.  At oral argument, Plaintiffs conceded that they can

17   ascertain such information via a public records requests prior to

18   determining whether it is appropriate to re-name these defendants

19   in an amended complaint.  Federal Rule of Civil Procedure 11

20   provides that an attorney has a duty to research in good faith

21   the facts and law before filing a complaint.

22

23       C.   Eleventh Amendment Immunity of Commission Members.

24       The doctrine of state sovereign immunity prohibits suits in

25   federal court against the State or entities of the State.  *Puerto*

26   *Rico Authority v. Metcalf & Eddy*, 506 U.S. 139, 144 (1993).  In

27   *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court enunciated

28   the "state officials" exception to the Eleventh Amendment bar

against suits directed at the states in federal court:

> [I]ndividuals, who, as officers of the State, are
> clothed with some duty in regard to the enforcement of
> the laws of the State, and who threaten and are about
> to commence proceedings, either of a civil or criminal
> nature, to enforce against parties affected an
> unconstitutional act, violating the Federal
> Constitution, may be enjoined by a Federal court of
> equity from such action.

*Id*. at 155-156.  In asserting this exception, a plaintiff must show that:

> In making an officer of the State a party defendant in
> a suit to enjoin the enforcement of an act alleged to
> be unconstitutional it is plain that such officer must
> have some connection with the enforcement of the act,
> or else it is merely making him a party as a
> representative of the State, and thereby attempting to
> make the State a party.

*Id*. at 157.  The *Ex parte Young* exception applies to both federal constitutional violations and federal statutory violations. *Almond Hill Sch. v. U.S. Dep't of Agric.*, 768 F.2d 1030, 1034 (9th Cir. 1985).

The Ninth Circuit has repeatedly applied this "enforcement connection" requirement under Ex Parte Young to bar actions against state officials where the plaintiffs have not alleged or established that the individuals are "clothed with some duty in regard to the <u>enforcement</u> of the laws of the State..." *Id*. at 156 (emphasis added).  In *Davis*, 307 F.3d at 847, the Ninth Circuit affirmed the dismissal of the Governor of California and the California Resources Secretary, given the absence of any showing that either had "direct authority and practical ability to enforce the challenged statute." *Id*. at 846 and 847. Similarly, in *Yakima Indian Nation v. Locke*, 176 F.3d 467, 469-470 (9th Cir. 1999), the Ninth Circuit affirmed the dismissal

31

of the Governor of Washington as a defendant in an action
challenging the state's lottery because "[n]owhere in [the
relevant] statutes is there any indication that the governor has
the responsibility of operating the state lottery or determining
where the tickets would be sold."  *Id*. at 470.

Although Plaintiffs have generally alleged a violation of
federal statutory law, the Complaint does not contain any
specific allegations that the individual Commission members or
the Commission's Executive Director, John Carlson, Jr., are
"clothed with some duty in regard to the enforcement of the laws
of the State" or have any "connection with the enforcement" of
state law.  *Ex Parte Young*, 209 U.S. 156-57.

A review of California Fish and Game Code provisions cited
by State Defendants reveals no indication that Commission Members
or Executive Director have any enforcement duties as to the
striped bass regulations.  Cal. Fish and Game Code, §§ 200, 202,
205, 702-704, and 850-851.

Plaintiffs' only response is to point out that "Defendants
fail to cite any authority to support the proposition that such
allegations are necessary at the pleading stage."  But, the
Commission's enforcement authority is a question of law that may
be resolved at the pleadings stage.  Should Plaintiffs discover
new legal authority regarding the Commission's role, they may so
allege in an amended complaint.

State Defendants' motion for judgment on the pleadings that
the Eleventh Amendment bars Plaintiffs' claims against the
Commission Members and Executive Director is GRANTED.  State
Defendants do not dispute that the Eleventh Amendment does not

bar the claims against John McCamman, named in his official capacity as Interim Director of CDFG, because CDFG is responsible for enforcing the striped bass regulations.

Again, Plaintiffs requested the opportunity to propound limited discovery to ascertain the responsibilities of the Commission before the Court rules on this issue.  At oral argument, Plaintiffs conceded that they can ascertain such information via a public records requests prior to determining whether it is appropriate to re-name these defendants in an amended complaint.

## V.   CONCLUSION

For the reasons set forth above, the State Defendants' motion for judgment on the pleadings is GRANTED.  Neither the Coalition or Dee Dillon have alleged facts sufficient for standing and the claims against the Commission and its individual Members and Executive director are barred by both legislative and immunity and the Eleventh Amendment.  Plaintiffs are GRANTED LEAVE TO AMEND, if they can do so within the requirements of Rule 11, within thirty (30) days.

IT IS SO ORDERED.

Dated:    July 23, 2008              _____/s/ Oliver W. Wanger_____
                                     UNITED STATES DISTRICT JUDGE