1

2

3

4                    UNITED STATES DISTRICT COURT

5            FOR THE EASTERN DISTRICT OF CALIFORNIA

6

7   COALITION FOR A SUSTAINABLE DELTA,
    BELRIDGE WATER STORAGE DISTRICT,        1:08-CV-00397 OWW
8   BERRENDA MESA WATER STORAGE            GSA
    DISTRICT, LOST HILLS WATER
9   DISTRICT, WHEELER RIDGE MARICOPA       MEMORANDUM DECISION
    WATER STORAGE DISTRICT, and DEE        DENYING PLAINTIFFS'
10  DILLON                                 MOTION FOR PARTIAL
                                           SUMMARY JUDGMENT
11          Plaintiffs,                     (DOC. 57)

12      v.

13
    DONALD KOCH, in his official
14  capacity as Director of the
    California Department of Fish and
15  Game,

16          Defendant,

17
    CENTRAL DELTA WATER AGENCY, et al.,
18
            Defendant-Intervenors,
19
    CALIFORNIA SPORTFISHING PROTECTION
20  ALLIANCE, et al.,

21          Defendant-Intervenors.

22

23

24                    I.   INTRODUCTION

25      This case challenges the California Department of

26  Fish and Game's ("CDFG") enforcement of state sport-

27  fishing regulations that protect striped bass populations

28
                          1

1  within the Sacramento-San Joaquin Delta.  Plaintiffs, a

2  coalition of water users led by the Coalition for a

3  Sustainable Delta ("Coalition"), complain that CDFG's

4  enforcement of these regulations violates the Endangered

5  Species Act ("ESA"), because striped bass prey upon at

6  least four species listed under the ESA, including the

7  Sacramento River winter-run Chinook salmon, Central

8  Valley spring-run Chinook salmon, Central Valley

9  steelhead, and delta smelt (the "Listed Species").

10     Plaintiffs move for summary judgment on the following

11  discrete issues, the resolution of which they assert

12  "will narrow the issues in the case and provide the

13  parties with guidance as to how to proceed":

14         (1) [T]hat those portions of the Central Valley
           Improvement Act ("CVPIA"), Pub. L. 102-575, 106
15         Stat. 4600, Title 34, 106 Stat 4706-31 (1992),
           pertaining to anadromous fish, do not exempt
16         CDFG's enforcement of striped bass sport-fishing
           regulations from the take prohibitions under
17         Section 9 of the ESA, 16 U.S.C. § 1538
           (a)(1)(B);
18
           (2) [T]hat it is a violation of the ESA to
19         "take" a single endangered Sacramento-River
           winter-run [C]hinook salmon, threatened Central
20         Valley spring-run [C]hinook salmon, threatened
           Central Valley steelhead, or threatened delta
21         smelt without prior take authorization from the
           appropriate federal Wildlife Agency;
22
           (3) [T]hat it is a violation of the ESA for a
23         government or government agency or entity to
           "take" a federally listed species through the
24         exercise of its regulatory authority without
           first receiving take authorization from the
25         appropriate federal Wildlife Agency; and

26         (4) [T]hat Mr. Dillon has standing under Article
           III of the United States Constitution to pursue
27         this litigation.

28  Doc. 57-2 at 1-2.

2

1      Defendant Donald Koch, Director of CDFG, ("State

2  Defendant") opposes summary adjudication on the second,

3  third, and fourth issues, but takes no position on the

4  CVPIA affirmative defense, which is asserted only by

5  Defendant-Intervenors Central Delta Water Agency, *et al.*

6  ("Central Delta").  Doc. 65.  By stipulation, State

7  Defendant also filed a supplemental opposition,

8  addressing recent discovery addressing Mr. Dillon's

9  standing.  Doc. 69.  Central Delta joins the State

10 Defendant's opposition, but separately opposes summary

11 adjudication on its CVPIA affirmative defense.  Doc. 66.

12 Defendant-Intervenors California Sportfishing Protection

13 Alliance, *et al.*, ("CSPA"), filed a separate brief

14 opposing summary adjudication on the first and second

15 issues, but take no position on the CVPIA affirmative

16 defense or Dee Dillon's standing.  Doc. 67.[1]

17

18                    II.   **BACKGROUND**

19      The striped bass (*Morone saxatilis*) is a non-native

20 species introduced from the New Jersey coast to the

21 California waters near Martinez in 1879.  Fuchs Decl.,

22 Doc. 65-5, Exh. A (Striped Bass Restoration and

23 ───────────────────
   [1]   CSPA filed the declaration of Bill Jennings in support of its
24 opposition to summary adjudication on the single take (second) and
   take by regulatory authority (third) issues.  Doc. 67-2.  Plaintiffs
25 object to Jennings' declaration on numerous grounds.  Doc. 75.
   Because, as discussed below, the second and third issues are not
26 cognizable on summary judgment, it is not necessary to resolve
   Plaintiffs' objections at this time.  If CSPA, or any other party,
27 relies upon the Jennings declaration in future proceedings,
   Plaintiffs may renew their objections.  No other evidentiary
28 objections were made in connection with this motion for partial
   summary adjudication.

1   Management Plan) at 1.   Upon introduction, the species
2   multiplied rapidly, with abundance reaching approximately
3   3 million adults by the early 1960s.   *Id.*, Exh. B
4   (Conservation Plan for the CDFG Striped Bass Management
5   Program ("Conservation Plan")) at 21.   Since the 1960s,
6   the striped bass population has experienced a decline,
7   with the adult population eroding to 775,000 by 1996.
8   *Id.*, Exh. C (Endangered Species Act, Section 7
9   Consultation Biological and Conference Opinion) at 1.
10  More recent surveys indicate that the adult striped bass
11  population now numbers approximately one million fish.
12  Nobriga Decl., Doc. 65-4, at ¶22.

13       Pursuant to Article 4, section 20 of the California
14  Constitution, the California Legislature delegated to the
15  California Fish and Game Commission (the "Commission")
16  "the power to regulate the taking or possession of birds,
17  mammals, fish, amphibians, and reptiles," Cal. Fish &
18  Game Code § 200, and the regulatory authority to
19  establish seasons, bag limits, and the "manner and the
20  means" of take for sport fish, including the striped
21  bass, Cal. Fish & Game Code § 205.   Pursuant to these
22  authorities, the Commission established sport-fishing
23  regulations for the striped bass that prohibit anglers
24  from taking the species in certain areas and in certain
25  situations.   14 Cal. Code Regs. §§ 5.75, 27.85.   Current
26  striped bass sport-fishing regulations impose catch
27  limitations, size limitations, and gear restrictions on
28  striped bass anglers.   *Id.*   For example, anglers may not

1  take striped bass from within the Delta that are less
2  than 18 inches in length and may only catch and keep two
3  striped bass in excess of 18 inches in length. *Id*. CDFG
4  is responsible for enforcing the sport-fishing
5  regulations. Plaintiffs' Statement of Undisputed
6  Material Facts ("PSUF") 2. Consistent with his
7  responsibilities, Defendant Koch has enforced and
8  continues to enforce the striped bass sport-fishing
9  regulations. PSUF 3.

10     The 1999 Conservation Plan proposed a striped bass
11  stocking program that would have stocked 1.275 million
12  yearling or hatchery-reared bass for a five-year period,
13  with reduced stocking in the following five years.
14  Conservation Plan at 40. In 2000, CDFG obtained from the
15  U.S. Fish and Wildlife Service ("FWS") and the National
16  Marine Fisheries Service ("NMFS") separate incidental
17  take permits under the ESA for the Striped Bass
18  Management Program. Fuchs Decl., Exhs. D and E. NMFS
19  prepared a Biological and Conference Opinion pursuant to
20  Section 7 of the ESA, which expressed concern about and
21  required mitigation for striped bass predation of Listed
22  Species due to the CDFG stocking program. Fuchs Decl.,
23  Exh. C. at 4-5, 31-39. CDFG halted its striped bass
24  stocking program in 2002 and the program has not been
25  reinitiated. Fuchs Decl., Exh. F (2003 Annual Report for
26  California Department of Fish and Game's Striped Bass
27  Management Program) at 1, 5.
28     Plaintiffs maintain that the striped bass sport-

1  fishing regulations have contributed to the maintenance
2  of an artificially high population of striped bass in the
3  Delta.  PSUF 9.  CDFG disputes this assertion, pointing
4  to analyses indicating that enforcement of the present
5  striped bass regulations, alone, will not stabilize the
6  striped bass population over the long-run.  For example,
7  the Conservation Plan concluded that CDFG management
8  efforts that did not include an artificial striped bass
9  stocking program would result in a long-term decline in
10 the adult striped bass population to 515,000 adults.
11 Conservation Plan at 37.  The plan further concluded that
12 maintaining the striped bass population at stable levels
13 would require much more restrictive sport-fishing
14 regulations than are presently enforced.  *Id.* at 117.

15 It is undisputed that populations of the Listed
16 Species have declined in recent years.  For example, the
17 delta smelt population as measured by abundance indices
18 relied upon by FWS has declined by two to three orders of
19 magnitude from historical highs.  PSUF 13; *see also*
20 *Natural Resources Defense Council v. Kempthorne*, 506 F.
21 Supp. 2d 322, 334-35 (E.D. Cal. 2007).  Delta smelt are
22 currently at a historic low and considered to be in
23 "critical condition."  PSUF 14.  The Sacramento River
24 winter-run Chinook salmon, Central Valley spring-run
25 Chinook salmon, and Central Valley steelhead populations
26 have also suffered sharp declines in abundance.  *Pac.*
27 *Coast Fed'n of Fishermen's Assns. v. Gutierrez*, 606 F.
28 Supp. 2d 1195, 1218-1224 (E.D. Cal. 2008).

It is undisputed that striped bass prey on Listed Species.  PSUF 10.  Plaintiffs maintain that by promoting and maintaining an artificially high population of striped bass in the Delta, the striped bass sport-fishing regulations have also artificially increased striped bass predation of the Listed Species.  PSUF 11.  However, while CDFG concedes that evidence shows that the Listed Species are among the species that constitute the striped bass' food source, the Listed Species "are not common in the striped bass diet and striped bass predation is not responsible for their current status."  Fuchs Dec., Exh. G (Biological Assessment for the California Department of Fish and Game Striped Bass Management Program, June 1995-June 1996 ("BA")) at 54-56.  As the Conservation Plan observed, "[s]almon and striped bass populations coexisted in much greater abundance than the populations existing today and available historical information on population trends does not suggest that high periods in striped bass abundance coincided with lower populations of salmon as would be expected if striped bass were a major factor limiting salmon abundance."  Conservation Plan at 26.  In fact, statistical analysis of species abundance data referenced in the Conservation Plan disclosed a positive, rather than a negative, correlation between striped bass abundance and salmon abundance.  The authors of the analysis concluded that "[w]hile it is difficult to interpret the causes for and therefore the meaning of such correlations, this positive correlation

7

1  certainly indicates that striped bass predation is not a
2  dominant factor controlling the salmon population." *Id*.
3  at 27; *see also* BA at 41-45.

4      CDFG submits the declaration of CDFG biologist
5  Matthew Nobriga to support its opposition to Plaintiff's
6  motion for partial summary judgment.  Nobriga opines that
7  "[i]t is logical that if predation by one species is
8  strong enough to cause declines in another that the
9  abundance of the prey species would go down when the
10  abundance of the predator goes up."  Nobriga Decl. at
11  ¶11.  Using a statistical method known as linear
12  regression, Nobriga reviewed the relationship between
13  striped bass abundance and the abundance of winter-run
14  salmon, spring-run salmon, and Delta smelt.  As in the
15  Conservation Plan, these regression analyses disclosed
16  the presence of a positive, not a negative, relationship,
17  between striped bass abundance and winter-run salmon
18  abundance.  The analyses did not find any statistical
19  relationship between striped bass abundance and spring-
20  run salmon abundance or striped bass abundance and Delta
21  smelt abundance.  *Id*. at ¶¶ 16-17.

22      Nobriga also summarizes the results of a 2003 study
23  of the relationship between striped bass abundance and
24  winter-run salmon abundance, conducted by biologists
25  Lindley and Mohr.  This study concluded that even the
26  complete elimination of the striped bass population from
27  the Bay-Delta system would only increase winter-run
28  recovery probabilities by slightly more than three

percent and that the winter run would still have about a
one in five chance of extinction in the next 50 years.
*Id*. at ¶22.

The only negative relationship disclosed by the
Nobriga regression analyses was between Delta smelt
abundance and the abundance of Mississippi silversides, a
small fish that preys on Delta smelt eggs and larvae.
Nobriga opines this negative relationship "is evidence
that silverside abundance may have reduced the per capita
number of smelt surviving to the summer." *Id*. at ¶15.
Nobriga notes that, while striped bass do eat delta
smelt, they also eat their predators and competitors,
like the Mississippi silverslide. *Id*. at ¶10.  From
this, suggests that it is possible that the elimination
of striped bass from the Bay-Delta system could <u>increase</u>
silverside abundance, which would increase silverside
predation of the Delta smelt. *Id*. at ¶ 10.  Increased
silverside predation of the Delta smelt could potentially
offset any reduced striped bass predation of the smelt.

### III.   <u>STANDARD OF DECISION</u>

A motion for summary judgment and a motion for
partial summary judgment (sometimes called summary
adjudication) are governed by the same standards.
*California v. Campbell*, 138 F.3d 772, 780-81 (9th Cir.
1998); *Costa v. Nat'l Action Fin. Servs.*, 2007 WL
4526510, at *2 (E.D. Cal. Dec. 19, 2007).  Summary

judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant has the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on claim on which it has the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted). With respect to an

issue as to which the non-moving party has the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.*

To defeat a motion for summary judgment, the non-moving party must show there exists a genuine dispute (or issue) of material fact. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In ruling on a motion for summary judgment, the district court does not make credibility

determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.


IV. <u>ANALYSIS</u>

A.  <u>Two of the Four Requested Determinations are Not Amenable to Summary Judgment.</u>

Federal Rule of Civil Procedure 56(a) provides that a plaintiff may move "for summary judgment on <u>all or part of [a] claim</u>."  Plaintiff cites a number of cases for the unremarkable proposition that a party may move for partial summary judgment on a single issue of law or fact relevant to a particular claim or defense.  Critically, however, in each cited case, legal rules were applied to specific facts to find a claim or issue undisputed as a matter of law.  *See Gillette v. Delmore*, 886 F.2d 1194, 1197-99 (9th Cir. 1988) (denying motion for summary adjudication as to whether specific phone call made by Plaintiff was protected speech because material facts were disputed); *Deimer v. Cincinnati Sub-Zero Products*, 990 F.2d 342, 344-46 (7th Cir. 1993) (denying motion for summary judgment on issue of causation, finding that material issues of fact existed); *Minority Police Officers Ass'n of South Bend v. City of South Bend*, 721 F.2d 197, 201-202 (7th Cir. 1983) (summarily adjudicating

12

issue of standing, rejecting plaintiffs' theory that minority police officers share interests with minorities applying to become officer); *First Nat'l Ins. Co. v. Federal Deposit Ins. Corp.*, 977 F. Supp. 1051, 1055-59 (S.D. Cal. 1997) (granting partial summary judgment on several issues, as opposed to causes of action, to narrow issues at trial, applying various legal doctrines to the specific facts of that case); *S. Pac. Transp. Co. v. California (Caltrans)*, 790 F. Supp. 983, 984 (C.D. Cal. 1991) (determining, on summary judgment, that the petroleum exclusion in the Comprehensive Environmental Response and Liability Act ("CERCLA") applies to unrefined and refined gasoline, used petroleum products, and petroleum-laden soil, substances at issue in that case).

Plaintiffs also cite *Disandro v. Morrison-Knudsen Co., Inc.*, 588 F. Supp. 889, 892 (D. Haw. 1984), and *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 13, 18 (D.D.C. 2004), for the proposition that it is appropriate to summarily adjudicate a "pure" legal issue to narrow the issues in a case and advance the progress of the litigation.  In *Disandro*, the district court entertained plaintiff's request, styled as a motion for partial summary judgment, on the issues of whether a

particular statute required proof of defendant's scienter and/or plaintiff's reliance.  Defendant argued that ruling on these discrete issues of law would amount to an advisory opinion in violation of Article III's case or controversy requirement.  *Id*. at 893.  This argument was rejected based on *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 768-69 & n.3 (9th Cir. 1981), recognizing that "[i]t is appropriate to decide a few limited issues by summary judgment, even if those issues are not entirely dispositive of any one claim ... [as] summary judgment can thus serve to set the issues for trial."  However, the quoted *Lies* language interprets Rule 56(d)(1), which permits a court to deem certain <u>facts</u> established if those facts appear to be "without substantial controversy."  See Lies 641 F.2d at 768.  *Lies* is not authority for the issuance of partial summary judgment on an <u>abstract issue of law</u> (i.e., one entirely divorced from the <u>facts</u> of the case under consideration).  *Disandro's* misplaced reliance on *Lies* renders its holding unpersuasive.

   *Philip Morris USA,* a RICO case, summarily adjudicated the "strict legal issue" of whether a defendant's liability for conspiracy under the RICO statute required that the defendant participate in the management of the

**14**

enterprise.  327 F. Supp. 2d at 18.  Citing *Warner v. United States*, 698 F. Supp. 877, 879 (S.D. Fla. 1988), this issue was deemed amenable to summary adjudication because its resolution could "narrow the issues in a case, advance the progress of the litigation, and provide the parties with some guidance as to how they proceed with the case."  327 F. Supp. 2d at 17.  But *Warner*, like *Lies*, concerned the application of rule 56(d), which permits the court to determine specific facts, not abstract issues of law.  *Philip Morris* is no more persuasive than *Disandro*.

Here, Plaintiffs request determinations of the following, abstract questions of law:  (1) whether the "take" of a single endangered listed fish without prior take authorization from the appropriate federal wildlife agency violates the ESA; and
(2) whether a government agency or entity violates the ESA by "taking" a federally listed species through the exercise of its regulatory authority without first obtaining take authorization from the appropriate federal Wildlife Agency.

As to the first issue, although the First Amended Complaint ("FAC"), Doc. 46, and the Plaintiffs' Statement of Undisputed Facts, Doc. 57-2, focus on alleged

population-level effects of the striped bass sport-

fishing regulations on the Listed Species, the FAC also

alleges:

> 113.  The ESA prohibits all take of all
> ESA-listed species, even of a single
> individual of the species.  *Loggerhead
> Turtle v. County Council of Volusia
> County*, 896 F. Supp. 1170, 1180 (M.D.
> Fla. 1995); 16 U.S.C. § 1538.
> ***
> 115.  By enforcing regulations to
> protect and increase the non-native
> striped bass population, defendant is
> taking the Listed Species in violation
> of section 9 of the ESA.

FAC at ¶¶ 113, 115.  Plaintiffs seek early adjudication

of the "single take" issue to vindicate their position

that "in order to succeed on the merits, Plaintiffs need

only prove that striped bass predation of Listed Species

is greater, by one fish, than if the sport-fishing

regulations were not enforced."  Doc. 79-2 at 3-4.[2]

This is an abstract question, as the motion is

supported by no undisputed facts that could possibly

support such a finding.  In other words, Plaintiffs

motion would require that the court hypothetically

<u>assume</u>, for purposes of this motion, that that the

striped bass sport-fishing regulations caused an

---

[2]   At oral argument, Plaintiffs' counsel suggested that the intent of this argument was, in fact, to establish that minute population-level effects, e.g., 0.01 percent, would be sufficient to establish a violation of the ESA.  But, Plaintiffs cite only single take cases in support of their motion for partial summary judgment.  Whether a certain percentage effect would satisfy the population-level effects standard turns on the application of population-level impact jurisprudence.

individual angler to release (or not catch) one
particular striped bass, which then, in turn, consumed
one particular, individual Listed Species, and determine
the legal effect of such a hypothetical case.  Plaintiffs
have not presented such evidence, precluding summary
adjudication of whether "take" of a single listed fish
violates ESA section 9.  On summary judgment, a district
court may not assume facts that do not exist or cannot be
proved to decide abstract questions of law.

The facts supporting Plaintiffs' alternative theory
of take -- that the sport-fishing regulations have
population-level effects on the Listed Species -- are
highly disputed.  Although striped bass may eat delta
smelt, they also eat delta smelt predators and
competitors.  Nobriga Decl. at ¶10.  As Mr. Nobriga
states: "[M]ajor food web perturbations can cause changes
that were not predictable in advance."  *Id.*  Mr. Nobriga
concludes that "it is impossible to forecast the
population responses of the Bay-Delta food web to the
removal of striped bass - one of its keystone species."
*Id.* at ¶24

Federal courts are courts of limited jurisdiction,
and "must refrain from deciding abstract or hypothetical
controversies and from rendering impermissible advisory

opinions with respect to such controversies." *See Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 694 (9th Cir. 2007), rev'd on other grounds, *Summers v. Earth Island Inst.*, 129 S. Ct. 1142 (2009) (citing *Flast v. Cohen*, 392 U.S. 83, 96 (1968)); *see also In re Michaelson*, 511 F.2d 882, 893 (9th Cir. 1975)("This Court does not intend to and cannot, issue an advisory opinion on a hypothetical fact situation."); *Matter of Fed Pak Systems, Inc.,* 80 F.3d 207, 211-12 (7th Cir. 1996)(federal court "lacks the constitutional power to render advisory opinions or to decide abstract, academic, or hypothetical questions").

The second request presents the same problem: whether it is unlawful for a government or government agency or entity to take a Listed Species through the exercise of its regulatory authority without first receiving ESA take authorization.  A district court cannot summarily adjudicate, in the abstract, whether "the exercise of [an agency's] regulatory authority" results in a take.  This inquiry does not require application of undisputed facts established in this case to the law.  Whether the specific exercise of regulatory authority that has occurred in this case resulted in an unlawful take of any of the Listed Species is not raised by the present motion.  The facts that underlie that

18

question are disputed.

Plaintiffs' motion for summary adjudication is DENIED WITHOUT PREJUDICE as to the single take (second) and take by regulatory authority (third) issues.

B.    CVPIA Affirmative Defense.

Central Delta asserts the following affirmative defense:

> The provisions of the Central Valley Project Improvement Act, Pub.L. 102-575, 106 Stat. 4600, Title 34, 106 Stat. 4706-31 (1992) pertaining to anadromous fish, which are defined to include striped bass, [] are a bar to any action to enforce any inconsistent provisions of the Endangered Species Act.

Doc. 20 at 13.  Plaintiffs request summary adjudication to foreclose this affirmative defense, the operative effect of which would be to exempt CDFG's enforcement of striped bass sport-fishing regulations from the take prohibitions under Section 9 of the ESA, 16 U.S.C. § 1538 (a)(1)(B), and the requirement that CDFG obtain an incidental take permit.

The CVPIA contains numerous provisions calling for protection and enhancement of striped bass within the Sacramento-San Joaquin Delta.  CVPIA section 3403(a) defines the term "anadromous fish" to include "striped bass," making applicable section 3406(b)(1)'s maintenance and restoration provisions.  That section requires the

Secretary of Interior to "develop within three years of enactment and implement a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period of 1967-1991."  To this end, it is undisputed that FWS has established a doubling goal for striped bass of 2,500,000 fish.  McDaniel Decl., Doc. 66-4, at ¶3 & Ex. B (Final Restoration Plan for Anadromous Fish Restoration Program, January 9, 2001) at 9-10.  It is also undisputed that this goal has not been achieved.  *Id*. at Ex. C (Anadromous Fish Restoration Program Doubling Graphs for striped bass).

Section 3406(b)(1)(B) provides that "the Secretary is authorized and directed to modify Central Valley Project operations to provide flows of suitable quality, quantity, and timing to protect all life stages of anadromous fish...."  Section 3406(b)(1)(D)(2) requires that the Secretary "upon enactment of this title dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title...."  This provision

has been interpreted to require that the Secretary give primacy to its anadromous fish doubling program in the allocation of the 800,000 acre-foot CVP yield dedication. *See San Luis & Delta Mendota Water Auth. v. U.S. Dept. of the Interior*, --- F. Supp. 2d ---, 2009 WL 1362652 (E.D. Cal. 2009); *Bay Institute of San Francisco v. United States*, 87 Fed. Appx. 637 (9th Cir. Jan. 23, 2004). Because striped bass are included in the statutory definition of "andadromous fish," they are intended and designated beneficiaries of these efforts.   CVPIA § 3403(a).[3]

[3]     Additional, specific requirements for the protection and restoration of anadromous fish, including striped bass, are found in section 3406(b)(8)(to implement "short pulses of increased water flows to increase the survival of migrating anadromous fish moving into and through the Sacramento-San Joaquin Delta and Central Valley rivers and streams"); section 3406(b)(9)(that the Secretary "develop and implement a program to eliminate, to the extent possible, losses of anadromous fish due to flow fluctuations caused by the operation of any Central Valley Project storage or re-regulating facility"); section 3406(b)(19)(that the Secretary "reevaluate existing operational criteria in order to maintain minimum carryover storage at Sacramento and Trinity river reservoirs to protect and restore the anadromous fish of the Sacramento and Trinity Rivers in accordance with the mandates and requirements of this subsection..."); section 3406(c)(1)(that the Secretary "develop a comprehensive plan, to reestablish where necessary and to sustain naturally reproducing anadromous fisheries from Friant Dam to [the San Joaquin River's] confluence with the San Francisco Bay/Sacramento-San Joaquin Delta Estuary"); section 3406(e)(1)(that the Secretary investigate "measures to maintain suitable temperatures for anadromous fish survival in the Sacramento and San Joaquin rivers and their tributaries, and the Sacramento-San Joaquin Delta by controlling or relocating the discharge of irrigation return flows and sewage effluent..."); section 3406(e)(5)(for investigation of "measures to provide for modified operations and new or improved control structures at the Delta Cross Channel and Georgiana Slough to assist in the successful migration of anadromous fish"); section 3406(f)(that "[t]he Secretary, in consultation with the Secretary of Commerce, the State of California, appropriate Indian tribes, and other appropriate public and private entities, shall investigate and report on all effects of the Central Valley

Section 3406(b)(14) is directed specifically to striped bass, requiring the Secretary to "develop and implement a program which provides for modified operations and new or improved control structures at the Delta Cross Channel and Georgiana Slough during times when significant numbers of striped bass eggs, larvae, and juveniles approach the Sacramento River intake to the Delta Cross Channel or Georgiana Slough."

Certain CVPIA provisions require the Secretary to coordinate with state agencies to protect anadromous fish in general and striped bass in particular.  For example, Section 3406(b)(21) requires that the Secretary "assist the State of California in efforts to develop and implement measures to avoid losses of juvenile anadromous fish resulting from unscreened or inadequately screened diversions on the Sacramento and San Joaquin rivers, their tributaries, the Sacramento-San Joaquin Delta, and the Suisun Marsh."  Similarly, section 3406(b)(18) requires that the Secretary "if requested by the State of California, assist in developing and implementing management measures to restore the striped bass fishery

---

Project on anadromous fish populations..."); and section 3406(g)(for the modeling of "measures needed to restore anadromous fisheries to optimum and sustainable levels in accordance with the restored carrying capacities of Central Valley rivers..." and "measures designed to reach sustainable harvest levels of resident and anadromous fish....").

of the Bay-Delta estuary."  Such measures must be "coordinated with efforts to protect and restore native fisheries."  *Id*.

Central Delta is correct that "[i]t cannot be reasonably disputed that Congress intended to protect and restore striped bass."  Doc. 66 at 5.  However, Congress also expressed its intention in CVPIA § 3406(b), that the Secretary "operate the Central Valley Project to meet all obligations under state and federal law, including but not limited to the federal Endangered Species Act...."  In light of the fact that the CVPIA expressly requires compliance with the ESA, Plaintiffs argue that their ESA claims cannot be barred as a matter of law by the CVPIA.  Doc. 57-2 at 5-7.  Central Delta rejoins that the more specific, and more-recently enacted, provisions of the CVPIA requiring restoration of the striped bass fishery should prevail over the ESA's earlier-enacted, general requirements.

Plaintiffs cite *Morton v. C.R. Mancari*, 417 U.S. 535, 550-551 (1974), for the proposition that "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to

23

regard each as effective."  *Mancari* and its progeny concern the repeal by implication of an earlier, specific provision, by a later-enacted, general one.  Here, the issue is whether a later, specific provision renders inapplicable an earlier-enacted general one.  Courts have "a duty to construe statutes harmoniously" whenever possible.  2B N. Singer & J. Singer, Sutherland Statutes and Statutory Construction § 53:1 (7th ed. 2008).

Central Delta is correct that the CVPIA is the more recent and more specific expression of Congressional intent.  Central Delta suggests that *Rodgers v. United States*, 185 U.S. 83, 89 (1902) sets forth the applicable canon of statutory construction:

> Where there are two acts or provisions, one of which is special and particular, and certainly includes the matter in question, and the other general, which, if standing alone, would include the same matter and thus conflict with the special act or provision, the special must be taken as intended to constitute an exception to the general act or provision, especially when such general and special acts or provisions are contemporaneous, as the legislature is not to be presumed to have intended a conflict.

Central Delta ignores the law that a later, more specific statute only trumps an earlier general one where the two statutes are in conflict.

Can the numerous CVPIA provisions directing the Secretary of the Interior, in consultation with other federal agencies, to protect and enhance the striped bass population, be harmonized with application of section 9's

1    take prohibition to CDFG's enforcement of the striped

2    bass sport-fishing regulations and more general

3    application of the ESA?  On Plaintiffs' motion for

4    summary adjudication on an affirmative defense for which

5    Central Delta has the burden of proof at trial,

6    Plaintiffs must show "an absence of evidence to support

7    the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

8    Plaintiffs maintain, and have presented evidence to

9    support their claim, that State Defendant's enforcement

10   of the sport-fishing regulations necessarily take Listed

11   Species, and that lawful application of the ESA to State

12   Defendant's enforcement activities will require

13   elimination of (or substantial modification to) those

14   sport-fishing regulations, which are causing jeopardy to

15   Listed Species.  The State rejoins that the current

16   sport-fishing regulations are critical to the maintenance

17   of current striped bass abundance levels.  The State's

18   evidence suggests that the continued enforcement of these

19   regulations, and/or the promulgation of more stringent

20   protections, may be necessary to achieve the 2,500,000

21   striped bass population goal promulgated by the Service.

22       This presents a material factual dispute over the

23   effects of CDFG's striped bass regulations on the bass

24   and Listed Species populations.  The express language and

25   the legislative purpose of the CVPIA do not evince an

26   intent to abrogate application of the ESA.  Only after

27   the facts are developed will it be possible to determine

28   if a conflict in operation exists between implementation

                                25

of the ESA to the sport-fishing regulations and achieving the CVPIA objectives by application of those regulations. Plaintiffs' motion for summary adjudication of Central Delta's CVPIA affirmative defense is DENIED WITHOUT PREJUDICE.

C.    <u>Standing of Dee Dillon.</u>

To maintain an action in federal court, Plaintiffs must have Article III standing. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872 (1990).[4] "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw,* 528 U.S. at 180-81.

The burden of establishing these three elements falls upon the party asserting federal jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[E]ach

---

[4]    In addition to the Article III requirements, plaintiffs bringing suit under the Administrative Procedure Act, 5 U.S.C. § 706, must establish that they fall within the "zone of interest" of the statute under which they bring their lawsuit. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, at 1199 (9th Cir. 2004). However, where Plaintiffs' suit arises under the ESA's citizen suit provision, which allows "any person" to commence a civil suit, the zone of interest test is negated, or at least expanded to include "any person." *Bennet v. Spear*, 520 U.S. 154, 164 (1997).

element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (quoting *Lujan*, 504 U.S. at 561).  On summary judgment, plaintiff "must show there is no genuine dispute as to material facts regarding their standing and that they have standing as a matter of law." *Citizens for a Better Envt.-Cal. v. Union Oil of Cal.*, 996 F. Supp. 934, 937 (N.D. Cal. 1997); *cf. Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) ("In reviewing the standing question, the court must be careful not to decide the questions on the merits for or against plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.").

When a plaintiff is an object of the challenged regulatory action, standing is usually not challenging to prove.  *Lujan*, 504 U.S. at 562.  When a plaintiff's asserted injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed."  *Id*.

> In that circumstance, causation and
> redressability ordinarily hinge on the response
> of the regulated (or regulable) third party to
> the government action or inaction -- and perhaps
> on the response of others as well.  The

27

existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.  Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish.

*Id.* (internal citations omitted).

1.   <u>Injury-In-Fact.</u>

To satisfy the "injury in fact" requirement, Plaintiffs must provide evidence of either actual or threatened injury.  *See United States v. Ensign*, 491 F.3d 1109, 1116-17 (9th Cir. 2007).  A plaintiff claiming environmental injury demonstrates injury in fact if he uses the affected area and is a person "'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  To satisfy this burden, Mr. Dillon does not need to show actual harm; "an increased risk of harm can itself be injury in fact sufficient for standing."  *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2004) (injury in fact existed where agency's issuance of a permit authorizing an oil company to build an addition

28

to its oil refinery dock increased the risk of an oil spill, an event that would harm plaintiffs' interests). To "require actual evidence of environmental harm, rather than an increased risk based on a violation of [a] statute, misunderstands the nature of environmental harm and would unduly limit the enforcement of statutory environmental protections." *Ocean Advocates*, 402 F.3d at 860.

Here, Mr. Dillon declares that he has visited the Delta "to appreciate the natural environment, to escape from the urban environment, and to engage in numerous recreational activities, including recreational boating, swimming, snorkeling, kayaking, and wildlife viewing." Dillon Decl., Doc. 57-5, at ¶3.  Through these activities he has "been able to gain significant exposure to the Sacramento River winter-run chinook salmon, Central Valley spring-run chinook salmon, Central Valley steelhead, and delta smelt ("Listed Species"). When [he] encounters the Listed Species [he] is generally filled with a sense of appreciation and satisfaction." *Id*.  Mr. Dillon Continues:

> My encounters with the Listed Species have occurred through a variety of different circumstances.  For example, I have witnessed salmon migrating through the Delta from a kayak, and viewed delta smelt while riding on a trawl vessel.  I have also viewed Listed Species while photographing the Delta's diverse wildlife, and while swimming along the Delta's banks.  These are but a few examples of my various experiences, and are in no way intended to be a comprehensive list.

1   *Id.* at ¶4.  He further states that "the decline of the

2   Listed Species, which I have personally witnessed over

3   the last seven years, has negatively impacted my use and

4   enjoyment of the Delta.  For example, as a result of the

5   decline of the Listed Species, my ability to fish for and

6   view salmon has been significantly impaired."  *Id.* at ¶6.

7   Mr. Dillon is a person "for whom the aesthetic and

8   recreational values of the area will be lessened by the

9   challenged activity."  *Friends of the Earth v. Laidlaw*

10  *Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 183 (2000).

11      The Supreme Court recently examined the "injury in

12  fact" requirement in *Summers v. Earth Island Institute*,

13  129 S. Ct. 1142 (2009).  *Summers* addressed whether

14  environmental organizations had standing to challenge a

15  U.S. Forest Service ("Service") regulation that exempted

16  certain types of projects from the Service's notice,

17  comment, and appeal process.  *Id.* at 1147.  The Court

18  first reviewed an affidavit in which one of the

19  plaintiffs asserted that he had suffered injury in the

20  past from development on Forest Service land.  This was

21  rejected as a basis for standing, because, among other

22  things, "it relates to past injury rather than imminent

23  and future injury that is sought to be enjoined."  *Id.* at

24  1150.  In addition, another plaintiff's claim that he

25  "want[s] to" visit specific sites in the Allegheny

26  National Forest was found insufficiently specific.  "This

27  vague desire to return is insufficient to satisfy the

28  requirement of imminent injury: 'Such 'some day'

1   intentions—without any description of concrete plans or
2   indeed any specification of when the some day will be—do
3   not support a finding of the 'actual or imminent' injury
4   that our cases require.'"  *Id*. at 1150-51 (quoting *Lujan*,
5   504 U.S. at 564).

6       In support of their motion for partial summary
7   judgment on the issue of standing, Plaintiffs originally
8   submitted only Mr. Dillon's declaration.  His declaration
9   arguably did not satisfy *Summers* because, although Mr.
10  Dillon "plans to continue frequenting the Delta," Dillon
11  Decl., Doc. 57-5, at ¶ 6, he does not set forth any
12  specific facts describing "concrete plans" for doing so.
13  However, on May 27, 2009, Mr. Dillon filed responses to
14  State Defendant's interrogatories, in which he describes
15  specific plans to return to the Delta to fish for Listed
16  Species over the 2009 Labor Day weekend.  *See* Second
17  Fuchs. Decl., Doc. 69-2, at Ex. A.  This is sufficient
18  evidence of Mr. Dillon's "concrete plans."  State
19  Defendants no longer contest Mr. Dillon's injury in fact.
20  Mr. Dillon satisfies the injury in fact requirement for
21  purposes of standing.

22
23      2.   <u>Causation.</u>

24      The second standing requirement, causation, requires
25  that the injury be "fairly traceable" to the challenged
26  action of the defendant, and not be "the result of the
27  independent action of some third party not before the
28  court."  *Tyler v. Cuomo*, 236 F. 3d 1124, 1132 (9th Cir.

1    2000).[5]  The causation element is lacking where an

2    "injury caused by a third party is too tenuously

3    connected to the acts of the defendant."  *Citizens for*

4    *Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961,

5    975 (9th Cir. 2003).  For the purposes of determining

6    standing, while the causal connection cannot "be too

7    speculative, or rely on conjecture about the behavior of

8    other parties, [it] need not be so airtight ... as to

9    demonstrate that the plaintiffs would succeed on the

10   merits.'"  *Ocean Advocates*, 402 F.3d at 860.

11       *National Audubon Society v. Davis*, 307 F.3d 835 (9th

12   Cir. 2002), provides guidance.  The plaintiffs in *Davis*,

13   bird enthusiasts, alleged that a California law banning

14   the use of leghold traps to capture or kill wildlife

15   violated the Migratory Bird Treaty Act.  *Id.* at 842-843.

16   Prior to the passage of that California law, federal

17   officials used leghold traps against predators to protect

18   several bird species.  *Id.* at 844.  The Ninth Circuit

19   held that plaintiffs had standing to challenge the

20   leghold trap ban, finding their injury was "fairly

21   _____

22   [5]     When a plaintiff seeks to vindicate a procedural harm, rather
     than a substantive right, the causation and redressibility
23   requirements are relaxed.  *Lujan*, 504 U.S. at 573 n.7; *Salmon
     Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th
24   Cir. 2008).  For example, a claim that a federal agency failed to
     engage in required consultation under ESA section 7(a)(2) is
25   procedural in nature and would be subject to this relaxed standard.
     *Defenders of Wildlife v. EPA*, 420 F.3d 946, 957-58 (9th Cir. 2005),
26   reversed on other grounds by *Home Builders v. Defenders of Wildlife*,
     551 U.S. 644 (2007).  Here, Plaintiffs claim that State Defendant's
27   enforcement of the sport-fishing regulations resulted in
     unauthorized take in violation of ESA section 9.  No party has
28   argued that this is an allegation of procedural, rather than
     substantive, harm under the ESA.

traceable" to the proposition because:

> [T]he federal government removed traps in direct response to Proposition 4 (whether under direct "threat of prosecution" or not). Removal of the traps leads to a larger population of predators, which in turn decreases the number of birds and other protected wildlife.

*Id.* at 849. "This chain of causation has more than one link, but it is not hypothetical or tenuous; nor do appellants challenge its plausibility." *Id.*[6]

Here, it is Plaintiffs' burden to establish that their theory of causation is at least "plausible." *Id.* *See also Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 867 (9th Cir. 2003) ("A plaintiff who shows that a causal relation is 'probable' has standing, even if the chain cannot be definitively established."). Plaintiffs do not have to establish causation by a preponderance of the evidence required to prevail on the merits. *Ocean Advocates*, 402 F.3d at 860 (while the causal connection cannot "be too speculative, or rely on conjecture about the behavior of other parties, [it] need not be so airtight ... as to demonstrate that the plaintiffs would succeed on the merits.").[7] Because Plaintiffs are moving for summary

---

[6]     *Davis* undermines State Defendants' suggestion that plaintiffs' causation showing is weakened by the presence of a non-human in the causal chain.  So long as there is evidence that the third party, whether possessing a four-chambered heart or not, will behave in a predictable manner, the causal chain is not necessarily rendered "tenuous" for purposes of the standing analysis.

[7]     The parties' unhelpfully rely on numerous cases deciding causation on the merits, including *Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir. 2004), *Pyramid Lake Paiute Tribe of Indians v. U.S. Department of the Navy*, 898 F.2d 1410 (9th Cir. 1990), *Palila v. Hawaii Department of Land and Natural Resources*, 639 F.2d 495 (9th Cir. 1981), and *American Bald Eagle v. Bhatti*, 9 F.3d 163 (1st Cir. 1993), as complete proof of causation is not required to establish

1  judgment, to prevail, there must be no material facts

2  that call into question the plausibility of their theory

3  of causation.

4      CDFG's Conservation Plan states that by modifying the

5  striped bass minimum size limits from 18 to 26 inches,

6  the striped bass population will increase by almost

7  210,000 fish.  Conservation Plan at 117.  If true, the

8  nature and extent of the sport-fishing regulations have a

9  cognizable impact on the striped bass population.  CDFG

10 counters that the Conservation Plan also concluded that

11 CDFG management efforts that do not include an artificial

12 striped bass stocking program would result in the long-

13 term decline of the adult striped bass population to

14 515,000 adults.  Doc. 65 at 3 (citing Conservation Plan

15 at 37).  The Conservation Plan additionally concludes

16 that maintaining the striped bass population at stable

17 levels requires much more restrictive sport-fishing

18 regulations than are presently in force.  *Id*. (citing

19 Conservation Plan at 117).[8]

20     Plaintiffs' evidence of a link between higher striped

21 bass abundance and increased Listed Species mortality is

22

23 standing.

[8]     The declaration of Bill Jennings, filed by CSPA, challenges
24 whether removal of the sport-fishing regulations will  necessarily
   lead to a decrease in striped bass population.  Specifically,
25 Jennings opines that he is "optimistic" that sport fishermen may
   self regulate and protect the striped bass fishery even in the
26 absence of the regulations.  Jennings Decl. at ¶7.  But, CSPA
   submitted Jennings' declaration in connection with its opposition to
27 Plaintiffs' request for summary adjudication of the single take and
   take by regulatory authority issues.  CSPA explicitly declined to
   oppose Plaintiffs' standing.  Accordingly, the Jennings declaration
28 will not be considered in this context.

1    materially disputed.   For example, CDFG's Conservation

2    Plan concluded that a striped bass population of 765,000

3    adults maintained through an artificial stocking program

4    would consume 6 percent of the Sacramento River winter-

5    run Chinook salmon population, 3.1 percent of the Central

6    Valley Spring-run Chinook salmon population, and 5.3

7    percent of the delta smelt population.   Conservation Plan

8    at 45, 56, 70.   Striped bass predation upon the Listed

9    Species will be slightly lower in the absence of the

10   stocking program, but will still be present and will

11   range from 3.4-4.7 percent of the winter-run, 2.3 percent

12   of the spring-run, and 3.6 percent of the delta smelt.

13   *Id.*  DFG reaffirmed these estimates in its Status Review

14   of the Longfin Smelt, released January 2009.   Second

15   Rubin Decl., Doc. 78, Ex. 13 at 28.   These statistics

16   support Plaintiffs' contention that increased striped

17   bass populations adversely affect the Listed Species'

18   abundance.

19        However, the statistical analyses described in the

20   Declaration of Matthew L. Nobriga raise questions about

21   Plaintiffs' assertion that ending the enforcement of the

22   striped bass sport-fishing regulations will cause a

23   measurable increase in the abundance of the Listed

24   Species.   Nobriga opines that it is possible that

25   reductions in striped bass populations will have

26   unintended, negative effects on Listed Species abundance.

27   Specifically, Nobriga emphasizes that, while striped bass

28   prey on delta smelt, they also prey on one of the delta

1   smelt's primary predators and competitors, the

2   Mississippi silverslide.  Nobriga Decl. at ¶¶ 7, 10.

3   Nobriga opines that allowing depletion of the striped

4   bass population may actually lead to <u>decreased</u> delta

5   smelt abundance, because striped bass predation of

6   Mississippi silverslide would be reduced.  *Id*. at ¶ 10.

7        Nobriga references research performed by others

8   contradicting the hypothesis that striped bass predation

9   had a major influence on salmon survival.  *Id*. at ¶12.

10  Nobriga also performed his own regression analyses of the

11  relationship between striped bass populations and those

12  of the Listed Species, evidencing a positive relationship

13  between striped bass abundance and winter-run abundance,

14  and no relationship between striped bass abundance and

15  either spring run, or delta smelt abundance.  *Id*. at ¶¶

16  16-17.

17       The Nobriga Declaration raises serious questions

18  about the plausibility of Plaintiffs' causal theory by

19  challenging Plaintiffs' fundamental assertion that there

20  is some, measurable link between increased striped bass

21  abundance and Listed Species mortality.  This is all that

22  is required to successfully oppose Plaintiffs' motion for

23  summary adjudication on the issue of standing based on

24  the extent of the dispute over causation.

25

26            3.   <u>Redressibility.</u>

27       To satisfy the final requirement of Article III

28  standing, a plaintiff must show it is "likely that a

favorable court decision will redress the injury to the
plaintiff."  *Lujan*, 504 U.S. at 560; *see also Steel Co.
v. Citizens for a Better Env't*, 523 U.S. 83 at 107
("Relief that does not remedy the injury suffered cannot
bootstrap a plaintiffs into federal court; that is the
very essence of the redressibility requirement").
"Redressibility requires an analysis of whether the court
has the power to right or to prevent the claimed injury."
*Gonzales v. Gorsuch*, 688 F. 2d 1263, 1267 (9th Cir.
1982).  A plaintiff need only show that the requested
relief is "likely" to redress his injury, "not that a
favorable decision will inevitably redress his injury."
*Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994)
(emphasis added and emphasis deleted from original).
"There is no redressability, and thus no standing, where
... any prospective benefits depend on an independent
actor who retains broad and legitimate discretion the
courts cannot presume either to control or to predict."
*Glanton v. AdvancePCS, Inc.*, 465 F.3d 1123, 1125 (9th
Cir. 2006); *see also United States v. Larson*, 302 F.3d
1016, 1019 (9th Cir. 2002).

        Even a small improvement to the Listed Species'
survival would be sufficient.  *See Massachusetts v. EPA*,
539 U.S. 497, 525 (2007)(for the purposes of standing, a
favorable decision need only slow the increase or
marginally reduce the risk of injury to plaintiff); *see
also Sierra Club v. Franklin County Power of Ill., LLC*,
546 F.3d 918, 927-28 (7th Cir. 2008) (environmental

1  plaintiff's injury would be redressed by favorable
2  decision requiring more stringent emissions controls,
3  even though defendant would likely be allowed to continue
4  polluting); *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d
5  328, 329 (7th Cir. 1993) ("even a small probability of
6  injury is sufficient to create a case or controversy ...
7  provided of course that the relief sought would, if
8  granted, reduce the probability."); *Natural Res. Def.*
9  *Council v. Kempthorne*, No. 1:05-cv-1207, 2007 WL 4462395,
10 at *14-15 (E.D. Cal. Dec. 14, 2007) (holding that even
11 though the Court could not determine "whether the
12 operations of the CVP and SWP export facilities are the
13 principal cause of the decline in the delta smelt or
14 whether other factors beyond the control of the Projects
15 are the principal cause ..., the impact from Project
16 operations is at least a concurrent cause which
17 jeopardizes the existence of the Delta smelt and
18 endangers its survival and its critical habitat, which
19 necessitates remedial action.").

20     Here, whether a favorable decision in this case,
21 e.g., enjoining enforcement of the striped bass sport-
22 fishing regulations, would redress to any extent the
23 claimed injury to Mr. Dillon's aesthetic enjoyment of the
24 Listed Species is materially disputed.

25     Plaintiffs' motion for summary adjudication of Dee
26 Dillon's standing is DENIED WITHOUT PREJUDICE.  This
27 ruling does not prevent Dillon from maintaining these
28 cases, as, for pleading purposes, his standing

38

1  colligations are accepted as true.

2
                            V. <u>CONCLUSION</u>
3

4      For the reasons set forth above, Plaintiffs' motion

5  for summary adjudication is DENIED WITHOUT PREJUDICE in

6  its entirety.

7

8  SO ORDERED

9  Dated:  July 16, 2009

10
                            <u>/s/ Oliver W. Wanger</u>
11                            Oliver W. Wanger
                            United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                            39