1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

9   COALITION FOR A SUSTAINABLE      1:08-cv-00397 OWW GSA
    DELTA, *et al.*,
10                                   MEMORANDUM DECISION RE
              Plaintiffs,            PLAINTIFFS' MOTION FOR
11                                   SUMMARY JUDGMENT (DOC.
         v.                          114)
12

13  JOHN MCCAMMAN, in his official
    capacity as the Director of the
14  California Department of Fish and
    Game,
15

16            Defendant,

17  CENTRAL DELTA WATER AGENCY, *et
    al.*,
18

19            Defendant-Intervenors,

20  CALIFORNIA SPORTFISING PROTECTION
    ALLIANCE, *et al.*,
21

22            Defendant-Intervenors.

23                  I. INTRODUCTION

24      This case concerns enforcement by the California

25  Department of Fish and Game ("CDFG"), through its

26  Director John McCamman, ("State Defendant") of state

27  sportfishing regulations designed to protect striped bass

28

                          1

population in the Sacramento-San Joaquin Delta.

Plaintiffs, the Coalition For a Sustainable Delta, *et al.*, ("Plaintiffs" or "the Coalition"), allege that State Defendants' enforcement of these regulations violates section 9 of the Endangered Species Act ("ESA" or "Section 9"), because striped bass prey on and take various ESA-listed species.

Plaintiffs move for summary judgment/adjudication that: (1) Plaintiff Dee Dillon has standing; (2) State Defendant's enforcement of the striped bass sportfishing regulations violates Section 9; and (3) the Central Valley Improvement Act ("CVPIA"), Pub. L. 102-575, 106 Stat. 4600 (1992), does not provide a legitimate affirmative defense in this case.[1]  Doc. 114.  State Defendant and Defendant Intervenors Central Delta Water Agency, *et al.* ("Central Delta") oppose Plaintiffs' motion.  Docs. 123 & 125.  Central Delta's opposition focuses primarily on the CVPIA affirmative defense.  Plaintiffs filed separate replies to each of the oppositions.  Docs.  143 & 144.[2]

_____

[1] The parties have stipulated that failure to establish Mr. Dillon's standing shall be deemed a failure to establish standing of all the Plaintiffs."  State Defendants' Statement of Undisputed Fact ("SDSUF") #3.
[2] On April 22, 2010, Plaintiffs requested permission to file a 25-page reply brief in response to State Defendant's opposition.  Doc. 134.  By minute order, the Court denied this request in part, permitting Plaintiff to file a "17-page reply brief."  Doc. 141.

1   State Defendant originally cross-moved for summary

2   adjudication that Dee Dillon does not have standing.

3   Doc. 113.  After additional discovery was completed,

4   State Defendant withdrew its motion, recognizing that

5   "Mr. Dillon's most recent declaration and deposition

6   testimony create a potential triable issue of material

7   fact as to whether Mr. Dillon has been injured by the

8   State Defendant's enforcement of the striped bass

9   regulations."  Doc. 162 at 3.  State Defendant did not

10  withdraw its opposition to Plaintiffs' motion for summary

11  adjudication as to Mr. Dillon's standing.  See *id*.

12  
13  The matter came on for hearing June 23, 2010, in

14  Courtroom 3 (OWW).

15  
16  II. **STANDARD OF DECISION**

17  Summary judgment is appropriate when "the pleadings,

18  the discovery and disclosure materials on file, and any

19  affidavits show that there is no genuine issue as to any

20  material fact and that the movant is entitled to judgment

21  as a matter of law."  Fed. R. Civ. P. 56(c).  A party

22  
23  _____

24  State Defendant Objects to Plaintiff' filing of two separate reply
    briefs because, combined, they exceed 17 pages.  Plaintiffs rejoin

25  that because their original request for leave to file a 25-page
    reply brief was directed at their reply to State Defendants'
    opposition, they assumed the Court's 17-page limit applied only to

26  that reply brief, and that they were free to file a separate reply
    to Central Delta's separate opposition pursuant to the Court's

27  Standing Order, Doc. 104, which limits replies to 10 pages.  Doc.
    151.  Plaintiffs' interpretation of the Court's minute order is

28  reasonable.  Their reply briefs will be considered.

moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant has the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on claim on which it has the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted).  With respect to an issue as to which the non-moving party has the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made

**4**

and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.*

To defeat a motion for summary judgment, the non-moving party must show there exists a genuine dispute (or issue) of material fact. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

5

# III. ANALYSIS

## A.   Section 9 Liability Standard.

Resolution of many of the disputes in these motions turns on whether liability under ESA § 9 is attributable to State Defendant's actions.  It is undisputed that the Central Valley spring-run Chinook salmon is listed as a threatened species, 64 Fed. Reg. 50,394 - 50,415; 70 Fed. Reg. 37,160 - 37,204, and that the Sacramento River winter-run Chinook salmon is listed as an endangered species, 59 Fed. Reg. 440.[3]

ESA § 9 prohibits the "take" of any species listed as endangered.  16 U.S.C. § 1538(a)(1)(B).  The Secretary of the Interior, through regulation, has applied the "take" prohibition to species that are listed as threatened.  50 C.F.R. § 17.31(a).  "Take" is defined to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

"Harm" is defined by regulation to include:

> an act which actually kills or injures wildlife. Such act may include habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

---

[3] The First Amended Complaint ("FAC") includes allegations regarding the effect of the striped bass sport fishing regulation on Delta smelt and Central Valley steelhead.  However, plaintiffs do not seek summary judgment as to those species.

50 C.F.R. § 17.3.  Under this regulation, a person can "harm" either directly, by actually killing or injuring a protected animal, or by modifying the species' habitat to the point of significantly impairing the species' essential behavioral patterns where that impairment results in the actual death or injury of endangered animals.

"Direct" harm involves the direct application of force to a member of a protected species, resulting in actual death of or injury to the animal.  *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 694 (1995).

Habitat modification may also constitute harm "where it <u>actually kills or injures wildlife</u> by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3 (emphasis added)[4]; *see also Sweet Home*, 515 U.S. at 697 (upholding 50 C.F.R. § 17.3 and holding that the ESA's definition of harm "naturally encompasses habitat

_____

[4] The Fish and Wildlife Service adopted this definition of "harm" in 50 C.F.R. § 17.3.

[T]he word "actually" before the words "kills or injures" ... makes it clear that habitat modification or degradation, standing alone, is not a taking pursuant to section 9. To be subject to section 9, the modification or degradation must be significant, must significantly impair essential behavioral patterns, and must result in actual injury to a protected wildlife species.

46 Fed. Reg. 54,748 (1981)

modification that results in actual injury or death to
members of an endangered or threatened species"); *Defenders of Wildlife v. Bernal*, 204 F.3d, 920, 924-25
(9th Cir. 2000) (affirming denial of injunction against
construction on property containing potential habitat for
a species of pygmy owl and confirming that habitat
modification does not constitute harm unless it "actually
kills or injures wildlife"); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1065-66 (9th Cir. 1996) (harm
through habitat modification can be projected into the
future only so long as the habitat modification will
cause actual killing or injury of members of a protected
species).

Either form of take by harm (direct harm or harm by
habitat modification) may include acts of a third party
that indirectly bring about a take by causing another to
effect a take.  16 U.S.C. § 1538(g) (making it "unlawful
for any person subject to the jurisdiction of the United
States to attempt to commit, solicit another to commit,
or cause to be committed, any offense defined in this
section"). A third party government actor[5] was found

---

[5] Because the ESA defines "person" broadly to include "any
State," or "any officer, employee, agent, department, or
instrumentality of ... any State," *id.* § 1532(13), "the statute ...
prohibits a party, including state officials, from bringing about
the acts of another party that exact a taking."  *Seattle Audubon
Soc'y v. Sutherland*, 2007 WL 1300964, at *8 (W.D. Wash. May 2,

liable for indirectly causing take by direct harm in *Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997), which concerned a challenge to Massachusetts' authorization of certain types of fixed fishing gear known to entangle Northern Right whales.  127 F.3d at 158-59.  The district court determined that the ESA "appl[ied] to acts by third parties that allow or authorize acts that exact a taking and that, but for the permitting process, could not take place."  *Id*. at 163.  The First Circuit found that the ESA "not only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking." *Id*. at 163.  Specifically, "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA."  *Id.*; *see also Loggerhead Turtle v. Volusia County*, 148 F.3d 1231, 1251-53 (11th Cir. 1998) (finding county caused a third party to effect take by harm due to habitat modification when it refused to ban beachfront artificial light sources adversely impacting sea turtles); *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1081 (D. Minn. 2008) (Minnesota Department of Natural Resources violated section 9 of the ESA by authorizing trapping and snaring 2007).

that could potentially result in take of the protected Canada Lynx).

It is unclear how the claims in this case should be classified.  Is predation by striped bass a direct harm indirectly caused by a government action (the enforcement of the striped bass sportfishing regulations)?  Or, is the human manipulation by increaseing the predator population a form of habitat modification?  *Strahan* expanded the meaning of take to include "not only [] the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking."  127 F.3d at 163.  The prerequisite to a finding of third party liability, however, is a first party act that exacts a taking.  A fish cannot "take" another fish under the ESA, because only a "person" can violate the ESA's take prohibition. *See* 16 U.S.C. § 1538(a)(1)(B)("...[I]t is unlawful for any person ... to ... take any [Listed] species within the United States or the territorial sea of the United States")(emphasis added); § 1538(g)("It is unlawful for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section."); § 1532 (defining the term "person" to means

10

"an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States"); *cf. Cetacean Community v. Bush*, 386 F.3d 1169 (9th Cir. 2004) (refusing to grant standing to community of whales, dolphins, and porpoises because the ESA only authorized "persons" to sue; "animals are the protected rather than the protectors").  A fish cannot "take" another fish, because a fish is not a "person," at least not for purposes of the ESA.  Here, the ESA "person" is the CDFG, the State Defendant.

Instead, the circumstances of this case must be addressed as a form of harm by habitat modification. This is consistent with cases that have found take where human activities reduce prey populations.  *Greenpeace Foundation v. Mineta*, 122 F. Supp. 2d 1123, 1134 (9th Cir. 2000) (finding removal of prey may constitute harm by habitat modification).  This is a close analogy to the present circumstances, where human activities are alleged

to be increasing predator populations.[6]

Here, this distinction is important, because, where direct harm and harm by habitat modification appear to differ is in their need for proof of a population-level effect. Take can result from _direct_ harm to a single, individual animal. *See, e.g., United States v. Nuesca*, 945 F.2d 254 (9th Cir. 1991) (affirming criminal convictions under the ESA for the direct take by hunting of a single Hawaiian monk seal and two green sea turtles); *Mausolf v. Babbitt*, 125 F.3d 661, 668-70 (8th Cir. 1997) (upholding agency decision to ban snowmobiling in a National Park based in part on evidence of "several cases" of harassment and harming of gray wolves, explaining that the ESA "prohibits any person, including a governmental agency, from 'taking' any individual member of a threatened or endangered species population"); *Strahan*, 127 F.3d at 165 (refusing to consider "significant efforts" made by state regulatory agency to minimize entanglements of endangered whale species in fixed fishing gear, noting that "a single

_____

[6] It is more clear that harm by habitat modification was intended to include actions that reduce prey availability because the definition includes "habitat modification or degradation" that "actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. But, being able to evade predators is an "essential behavioral pattern," and arguably falls within the term "sheltering."

injury to one whale is a taking under the ESA.").[7]

In contrast, there is some authority suggesting that, in the Ninth Circuit, harm by habitat modification requires proof of a population level effect.  For example, in *Palila v. Hawaii Dept. of Land and Natural Resources*, 852 F.2d 1106, 1108 (9th Cir. 1988), a pre-*Sweet Home* case, the Ninth Circuit affirmed the district court's construction of the harm regulation to include "habitat destruction that could drive [a species] to extinction."  In *Palila*, it was undisputed that large numbers of mouflon sheep would significantly damage the Palila's (an ESA-listed bird) habitat, driving the Palila to extinction.  *Id.* at 1109.  It was disputed, however, whether a controlled number of sheep could co-exist with the *Palila*.  *Id.*  After a bench trial, the district court credited those witnesses who maintained the two species could not coexist at any level of sheep population, finding that the state agency's permitting of sheep in the Palila's habitat constituted a taking under the ESA. *Id.* at 1109-1110; *see also Greenpeace Foundation*, 122 F. Supp. 2d at 1134 (denying motion for summary judgment, finding there was a dispute of fact regarding whether reduction in monk seal prey as a result of NMFS's

---

[7] *Strahan* is not a harm by habitat modification case.  Rather, it concerns direct harm (injuries caused by entanglement in fishing gear) that was indirectly caused by a third party government agency.

management of lobster fishing would "doom[] the monk seal to extinction").

*Palila's* requirement of proof that habitat modification would lead to extinction was re-affirmed in the post-*Sweet Home* case *National Wildlife Federation v. Burlington N. R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994), and extended to also include habitat degradation where a plaintiff can "show significant impairment of the species' breeding or feeding habits and prove that the habitat degradation prevents, or possibly, retards, recovery of the species."  In *Burlington Northern*, a series of grain spills from defendant's trains in northwestern Montana resulted at least seven grizzly bear fatalities in and around the spills.  *Id.* at 1510. Environmental plaintiffs' request for a preliminary injunction against defendant's operations was denied because they failed to show that similar harm in the future was likely.  *Id.* at 1511-13.  Specifically, the Ninth Circuit cited evidence that "mortalities in the spill area 'likely have had little long term overall effect'" on the region's grizzly bear population; the impacts of the corn spill were "of a 'localized nature' and could not 'be characterized as significant'"; and "that grizzly bears have not been habituated over a long

14

period of time to the corn spill area, reducing the likelihood that grizzly bears would continue to frequent the area once the food source was removed." *Id.* at 1511.[8]

The Ninth Circuit's reasoning in Defenders of *Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 2000), cited by Plaintiffs, suggests that actual proof that habitat modification would harm a single, individual listed species is sufficient to establish a section 9 violation. *Bernal* concerned the construction of a school in an area that was potential habitat for the endangered ferruginous pygmy owl. The district court framed the analysis as follows:

> In this case, there are primarily two material factual questions: 1) Does a pygmy-owl use or occupy any part of the school site? 2) Will the construction and operation of the site result in

---

[8] The imposition of a requirement that there be a population-level effect is supported by language in *Sweet Home*, which involved a facial challenge to the regulatory definition of "harm" that included habitat modification.

> Respondents advance strong arguments that activities that cause minimal or unforeseeable harm will not violate the Act as construed in the "harm" regulation. Respondents, however, present a facial challenge to the regulation. Cf. *Anderson v. Edwards,* 514 U.S. 143, 155-156, n.6 (1995); *INS v. National Center for Immigrants' Rights, Inc.,* 502 U.S. 183, 188 (1991). Thus, they ask us to invalidate the Secretary's understanding of "harm" in every circumstance, even when an actor knows that an activity, such as draining a pond, would actually result in the extinction of a listed species by destroying its habitat. Given Congress' clear expression of the ESA's broad purpose to protect endangered and threatened wildlife, the Secretary's definition of "harm" is reasonable.

*Sweet Home,* 515 U.S. at 699-700.

15

a § 9 "take" through the "harm" or "harassment" of a pygmy-owl?

*Id*. at 925.  After a three-day bench trial, the district court found that the proposed construction project would not "result in the take of a pygmy owl."  *Id*. at 922.  Although there was some evidence that owls used the 30-acre parcel, there was inconsistent evidence regarding the impact of construction on the owls.  *Id*. at 925.  Given the ultimate conclusion that harm, even to one owl, had not been proven, the district court's assumption that harm by habitat modification could be shown by proving harm to an individual animal was not necessary to its decision.  Without discussing the district court's assumption, the Ninth Circuit affirmed.  *Id*. at 930.

The balance of the authority suggests that a population level effect is necessary for harm resulting from habitat modification to be considered a take. *Arguendo*, imposing such a requirement in all cases of alleged harm by habitat modification might cause a species' habitat, and its continued survival and/or chances of recovery, to be destroyed in a piecemeal fashion.  This is not a case in which such piecemeal destruction is a threat.  This case involves the entire striped bass population in the Delta and its alleged predatory impact on the entire populations of listed

16

winter and spring-run Chinook salmon.

Finding that an actionable take occurred whenever an action that disturbs the balance of an ecosystem poses a reasonably certain threat of imminent harm[9] to a single member of the listed species would effectively eviscerate *Sweet Home's* requirements of proximate causation and

---

[9] Plaintiffs need only prove a reasonably certain threat of imminent harm. In *Marbled Murrelet*, 83 F.3d at 1066, a post-*Sweet Home* decision, the Ninth Circuit relied on *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 787-88 (9th Cir. 1995), for the proposition that "[a] reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA." *Marbled Murrelet* specifically held that the Supreme Court's 1995 decision in *Sweet Home* does not affect the vitality of *Rosboro's* holding.

In *Marbled Murrelet*, an environmental group asserted that the defendant's logging activities would result in the take of listed marbled murrelets. 83 F.3d at 1062. After finding that the logging activities would likely "harass" and "harm" the marbled murrelet, the district court issued an injunction. *Id.* at 1063. The defendant appealed, arguing that plaintiff failed to prove actual harm to an individual bird. *Id.* at 1062. The Ninth Circuit rejected the defendant's argument, finding that "a showing of a future injury to an endangered or threatened species is actionable under the ESA," and that "[a] reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA." *Id.* at 1064-66. The Appeals Court found undisputed evidence that the marbled murrelet was located within the logging area, and that the logging activities "would likely harm marbled murrelets by impairing their breeding and increasing the likelihood of attack by predators on the adult murrelets as well as the young." *Id.* at 1067-68 (emphasis added). Accordingly, the Ninth Circuit affirmed the district court's injunction, as "there was a reasonable certainty of imminent harm to [the marbled murrelet] from [defendant's] intended logging operation." *Id.* at 1068.

State Defendant relies on *American Bald Eagle v. Bhatti*, 9 F.3d 163, 166 (1st Cir. 1993), which held:

[F]or there to be 'harm' under the ESA, there must be actual injury to the listed species. Accordingly, courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species.

But, this First Circuit case directly conflicts with the Ninth Circuit's subsequent holding in *Marbled Murrelat*. *Marbled Murrelat* controls.

17

foreseeability, imposed upon cases concerning harm from habitat modification.  *See* 515 U.S. 700 n. 13 ("[T]he regulation [defining harm] merely implements the statute, and it is therefore subject to the statute's 'knowingly violates' language and ordinary requirements of proximate causation and foreseeability.").  This is particularly the case where the intervening actor is not a human, and therefore not within the complete control of the human actors involved, including the Court.

**B.   Evidentiary Objections.**

   **1.   State Defendants' Objection to the Electronic Signatures on the Declarations of Dee Dillon.**

   In a footnote to its reply brief, State Defendant objects to the electronic signatures on Mr. Dillon's declaration in support of Plaintiffs' motion for partial summary judgment, Doc. 114-4, and in opposition to State Defendant's motion for summary judgment, Doc. 119-2. State Defendant asserts that Mr. Dillon's electronic signature fails to comply with the requirements of Local Rule 131(f), which provides

   **Non-Attorney's Electronic Signature.** Documents that are required to be signed by a person who is not the attorney of record in a particular action (verified pleadings, affidavits, papers authorized to be filed electronically by persons in pro per, etc.), may be submitted in electronic format bearing a "/s/" and the person's name on the signature line along with a statement that counsel has a signed original, e.g., "/s/ John Doe (original signature retained

> by attorney Mary Roe)." It is counsel's duty to maintain this original signature for one year after the exhaustion of all appeals. This procedure may also be followed when a hybrid electronic/paper document is filed, i.e., the conventionally served document may also contain an annotated signature in lieu of the original.

However, Local Rule 131(g) requires any party disputing the authenticity of an electronically-filed document with a non-attorney signature to "file an objection and request that the document be stricken within twenty-one (21) days of receiving the Notice of Electronic Filing or a copy of the document, whichever first occurs, unless good cause exists for a later contest of the signature by a person exercising due diligence."  Here, the Declarations in question were filed electronically on February 22, 2010 and March 30, 2010, respectively. State Defendant's reply brief objecting to the electronic signature was not filed until April 30, 2010, sixty seven (67) and thirty one (31) days after receiving notices of the electronic filing, denying Plaintiffs the opportunity to correct the signature.  State Defendant has presented no evidence suggesting good cause existed for a later contest of the signatures.  State Defendant's objection to these declarations is OVERRULED.

    2.   **Effect of Rule 30(b)(6) Designee's Testimony.**

    Plaintiffs rely extensively on a series of purported "admissions" made by State Defendant's Rule 30(b)(6)

designee Marty Gingras.   Plaintiffs maintain that any

such admissions are "absolutely binding."   State

Defendant argues that Mr. Gingras' admissions as its

designee under Federal Rule of Civil Procedure 30(b)(6)

are merely admissible, and not binding.   Doc. 123 at 23-

24.

The Ninth Circuit has yet to decide this issue.

There is a marked divide in the caselaw.   Some courts

suggest that an agency is bound by the testimony of its

Rule 30(b)(6) designee.[10]   Other courts hold that

"testimony given at a Rule 30(b)(6) deposition is

---

[10] *E.g., Mitchell Eng'g v. City & County of San Francisco*, ,
2010 U.S. Dist. LEXIS 20782, at *4 (N.D. Cal. Feb. 2, 2010) ("A
30(b)(6) witness testifies as a representative of the entity, his
answers bind the entity and he is responsible for providing all the
relevant information known or reasonably available to the entity."
(quotation marks and citation omitted); *Great Am. Ins. Co. of N.Y.
v. Vegas Constr. Co., Inc.*, 2008 U.S. Dist. LEXIS 108488, at *10 (D.
Nev. Mar. 24, 2008) (same); *State Farm Mut. Auto. Ins. Co. v. New
Horizont, Inc.*, 250 F.R.D. 203, 212 (E.D. Pa. 2008) ("the purpose
behind Rule 30(b)(6) is to create testimony that will bind the
[agency]" (quotation marks and citations omitted)); *Booker v. Mass.
Dep't of Pub. Health*, 246 F.R.D. 387, 389 (D. Mass. 2007) ("the
[agency] is obligated to prepare the designees so that they can give
knowledgeable and binding answers" (quotation marks and citations
omitted)); *Kyoei Fire & Marine Ins. Co., Ltd. v. M/V Maritime
Antalya*, 248 F.R.D. 126, 152 (S.D.N.Y. 2007) (same); *Poole ex rel.
Elliott v. Textron, Inc.*, 192 F.R.D. 494, 504 (D. Md. 2000) (same);
*Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D. Neb.
1995) (same); *Rainey v. Am. Forest and Paper Ass'n, Inc.*, 26 F.
Supp. 2d 82, 94-95 (D.D.C. 1998) (same); *Nev. Power Co. v. Monsanto
Co.*, 891 F. Supp. 1406, 1418 (D. Nev. 1995) ("a[n agency] must
prepare them to give complete, knowledgeable and binding answers"
(quotation marks and citations omitted)); *Marker v. Union Fidelity
Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C. 1989) ("give complete,
knowledgeable and binding answers"); *Diamond Triumph Auto Glass,
Inc., v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 723 (M.D. Pa.
2006) ("designee does not merely speak for his own personal
knowledge, but is 'speaking for the corporation.' ... [I]t cannot
present 'a theory of facts that differs from that articulated by the
designated representatives.'" (citations omitted)).

evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes," and that such testimony does not "bind" the designating entity "in the sense of [a] judicial admission." *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001).[11]  This treats the testimony as that of any witness, making it subject to correction and/or impeachment.  Other courts adopt a middle ground and hold that a party cannot rebut the testimony of its Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and there is no adequate explanation for the rebuttal.[12]

     It is not necessary to resolve the competing lines of

_____

[11] *See also Industrial Hard Chrome, LTD. v. Hetran, Inc.*, 92 F. Supp. 2d 786, 791 (N.D. Ill 2000) ("Such testimony is not a judicial admission that ultimately decides an issue."); *Media Services Group, Inc. v. Lesso, Inc.*, 45 F. Supp. 2d 1237, 1254 (D. Kan. 1999) ("The testimony of a Rule 30(b)(6) deponent is merely an evidentiary admission ... [that] may be controverted or explained by a party"); 8A Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, Federal Practice and Procedure § 2103, pp. 469-470 (2010) ("[A]s with any other party statement, [Rule 30(b)(6) deposition statements] are not 'binding' in the sense that the corporate party is forbidden to call the same or another witness to offer different testimony at trial.").

[12] *Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000), aff'd 31 Fed. Appx. 151 (5th Cir. 2001) (per curiam) (unpublished); *State Farm Mut. Auto. Ins. Co. v. New Horizon*, 250 F.R.D. 203 (E.D. Pa. 2008) ("The better rule is that the testimony of a Rule 30(b)(6) representative, although admissible against the party that designates the representative, is not a judicial admission absolutely binding on that party," but the party still may not "retract prior testimony with impunity" and courts can disregard inconsistent testimony when the movant has relied on it); *Tex. Technical Inst. v. Silicon Valley, Inc.*, 2006 U.S. Dist. LEXIS 6257, at *21 (S.D. Tex. Jan. 31, 2006) (affidavit did not create an issue of material fact because it conflicted without explanation with Rule 30(b)(6) testimony).

21

authority on the binding effect of testimony of a "person most knowledgeable" deponent, because State Defendants do not seek to withdraw any of these "admissions," all of which are generic statements Mr. Gingras agreed with during his deposition.  Rather, State Defendants seek to qualify and/or explain those statements.  For example, Plaintiffs assert that Mr. Gingras has admitted that "eliminating the size and catch limits for striped bass would reduce the striped bass population."  Pltf's Statement of Undisputed Facts ("PSUF"), Doc. 114-2, 2(A). State Defendants simply maintain that this generic statement does not accurately reflect Mr. Gingras' own testimony, and that Mr. Gingras' qualifications to his testimony are supported by other evidence in the record. Nothing in Rule 30(b)(6) or the cited caselaw requires the Court to blindly accept these generic statements out of context.

The Gingras testimony may be amplified or explained, so long as a material change or retraction is not made without a reasonable basis.

//

//

//

//

3.  **Plaintiffs' Objections to State Defendant's Statement of Undisputed Facts in Support of State Defendant's Motion for Summary Judgment.**

(1)  **Objections to Background Facts.**

Plaintiffs object to State Defendant's inclusion of certain background facts in its Statement of Undisputed Fact.  For example, Plaintiffs object to the following statement as irrelevant: "The water district plaintiffs base their claim of injury on the allegation that DFG's enforcement of the regulations have harmed ESA-listed species, causing federal fishery agencies to reduce State Water Project (SWP) water deliveries to them."  SDSUF #1. This objection is OVERRULED, as this fact provides relevant background information and is admissible for that purpose.  The conclusions that such reductions are caused by the regulations is disputed.  The same conclusion applies to the same objection as to SDSUF Numbers 4 and 5.

(2)  **Objections to Facts Related to Mr. Dillon's Use and Enjoyment of the Delta.**

Plaintiffs also object to certain statements describing the extent to which Mr. Dillon has used and enjoyed the Delta.  For example, they object to the following statement as "immaterial":  "Mr. Dillon stated that he has photographed salmon two or three times in the Delta."  SDSUF #10.  Plaintiffs insist that "the relevant

23

material fact is not how many salmon Mr. Dillon has
photographed in the Delta; instead, it is whether Mr.
Dillon has attempted to photograph salmon in the Delta."
Doc. 121 at 8.  This fact is not wholly irrelevant to a
determination of whether Mr. Dillon has ever and/or
continues to photograph salmon in the Delta.  The weight
to be given this fact is a separate question.  The
objection is OVERRULED.

     The same reasoning and conclusion apply to
Plaintiffs' objections to SDSUF Nos. 11, 12, 15, 16, 23,
24, 25, 27, 28, 29, 35, 36, 37, 38, 39, 40, 41, 42, 45,
46, 47, and 48, all of which present facts related to Mr.
Dillon's use and enjoyment of the Delta and its wildlife,
bearing on his standing.  These facts are at least
marginally relevant.  The objections are OVERRULED.

                    (3)  **Facts Related to Mr. Dillon's**
                         **Recruitment by Plaintiff Coalition for**
                         **a Sustainable Delta.**

     Plaintiffs object to the following facts as
immaterial to the present motion:

          • SDSUF #17:  Mr. Dillon was recruited by
            plaintiff Coalition for a Sustainable Delta
            (Coalition) about two years ago, approximately
            the same time the Coalition was formed, after
            being contacted by the Coalition's counsel, Paul
            Weiland.

          • SDSUF #18:  The purpose for contacting Mr.
            Dillon was to enlist him as a plaintiff in this
            litigation, as evidenced by his understanding

                              24

that his role in the Coalition would involve
recounting his fishing and recreation history,
ultimately to a judge.

State Defendants have presented no authority
suggesting that how Mr. Dillon came to be associated with
the Coalition is relevant to Mr. Dillon's own standing as
an individual plaintiff, who has bona fide protectable
environmental interests.  The relevance objection is
SUSTAINED.

    4.   **State Defendant's Objections to Evidence.**

        a.   **Deposition Testimony Of Marty Gingras.**

State Defendant has objected to all of the statements
made by its own Federal Rule of Civil Procedure 30(b)(6)
designee, Marty Gingras.

• **"Eliminating the size and catch limits for striped
bass would reduce the striped bass population."  Pls'
Statement of Undisputed Facts ("SUF") 2(A).**

Defendant objects to the inclusion of Mr. Gingras'
admission that "eliminating the size and catch limits for
striped bass would reduce the striped bass population" on
the basis that the admission is irrelevant, that
Plaintiffs have misstated the testimony, that the
admission is not binding, and that "Mr. Gingras did not
testify as to the magnitude of the alleged effect, and
did not testify that it was substantial."  Doc. 123-2 at
6:14-18.

Defendant's relevancy objection is misplaced. Plaintiffs have alleged that the striped bass sport-fishing regulations artificially maintain and enhance the size of the striped bass population in the Delta, increasing striped bass predation on Listed Salmon. There is a serious dispute over the applicable legal standard under Section 9. State Defendant maintains that to violate section 9, the government regulation must have a significant impact on the species' chances of survival and recovery. Even if, *arguendo*, State Defendant's articulation of the legal standard is correct, Mr. Gingras' assertion that eliminating the catch limits for striped bass would reduce the striped bass population is relevant. It tends to establish a fact in dispute relative to causation. This objection goes to the weight of this generic evidence, not its admissibility. The objection is OVERRULED. State Defendant is not precluded from presenting additional evidence on this subject.

The same conclusion applies to the State's objections to the admission of this statement on the basis that "Mr. Gingras did not testify as to the magnitude of the alleged effect, and did not testify that it was substantial." The absence of testimony about the magnitude of the effect goes to its weight, not

admissibility.

Defendant's next objection that Plaintiffs have misstated Mr. Gingras' testimony is unfounded.  He testified:

> Q.... [A]s you sit here today, wouldn't you agree that eliminating the striped bass regulations that limit the catch and the size of striped bass that anglers in the Delta can take, that getting rid of those regulations would have the effect of reducing in some amount the striped bass the striped bass population?
>
> A. I agree that that's the case.

Gingras Depo. at 612:1-9.  The testimony is unambiguous.

State Defendant next argues that the deposition testimony of Mr. Gingras, the Rule 30(b)(6) designee for Defendant, is not binding.  This objection is addressed above.  State Defendant may offer explanatory evidence.

- <u>**"Estimating striped bass predation on winter-run and spring-run Chinook salmon averages between 5% and 25%."  PSUF 3(A).**</u>

Defendant objects to this statement on the ground that Mr. Gingras was "speculating" and "guessing" as to the predation levels.  Doc. 123-2 at 12:13-17.  Mr. Gingras did state elsewhere that providing a specific percentage would be speculation, Gingras Depo. 388:23-389:2, 496:21-23, 533:15-21, 605:12-22.  Nevertheless, after specific instruction from his attorney not to answer the question if he had to speculate, Gingras

27

1   testified to a specific range:

2           MS. WORDHAM: If you have to speculate, then you
3           have no answer to give him. You just don't know.
                            ***
4           MR. WEINSTOCK: If you're just throwing darts at
            the board and your opinion is no better than
5           mine or just chance, you can say that. But if
            you think you have an opinion that's of some
6           value, then we want you to give it to us and
            we'll take it for what it's worth.
7                           ***
8           THE WITNESS:  Sure.  I think it's plausible that
            -- and this is more or less a conclusion based
9           on a number of studies and understanding the ups
            and downs of things -- that for both winter-run
10          and spring-run, the range would be maybe 5 to 25
            percent.
11
            BY MR. WEINSTOCK: Q. Okay. 5 at the low end and
12          25 at the high end?

13          A. Correct.

14  Gingras Depo. 496:24-498:21.

15       Mr. Gingras was clearly instructed not to speculate,

16  and he answered the question with an estimate based on

17

18  his experience and study, by defining a range of

19  percentage effects.  This testimony is admissible.  Other

20  statements elsewhere in the record providing predation

21  estimates go to the weight of his proffered predation

22
    figures, not their admissibility.  The objection is

23
    OVERRULED.
24

25      • "[S]triped bass predation is one of many factors
          contributing to the decline of the listed species."
26        SUF 3(B).

27      • "[P]redation by striped bass increases mortality on
          those listed species."  SUF 3(C).
28

28

1    The objections to these two statements are

2  substantially the same as made to the statement in PSUF

3  2A.  The same reasoning applies.  The objections are

4  OVERRULED.

5
•  "**Striped bass predation 'can influence viability of**
6  **Central Valley Salmonoids."  SUF 3(D).**

7    State Defendant objects to the inclusion of Mr.

8  Gingras' admission that striped bass predation "can

9  influence viability of Central Valley Salmonoids" on the

10  basis that Mr. Gingras testified that <u>quantifying</u> such

11
effect would be speculation.  Doc. 123-2 at 12:20-21.

12
But, Mr. Gingras' was not asked to quantify the effect;

13
he was only asked to confirm whether there was an

14
"influence":

15
16          Q. Okay. Let's look at paragraph two of your
email. At the end of paragraph two you state:
17          "NMFS recently published a report on a model
that shows predation by striped bass can
18          influence viability of Central Valley salmonids,
but that is no surprise."
19
20                          ***

21          Q. ... And you say that the conclusion that
striped bass can influence the viability of
22          Central Valley salmonids, you say that that is
no surprise. And why do you say that?
23
24          A. I don't recall why I said that.

25          Q. Do you agree with that today?

26          A. Yes.

27
Gingras Depo. at 643:5-644:2.  State Defendant's
28

objection is OVERRULED.

- **"[A]greeing with findings by Linley & Mohr regarding the effects of striped bass predation on winter-run chinook salmon."  SUF 3(F).**

Defendant objects to the statement that Mr. Gingras agreed "with findings by Linley & Mohr regarding the effects of striped bass predation on winter-run chinook salmon," arguing that Mr. Gingras did not "agree," but only that he found the statements by Linley & Mohr plausible.  Doc. 123-2 at 13:1-4.  This is a distinction without a difference, as Plaintiffs only relied on Mr. Gingras' statement to support its assertion that the conclusion of the Lindley & Mohr paper is not in dispute. This statement is admissible.  The objection is OVERRULED.

- **"I do agree that reduction in striped bass abundance ... would reduce total juvenile salmon predation and mortality, with a corresponding increase in juvenile salmon survival."  SUF 4(A).**

State Defendant objects to the admission of this statement on the ground that Mr. Gingras stated he would be "speculating" when offering figures for striped bass predation and because Mr. Gingras did not testify as to the magnitude of any effect.  Doc. 123-2 at 19:7-16, 32:27.  This objection is OVERRULED because this statement does not offer any figures for striped bass predation nor does it address the magnitude of any

30

predation effect.  This is an expert opinion form the State's qualified witness.

- "[A]dmitting that striped bass predation is one of the factors contributing to the decline of the winter-run and spring-run Chinook salmon."  SUF 7(B).

State Defendant objects to the inclusion of this admission by Mr. Gingras' on the basis that Mr. Gingras stated it was one of "many" factors contributing to the decline, and that while it was his personal opinion, he did not know if it was the consensus view, but his opinion is stated with reasonable certainty as a scientist.  Doc. 123-2 at 24:25-25:2.  These concerns go to the weight of the evidence not its admissibility.  The objection is OVERRULED.

- "[A]dmitting 'predation by striped bass increases mortality on those listed species."  SUF 7(C).

Defendant objects to this admission by Mr. Gingras on the basis that the statement is irrelevant because the reference discusses mortality and does not address decline, suggesting that the two concepts are not equivalent.  (Def.'s Objections at 25:3.)  These concerns go to the weight of the evidence not its admissibility.  The objection is OVERRULED.

- "[A]dmitting Striped bass predation 'can influence viability of Central Valley Salmonoids.'"  SUF 7(D).

Defendant objects to the inclusion of this admission

by Mr. Gingras' on the basis that Mr. Gingras was

responding to a "hypothetical with a hypothetical," but

State Defendants fail to point to the hypothetical to

which Mr. Gingras was originally responding.  His answer

was not hypothetical.  Mr. Gingras confirmed this

assertion during his deposition:

> Q. Okay. Let's look at paragraph two of your
> email. At the end of paragraph two you state:
> "NMFS recently published a report on a model
> that shows predation by striped bass can
> influence viability of Central Valley
> salmonids, but that is no surprise."
>
> So is this sentence referring to the article by
> Steve Lindley? I can't remember if there was a
> co-author. Why don't you tell us what report
> you're referring to.
>
> A. I have to tell you, I don't remember this
> message at all. But from what's there, I would
> conclude that I was talking about Lindley and
> Mohr 2003.
>
> Q. Okay. And we've seen that already, and we've
> talked about it.
>
> And you say that the conclusion that striped
> bass can influence the viability of Central
> Valley salmonids, you say that that is no
> surprise. And why do you say that?
>
> A. I don't recall why I said that.
>
> Q. Do you agree with that today?
>
> A. Yes.
>
> Q. And why do you think it is no surprise?
>
> A. Because striped bass are abundant and
> piscivorous, and the nature of their model was
> such that it could forecast an impact.

32

        Q. It did forecast an impact?

        A. It did forecast an impact.

        Q. And you found that report to be persuasive
        and reliable?

        A. I was not able to determine whether it was
        reliable. It was certainly persuasive. As I
        mentioned, I got in touch with Steve Lindley to
        try to discuss the reliability of the report and
        he didn't respond.

Gingras Depo. 643:5-644:15. State Defendant correctly

point out that Mr. Gingras' testimony states that striped

bass predation "can" influence the viability of the

listed species, not that it "does." Doc. 123-2 at 25:4-

7. However, this objection goes to the weight of the

evidence, not its admissibility. The objection is

OVERRULED.

- "[A]dmitting that eliminating the size and two fish
  bag limit 'would reduce the predation' on the
  winter-run chinook salmon and spring-run chinook
  salmon.'"   SUF 8(A).

- "[A]dmitting eliminating the striped bass catch and
  size limits would reduce the striped bass
  population."   SUF 8(B).

    Defendant objects to these statements by Mr. Gingras'

on the basis that Mr. Gingras declined to estimate a

magnitude for any such effect. Doc. 123-2 at 27:4-8.

These objections go to the weight of this generic

evidence, not its admissibility. The objections are

OVERRULED. State Defendant may present explanatory, more

specific evidence.

- **"[A]dmitting that deregulation would benefit the salmon species."  SUF 9(A), 10(B).**

- **"[A]dmitting that 'odds are' that deregulation is likely to help the salmon recovery.'"  SUF 9(B), 10(C).**

State Defendant first objects to these statements on the basis that Mr. Gingras stated he disagreed that the magnitude of any such effect would be substantial.  Doc. 123-2 at 29:12-16  This objection goes solely to the weight of the evidence, not its admissibility.  The objection is OVERRULED.

State Defendant also objects that Mr. Gingras stated he did not know how effective it would be to deregulate striped bass sportfishing.  Doc. 123-2 at 32:21-26. Again, this objection goes to weight, not admissibility. While Mr. Gingras could not provide a specific percentage or numerical value of the positive impact resulting from deregulation, he confirmed that deregulation would benefit the Listed Salmon.  Gingras Depo. at 474:1-5.

These objections are OVERRULED.

- **"[A]dmitting that modifying the striped bass sport-fishing regulations would have some 'beneficial effect.'"  SUF 9(D), 10(E).**

State Defendant objects to this statement on the ground that Mr. Gingras did not testify as to the magnitude of any effect.  Doc. 123-2 at 29:27, 33:1-2.

This objection, which goes to weight, not admissibility, is OVERRULED.

- "[A]dmitting that eliminating the striped bass sportfishing regulations would contribute to the recovery of the winter-run and spring-run salmon, assuming that deregulation would reduce striped bass abundance."  SUF 9(E), 10(F).

Defendant objects to the inclusion of statement on the grounds that Mr. Gingras stated he would be speculating when offering figures for striped bass predation and that he did not testify as to the magnitude of any effect.  Doc. 123-2 at 30:1, 33:3.  As discussed above, these objections go to weight not admissibility and are OVERRULED.

- "[A]greeing with Dr. Hanson's conclusion that a reduction in the striped bass population would contribute 'to a reduction in the risk of extinction of winter-run salmon.'"  SUF 10(A).

This statement is offered to support the factual assertion that "enjoining the enforcement of the striped bass sportfishing regulations would likely benefit [winter-run] and [] spring-run [] by reducing their risk of extinction."  PSUF #10(A).  Defendant objects that PSUF 10A, a characterization of Mr. Gingras' testimony, does not support the general assertion in PSUF 10, because Mr. Gingras was responding to questions about Dr. Hanson's report, which assumed a hypothetical reduction in striped bass population, rather than injunction of the

striped bass sportfishing regulations.   Doc. 123-2 at

32:17-20.   This objection goes to the weight of PSUF 10A,

not its admissibility.   The objection is OVERRULED.

In the final analysis, the extent of predation of

protected salmonids by striped bass and the materiality

of the benefit of a reduction of striped bass population

is what is to be decided.   Even without magnitude, Mr.

Gingras' testimony directly addresses these issues.

b.   Deposition Testimony of Matthew Nobriga.

Defendant has also objected to statements

characterizing the testimony of its designated expert,

Matthew Nobriga.

- "[E]stimating that striped bass predation on winter-
  run and spring-run chinook salmon averages between 6%
  and 50%."   SUF 3(G).

Defendant objects to the inclusion of Mr. Nobriga's

predation estimates on the basis that Mr. Nobriga

testified that making such an estimate would be "silly."

(Def.'s Objections at 13:5-7.)   However, Mr. Nobriga did

offer his own predation estimates:

> Q. Okay. So I think you've given us a range for
> the salmonids, call it a ballpark of
> reasonableness -- at least that's what I'll call
> it, you can call it something else -- for these
> estimates of somewhere roughly between 6 or 10
> percent at the low end and around 50 percent at
> the high end for the winter-run and spring-run
> salmon. Is that right?
>
> A. Yes.

1

2      Q. And for the steelhead, I take it you feel the
       data is just so insufficient that you don't even
3      have the beginnings of an opinion on the
       subject?

4
       A. Yes.
5
       Q. And for delta smelt, what's the range you
6      could feel comfortable with for the predation
       estimates, upper and lower?
7

8      A. I don't know. From a scientific perspective,
       this is silly to me. I mean, it's just pulling
9      numbers out of the air.

10     Q. Well, I assume that this is something that
       you have studied and discussed at length. So
11     your opinion is worth certainly more than mine,
       so I'm asking for your opinion.
12

13     A. I'm trying to remember papers that I've seen
       where a predation estimate on a pelagic fish
14     population has been published. So a low-end
       estimate that's reasonable is probably 20
15     percent ....

16
Nobriga Depo. at 119:1-120:2.  Any statements Mr. Nobriga
17
may have made elsewhere regarding the speculative nature
18
of any predation estimates go to the weight of this
19
evidence, not its admissibility.  He has expressed his
20
opinion by giving an estimate.  The objection is
21
OVERRULED.
22

23     • "[A]greeing that Linley & Mohr used a sound
         scientific method when estimating striped bass
24       predation on winter-run chinook salmon averaged 9%."
         SUF 3(H).
25

26     Defendant objects to this statement on the basis that
27
Mr. Nobriga indicated elsewhere he would be speculating
28
                              37

as to whether the estimate is high or low, and that he disagreed with their findings regarding survival and extinction possibilities.  Doc. 123-2 at 13:8-10.  This statement does not offer Mr. Nobriga's own predation estimates.  It merely confirms that Linley & Mohr's study used a sound scientific method in reaching their conclusions.  See Nobriga Depo. at 110:25-111:2.  The objection is OVERRULED, but this does not preclude State Defendant from presenting contrary predation estimates.

- "[A]greeing with Dr. Hanson's conclusion that 'a reduction in striped bass abundance would not be expected to substantially increase other salmon predators in the River, but rather would reduce total juvenile salmon predation and mortality, with a corresponding increase in juvenile salmon survival.'" SUF 9(F), 10(G).

Defendant objects to this admission by Mr. Nobriga on the grounds that Mr. Nobriga's qualified his agreement with Dr. Hanson in various ways.  Doc. 123-2 at 19:23-20:1, 30:2, 33:4-5.  These qualifications do not completely undermine Mr. Nobriga's agreement with Dr. Hanson's conclusion:

> Q. Okay. I just wanted to find out if you agree or disagree with that [paragraph reflecting Dr. Hanson's conclusion].
>
> A. I agree with it.

Nobriga Depo. 259:24-260:6.  Mr. Nobriga's qualifications go to the weight not the admissibility of his testimony.

38

The objection is OVERRULED.

- **"I would agree that less striped bass would create some increase in salmon.'"  SUF 9(G), 10(H).**

Defendant similarly objects to this characterization of Mr. Nobriga's testimony as "misstated" because Mr. Nobriga testified that he did not know whether the relationship would be proportionate.  Doc. 123-2 at 20:2-3, 30:3, 33:6-7.  This objection, which goes to weight not admissibility, is OVERRULED.

        c.  **Objections to Documents.**

State Defendant has also objected to a number of documents.

- **Department Of Fish And Game Memorandum Authored By Stevens and Delisle: SUF 2(B).**

State Defendant objects on several grounds to the admission of a CDFG memo authored by Don Stevens and Glen Delisle, two key CDFG biologists.

State Defendants objection on relevancy grounds is unfounded, as this is a CDFG document analyzing the impact of eliminating the striped bass sport-fishing regulations is clearly relevant to this case.

State Defendants also object that the document "does not reflect the official position of the State Defendant."  This objection, which is unsupported by any caselaw, has no bearing on document's admissibility.

State Defendant's objection that the document is unauthenticated is also unfounded, because, as a CDFG document produced by Defendant in response to a discovery request, the document has been authenticated by Defendant. *See Orr v. Bank of Am.*, 285 F.3d 764, 777 n.20 (9th Cir. 2002) (confirming that documents produced in response to discovery are deemed authentic when offered by the party-opponent).

Finally, State Defendant asserts "CDFG employees testified they disagreed with any statement in the memo as to magnitude." Doc. 123-2 at 6:20-23. But, the existence of any such contrary testimony goes to the weight of this evidence, not its admissibility.

The objections to this document are OVERRULED.

- <u>Department Of Fish And Game Proposed changes to marine sport fishing regulations for the 2006 triennial process: SUF 2(C).</u>

Defendant has objected that the document is not relevant to this litigation on the grounds that the increase in striped bass catches associated with changed sportfishing regulations would not necessarily equate to a reduced striped bass population. This objection goes to weight, not admissibility.

Defendant has also objected that the document lacks foundation. Although it is not clear, it appears that State Defendants advance the same authentication

objection rejected above.

The objections to this document are OVERRULED.

• <u>Draft Conservation Plan For The California
Department Of Fish And Game Striped Bass Management
Program: SUF 2(D), 4(K).</u>

Defendant's relevance objection is unfounded, because

this is a CDFG document analyzing the impact of

eliminating the striped bass sport-fishing regulations, a

subject that is relevant to this case.

State Defendant also objects to Plaintiffs' reliance

on a statement in the conservation plan that "it is

reasonable to assume that predation on winter-run chinook

salmon ... would decrease roughly in proportion to

whatever decline occurred in striped bass abundance due

to regulation changes" because the report allegedly lacks

foundation and does not offer support for this statement.

Doc. 123-2 at 20:16-17.

The foundational objection has been rejected.  As to

the objection that the document lacks internal support

for this assertion, this goes to weight not

admissibility.

The objections to this document are OVERRULED.

• <u>Donald Koch's Supplemental Responses To Plaintiffs'
First Set Of Requests For Admissions No. 2: SUF
2(E).</u>

Defendant also objects to the inclusion of Donald

41

Koch's own interrogatory response on the basis of relevancy, claiming that the response does not contain an estimate of magnitude with respect to the increase in striped bass as a result of the sport-fishing regulations.  Doc. 123-2 at 7:5.  This objection is without merit, as this general response by CDFG's Director analyzing the impact of the striped bass sport-fishing regulations is relevant to this case.

That the interrogatory response does not estimate the magnitude of the impact on the striped bass population goes to its weight, not its admissibility.

The objections to this document are OVERRULED.

- **E-Mail From Marty Gingras To Geoff Malloway: SUF 2(I).**

Defendant also objects to the inclusion of Mr. Gingras' statement that eliminating the striped bass regulations "would reduce" the population on the basis that the e-mail also notes "changes in Delta habitat" as "the fundamental problem for native fish species."  Doc. 123-2 at 7:15-16.  The fact that the email identifies an alternative source of mortalty as the "fundamental problem" goes to the weight of the statement, not its admissibility.

The objections to this document are OVERRULED. State Defendant may present the context within which the

statement is made.

- **<u>Biological Assessment For The Department Of Fish And Game Striped Bass Management Program: SUF 2(K), 4(I), 4(J).</u>**

Defendant objects to Plaintiffs' reliance on the statement by State Defendant in its own Biological Assessment that the sport-fishing regulations maintain striped bass abundance at a greater level than if fishing were unregulated, on the ground that the admission is irrelevant since the assessment gives no estimate of magnitude.  Doc. 123-2 at 7:20-21.  This objection, which goes to weight, not admissibility, is OVERRULED.  The magnitude may be relevant to the ultimate outcome of Plaintiffs' claims, and State Defendants may present evidence that clarifies its own general statements about the effect of striped bass abundance.

State Defendant raises the same objection to Plaintiffs' reliance on statements in the Biological Assessment that: (1) the result of maintaining striped bass abundance at a greater level "is greater predation on the species of concern," arguing that the statement is irrelevant because the environmental document does not provide any estimate of magnitude, Doc. 123-2 at 20:14; and (2) that eliminating striped bass regulations "would further depress the striped bass population and reduce

predation on winter-run chinook salmon," Doc. 123-2 at 20:15.  The result is the same.  These objections, which go to weight not admissibility, are OVERRULED.

- **Nobriga & Feyrer Shallow-Water Piscivore-Prey Dynamics In The Delta: SUF 3(J), 7(H).**

Defendant also objects to Mr. Nobriga's statement, in a peer reviewed scientific article, that "striped bass likely remains the most significant predator of Chinook salmon."

State Defendants argue that the statement is hearsay and lacks foundation.  But, the statement was included in a report drafted by State Defendant's expert, identified and relied on by the Defendant's expert in reaching his opinions, *see* Doc. 124, Exh. A, October 1, 2009 Report by Matthew L. Nobriga ("Nobriga Report"), and was produced by Defendant in response to discovery.  Therefore, Defendant's foundation and hearsay objections are meritless.  *See Orr v. Bank of Am.,* 285 F.3d at 777 n.20; Fed. R. Evid. 803(18), 807.

State Defendants also argue that the statement is irrelevant because even if the striped bass is the "most significant predator of Chinook salmon, this does not mean that: (1) they are a significant predator; (2) predation is a significant cause of salmon mortality; or (3) eliminating striped bass will reduce salmon

mortality." Doc. 123-2 at 13:13-18.  This objection goes

to the weight, not the relevance of the statement, which

provides some support for Plaintiffs' theory that striped

bass prey on Chinook salmon.

State Defendant further objects on the basis of

relevancy because the report only discusses striped bass

as a predator and does not discuss decline of the species

overall.  Doc. 123-2 at 25:13-14.  This objection goes to

weight, not relevance, as there is clear relevance to

evidence that the striped bass prey on the Listed

Species.

- **Lindley & Mohr Modeling The Effect Of Striped Bass
  Report: SUF 3(K), 7(I), 10(K).**

Defendant also objects to Plaintiffs' reliance on a

scientific, peer-reviewed article that concludes that

"the current striped bass population of roughly 1x10^6

adults consumes about 9% of winter-run chinook salmon

outmigrants," asserting that the statement is hearsay,

lacks foundation, and that Defendant's expert's report

disputes this modeling.  Doc. 123-2 at 13:19-14:3, 33:10.

The foundation objection is without merit because at

least one of Defendant's experts discusses this document

at length.  *See* Doc. 124, Exh. A, Nobriga Report.

Because experts may rely on hearsay, that objection is

also without merit.  The objection that the report is

disputed by Defendant's expert goes to weight, not admissibility.

The same applies to State Defendant's objection that the report is irrelevant because it only discusses striped bass predation as a "risk factor" and does not discuss decline of the population overall.  Doc. 123-2 at 25:15-16.  This goes to weight, not relevance.

The objections are OVERRULED.

- <u>National Marine Fisheries Service Public Draft Recovery Plan: SUF 7(F), 7(G).</u>

State Defendant objects to Plaintiffs' reliance on a report prepared by the National Marine Fisheries Service ("NMFS"), arguing that the report's statement that "predation of Chinook salmon and steelhead from introduced species such as striped bass and black bass [is an important stressor]" is hearsay and irrelevant because it fails to discuss decline of the species overall.  Doc. 123-2 at 25:9-10.  The relevancy objection is OVERRULED, as it goes to the weight, not admissibility of this document.

The hearsay objection is overcome by an expert's right to rely on hearsay, as well as by Federal Rule of Evidence 803(8), which applies to "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of

the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report...."  The Recovery Plan, which is a policy document, describes "matters observed pursuant to a duty imposed by law," the evaluation of the status of listed species under the jurisdiction of NMFS.  Documents such as the Recovery Plan are also routinely the subject of judicial notice under Federal Rule of Evidence 201.

The same analysis applies to State Defendant's objections to a statement in the Recovery Plan that calls for implementation of "programs and measures designed to control non-native predatory fish ... including harvest management techniques."  The analysis is relevant to recovery of the species and the claim that the statement fails to support the material fact at issue, Doc. 123-2 at 25:9-10, 30:4-5 and 33:11, goes only to the weight of the opinion.

State Defendant's objection to Plaintiffs' reliance on the NMFS Recovery Plan for the truth of the matters asserted therein is OVERRULED.

    5.   <u>Central Delta's Objections to Plaintiffs'
         Statement of Undisputed Material Facts.</u>

Central Delta's objections to Plaintiffs' Statement of Undisputed Material Facts incorporate the arguments made by the State Defendants.  *See* Doc. 125-2.

47

Plaintiffs' argue that Central Delta's objections should be stricken on the grounds that they violate the May 28, 2008, Order strictly limiting Central Delta's intervention in this case to "issues about which they can provide unique information and/or arguments."  Doc. 32 at 11.  Here, the only unique issue Central Delta expressed any intention to address is the effect of the CVPIA on State Defendant's liability.  Central Delta's objections have nothing to do with their CVPIA argument.  For this reason and because the objections are cumulative of the State Defendant's objections, Central Delta's objections are not considered.  They add nothing and have been decided by the rulings on the State Defendant's objections.

      6.   <u>Plaintiffs' Objections to the Declaration of Robert Souza.</u>

    In support of its motion for summary judgment, Central Delta offers the Declaration of Robert Souza, who opines about the causes of harm to the Listed Species.  Mr. Souza claims no expertise that qualifies him to opine on these subjects.  Nevertheless, he opines, based on his years of fishing the Delta, that the general decline in delta smelt "is not due to striped bass predation, but instead is attributable to excessive export pumping from the Delta," Doc. 125-4 at ¶9, and that the "construction

and excessive operation of the massive projects to divert
water in the south Delta for agriculture and other human
uses have had a tremendously negative impact on striped
bass, [the delta smelt], and other fish in the Delta."
*Id.*

Plaintiff objects that Mr. Souza's Declaration is
inadmissible as improper lay opinion.  Under Federal
Rules of Evidence 701, lay opinions cannot be "based on
scientific, technical, or other specialized knowledge
within the scope of Rule 702."  The purpose of this rule
is to prevent a party from offering an expert opinion "in
lay witness clothing," and thereby evading Federal Rules
of Evidence 702's requirements and the corresponding
disclosure requirements under Rule 26.  *See United States
v. Conn.*, 297 F.3d 548, 553 (7th Cir. 2002).  Mr. Souza's
opinions regarding the cause of the decline in delta
smelt and the impacts of water diversion from the Delta
are just that, as they require scientific, technical, or
specialized knowledge that exceed the scope of common
experience.  *E.g., Certain Underwriters at Lloyd's,
London v. Sinkovich*, 232 F.3d 200, 204-06 (4th Cir. 2000)
(error to allow lay witness to answer questions on
matters exceeding scope of common experience).  Mr.
Souza's declaration is STRICKEN.

        7.   **Requests for Judicial Notice.**

        **Central Delta** requests that judicial notice be taken
of 10 documents that are public records.  Doc. 125-3.
Plaintiffs request that judicial notice be taken of a
U.S. Fish and Wildlife Service ("FWS") webpage and a
portion of a March 3, 2010 California Fish and Game
Commission ("CFGC") meeting, submitted on DVD.  Doc. 145.
All of the documents offered by Central Delta, along with
the FWS web page and the DVD depicting the CFGC meeting,
are subject to judicial notice under Federal Rule of
Evidence 201 to prove their existence and content, but
not for the truth of the matters asserted therein.  This
means that factual information asserted in these document
or the meeting cannot be used to create or resolve
disputed issues of material fact.

**C.   Standing of Dee Dillon.**

        1.   **General Legal Standard.**

        Standing is a judicially created doctrine that is an
essential part of the case-or-controversy requirement of
Article III.  *Pritikin v. Dept. of Energy*, 254 F.3d 791,
796 (9th Cir. 2001) (citing *Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 560 (1992).  "To satisfy the
Article III case or controversy requirement, a litigant
must have suffered some actual injury that can be

redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To have standing, a plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. 560-61 (internal citations and quotations omitted).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume

that general allegations embrace those specific
facts that are necessary to support the claim.
In response to a summary judgment motion,
however, the plaintiff can no longer rest on
such "mere allegations," but must "set forth" by
affidavit or other evidence "specific facts,"
Fed. Rule Civ. Proc. 56(e), which for purposes
of the summary judgment motion will be taken to
be true. And at the final stage, those facts (if
controverted) must be supported adequately by
the evidence adduced at trial.

*Id.* at 561; *see also Churchill County v. Babbitt*, 150

F.3d 1072, 1077 (9th Cir. 1998).

A plaintiff is not required to prove that he would

succeed on the merits to summarily adjudicate his

standing to sue. *Farrakhan v. Gregoire*, 590 F.3d 989,

1001 (9th Cir. 2010) (granting summary judgment and

noting that "[w]hether Plaintiffs can succeed on their []

claim is irrelevant to the question whether they are

entitled to bring that claim in the first place.").

Plaintiffs suggest that, "even in the face of

conflicting evidence," Mr. Dillon will satisfy his burden

of proof so long as he shows a "substantial probability

that [he] has been injured, that the defendant caused

[his] injury, and that the court could redress [the]

injury."  Doc. 116 at 15 (quoting *Sierra Club & Envtl.*

*Tech. Council v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).

This is misleading.  Each element of standing "must be

supported in the same way as any other matter on which

the plaintiff bears the burden of proof, *i.e.,* with the

manner and degree of evidence required at the successive
stages of litigation." *Lujan*, 504 U.S. at 561.  Unlike
in *Lujan*, where the plaintiff was the non-movant whose
factual submissions on summary judgment were "taken to be
true," *id.*, here, Mr. Dillon, as the moving party, has
the burden of proof on an issue at trial and must
"affirmatively demonstrate that no reasonable trier of
fact could find other than for the moving party."
*Soremekun*, 509 F.3d at 984.  At the summary judgment
stage, Mr. Dillon can satisfy his burden only by showing
that the <u>undisputed evidence</u> establishes that no
reasonable trier of fact could find that he has not
satisfied the relevant legal standard applicable to each
element of the standing inquiry.

 2. <u>Injury In Fact.</u>
  a. <u>Legal Standard.</u>

Dee Dillon first must establish that he has suffered
an injury in fact, which *Lujan* defines as "an invasion of
a legally protected interest which is (a) concrete and
particularized; and (b) actual or imminent, not
'conjectural or hypothetical.'"  504 U.S. at 560
(internal citations omitted).

The Supreme Court recently examined the "injury in
fact" component of constitutional standing in *Summers v.*

*Earth Island Institute*, 129 S. Ct. 1142 (2009), addressing whether environmental organizations had standing to challenge a U.S. Forest Service regulation that exempted small fire-rehabilitation and timber-salvage projects from the Service's notice, comment, and appeal process. *Id*. at 1147.  Although the plaintiffs originally challenged the regulations and an individual salvage sale under the regulations, the dispute as to the individual salvage sale was subsequently settled, limiting the lawsuit to the facial challenge.  *Id*. at 1148.  Noting the language in *Lujan* that "it is substantially more difficult to establish" standing when "the plaintiff is not himself the object of the government action," *Summers* concluded that the plaintiffs' affidavits failed to establish that the plaintiffs had suffered the concrete and particularized injury required of constitutional standing.  *Id*. at 1149 (quoting *Defenders of Wildlife*, 504 U.S. at 562).

The *Summers* Court reviewed a plaintiff's affidavit alleging that he suffered injury in the past from development on Forest Service land.  The Court rejected this factual claim as a basis for standing "because it was not tied to application of the challenged regulations, because it does not identify any particular

54

site, and because it relates to past injury rather than imminent and future injury that is sought to be enjoined." *Id.* at 1150.  It was not sufficient for plaintiff to assert that he has visited many National Forests and plans to visit other unnamed National Forests in the future, because although "[t]here may be a chance, [it] is hardly a likelihood, that [plaintiff's] wanderings will bring him to a parcel about to be affected by a project unlawfully subject to the regulations."  *Id.*

The *Summers* plaintiff did refer specifically to a series of projects in the Allegheny National Forest that were subject to the challenged regulations.  However, his claim that he "want[ed] to" visit those specific sites was insufficient for lack of specificity.  *Id.*  "This vague desire to return is insufficient to satisfy the requirement of imminent injury: 'Such "some day" intentions -- without any description of concrete plans or indeed any specification of *when* the some day will be -- do not support a finding of the 'actual or imminent' injury that our cases require.'"  *Id.* at 1150-1151 (quoting *Lujan*, 504 U.S. at 564) (emphasis in the original).

To satisfy the injury-in-fact component of Article

55

III standing *Summers* requires environmental plaintiffs
to: (1) identify a "particular site" affected by the
challenged action that they intend to visit; and (2)
provide evidence of "concrete plans," including specific
dates, to visit those such sites.  Plaintiffs bear the
burden of showing the "likelihood" that they will visit
such sites.  *See id*. at 1150-51.  In other words, there
must be a "geographic nexus between the individual
asserting the claim and the location suffering an
environmental impact." *Ashley Creek Phosphate Co. v.
Norton*, 420 F.3d 934, 938 (9th Cir. 2005).  This
geographic nexus must be site-specific.  Citing *Summers*
and *Lujan*, the Seventh Circuit observed: "When
governmental action affects a discrete natural area, and
a plaintiff merely states that he uses unspecified
portions of an immense tract of territory, such averments
are insufficient to establish standing." *Pollack v.
United States*, 577 F.3d 736, 742 (7th Cir. 2009).
However, "repeated recreational use itself, accompanied
by a credible allegation of desired future use, can be
sufficient, even if relatively infrequent, to demonstrate
that environmental degradation of the area is injurious
to that person." *Ecological Rights Foundation v. Pacific
Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000).  Mr.

56

Dillon does not need to show actual harm, as a mere "increased risk of harm can itself be injury in fact sufficient for standing."  *Id.* at 1151.

    b.  <u>Previous Ruling.</u>

    Although Plaintiffs' previous motion for summary judgment on the issue of standing was denied without prejudice on the ground that there were material factual disputes relevant to causation and redressibility, Mr. Dillon was found to have satisfied the injury-in-fact requirement:

> ... Mr. Dillon declares that he has visited the Delta "to appreciate the natural environment, to escape from the urban environment, and to engage in numerous recreational activities, including recreational boating, swimming, snorkeling, kayaking, and wildlife viewing."  Dillon Decl., Doc. 57-5, at ¶3.  Through these activities he has "been able to gain significant exposure to the Sacramento River winter-run chinook salmon, Central Valley spring-run chinook salmon, Central Valley steelhead, and delta smelt ("Listed Species"). When [he] encounters the Listed Species [he] is generally filled with a sense of appreciation and satisfaction."  *Id.*
> Mr. Dillon Continues:

> My encounters with the Listed Species have occurred through a variety of different circumstances.  For example, I have witnessed salmon migrating through the Delta from a kayak, and viewed delta smelt while riding on a trawl vessel.  I have also viewed Listed Species while photographing the Delta's diverse wildlife, and while swimming along the Delta's banks.  These are but a few examples of my various experiences, and are in no way intended to be a comprehensive list.

*Id.* at ¶4.  He further states that "the decline of the Listed Species, which I have personally witnessed over the last seven years, has negatively impacted my use and enjoyment of the Delta.  For example, as a result of the decline of the Listed Species, my ability to fish for and view salmon has been significantly impaired."  *Id.* at ¶6.  Mr. Dillon is a person "for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 183 (2000).

[Summary of *Summers'* requirement that plaintiffs have concrete plans to visit the affected area.]

In support of their motion for partial summary judgment on the issue of standing, Plaintiffs originally submitted only Mr. Dillon's declaration.  His declaration arguably did not satisfy *Summers* because, although Mr. Dillon "plans to continue frequenting the Delta," Dillon Decl., Doc. 57-5, at ¶ 6, he does not set forth any specific facts describing "concrete plans" for doing so.  However, on May 27, 2009, Mr. Dillon filed responses to State Defendant's interrogatories, in which he describes specific plans to return to the Delta to fish for Listed Species over the 2009 Labor Day weekend.  *See* Second Fuchs. Decl., Doc. 69-2, at Ex. A.  This is sufficient evidence of Mr. Dillon's "concrete plans."  State Defendants no longer contest Mr. Dillon's injury in fact.  Mr. Dillon satisfies the injury in fact requirement for purposes of standing.

Doc. 85 at 29-31.

This ruling is not dispositive of the challenge to standing here, because a plaintiff must retain standing throughout the litigation.  The case-or-controversy requirement of Article III of the U.S. Constitution "subsists through all stages of federal judicial proceedings, trial and appellate."  *Lewis v. Continental*

*Bank*, 494 U.S. 472, 477 (1990).  "To qualify as a case

fit for federal-court adjudication, an actual controversy

must be extant at all stages of review, not merely at the

time the complaint is filed."  *Davis v. Federal Election

Commission*, 128 S. Ct. 2759, 2768 (2008) (internal

quotation and citation omitted).  "[T]he requirement that

a claimant have 'standing is an essential and unchanging

part of the case-or-controversy requirement of Article

III.'"  *Id*. (quoting *Lujan*, 504 U.S. at 560).  "The

parties must continue to have a personal stake in the

outcome of the lawsuit."  *Lewis*, 494 U.S. at 478

(internal quotations and citations omitted).

    c. **Does Mr. Dillon Remain a Person "For Whom
the Aesthetic and Recreational Values of a
Particular Area will be Lessened by the
Challenged Activity?"**

     (1) **Mr. Dillon's General Assertions of
Harm.**

  For the purposes of standing, an environmental

plaintiff, such as Mr. Dillon, demonstrates injury in

fact if he uses the affected area and is a person "for

whom the aesthetic and recreational values of the area

will be lessened by the challenged activity."  *Laidlaw*,

528 U.S. at 183.

  Mr. Dillon has visited the Sacramento-San Joaquin

Delta more than 200 times since 2001, including 5 visits

59

in 2008-09.  During his visits, Mr. Dillon spent several hundred days in the Delta engaging in numerous recreational activities, including boating, fishing, wildlife photography, swimming, snorkeling, kayaking, and viewing wildlife, including the listed salmon and steelhead.  *See* Rubin Opp'n Decl., Doc. 119-3, Exh. 2 ("First Dillon Depo.") at 49:3-52:13, 25:19-26:2, 26:21-27:2; Dillon Opp'n Decl., Doc. 119-2, ¶¶ 1-2; Wordham Decl., Doc. 113-4, Exh. B ("Dillon Interrog. Resps.") at 3:22-7:16.

During his fishing trips in the Delta, Mr. Dillon fishes for a variety of fish, including striped bass, steelhead, and salmon, when doing so is legal.  First Dillon Depo. at 33:6-10, 34:8-10, 35:25-36:8, 73:24-74:6, 76:2-6; First Dillon Decl., Doc. 114-4 ¶5.

Mr. Dillon enjoys viewing the Delta's native wildlife, and has viewed and taken photos of salmon both in the Delta and in rivers upstream of the Delta.  First Dillon Depo. at 55:12-18, 60:11-23, 103:16-104:13; First Dillon Decl. ¶¶ 3-4; Dillon Opp'n Decl. ¶¶ 1-2.

While Mr. Dillon tries to enjoy the aesthetic benefits of the Delta and its native fish, the depleted numbers of the Listed Species make it more difficult to view and take pictures of them.  First Dillon Depo. at

58:2-17; First Dillon Decl. ¶¶ 3-4, 6; Dillon Opp'n Decl. ¶¶ 1-2, 4.

### (2)  Recreational Interests.

Mr. Dillon's alleges injuries to his recreational interests, including boating, swimming, fishing, kayaking, skiing, wake-boarding, jet-skiing, snorkeling, water-camping, and wildlife photography.  SDUMF #9.  It is undisputed that Mr. Dillon admitted that, of his recreational interest, all but his interests in fishing and wildlife photography have not been impaired by the status of the listed species.  SDUMF #13.

### (a)  Fishing.

Mr. Dillon clearly claims that his ability to fish for salmon has been adversely affected by the striped bass sport fishing regulation.  Dillon Interrog. Resps, #3 at 8:10-18.  In particular, he cites the recent restrictions on recreational salmon fishing imposed in 2009.  *Id*.  However, Mr. Dillon has admitted that he sold his boat in January 2008.  SDUMF # 35.  Since then, his visits to the delta have dropped considerably, from approximately 120 days a year, to three or four times in 2008 and once in 2009.  SDUMF ## 39-40.  However "repeated recreational use itself, accompanied by a credible allegation of desired future use, can be

sufficient, **even if relatively infrequent**, to demonstrate that environmental degradation of the area is injurious to that person." *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000).  The relative frequency of Mr. Dillon's visits to the Delta is not fatal to his standing.

State Defendant points out that because the salmon at issue in this litigation -- the Sacramento River winter-run and Central Valley spring-run -- are listed as endangered or threatened, the only salmon that Mr. Dillon can fish for legally is fall-run Chinook.[13]  Therefore, Mr. Dillon's interest in fishing cannot be negatively affected by any impact of the striped bass sportfishing regulation on the Listed Species, because he cannot lawfully fish for those species until they recover and take prohibitions are lifted.

(b)  **Wildlife Photography.**

Mr. Dillon stated at his deposition that because of the imperiled status of the Listed Species, "if I were to take -- or trying to take pictures of salmon it would be more difficult because there are fewer."  First Dillon

_____

[13] Salmon fishing is regulated by season, not by species. *See, e.g.*, 14 Cal. Code. Regs. § 7.00.  It would be unlawful for Mr. Dillon to fish for salmon during the season when Central Valley spring-run and Sacramento River winter-run, two of the listed species at issue, are migrating through the Delta.  Mr. Dillon does not claim to fish for delta smelt.  SDUMF No. 45.

Depo. at 58:3-17; *see also* Dillon Opp'n Decl. ¶2.  Mr.
Dillon repeatedly stated, when he goes to the Delta, he
goes for a variety of reasons, including viewing and
photographing the Listed Species.  First Dillon Depo. at
49:8-22, 50:11-13, 51:16-52:13, 54:1-6, 54:25-55:14 ("I'd
take photographs almost every time we went down to the
Delta, for one reason or another."); Dillon Opp'n Decl.
¶2 ("because there are so few salmon left in the Delta, I
have not made trips to the Delta 'specifically' to
photograph salmon or steelhead -- meaning for that
limited purpose -- but I instead visited for multiple
recreational purposes" including viewing and
photographing salmon and steelhead).  Although Mr. Dillon
has not been crystal clear about his intention to take
photographs of listed species in the future, the
implication of his testimony, both in his initial and
supplemental deposition, is that he has done so, is still
interested in doing so, and intends to do so in the
future.

    In its notice withdrawing its motion for summary
judgment, State Defendant asserts that "the late filed
declaration of Mr. Dillon and his deposition testimony
crate a triable issue of material fact" as to Mr.
Dillon's standing, suggesting that Mr. Dillon's testimony

regarding his desire to return to the Delta to photograph
wildlife is not credible.   State Defendant's argument
regarding Mr. Dillon's credibility appears to focus on
the variable frequency of Mr. Dillon's visits to the
Delta:

> As noted in the State Defendant's Motion, the
> facts developed in discovery demonstrate that
> Mr. Dillon's in the Delta has been waning. Mr.
> Dillon testified in deposition that, between
> 2001 and 2007, he visited the Delta on average
> 120 days per year, but that he had gone only
> four times in 2008, and only once in early 2009.
> Although he claimed in interrogatory responses
> to have specific plans to visit the Delta on
> several more occasions in 2009, including Labor
> Day, and in his December 1, 2009 deposition he
> claimed an intent to visit during Christmas-
> time, none of those plans materialized.
>
> After Mr. Dillon's December 1, 2009 deposition,
> he apparently developed a renewed enthusiasm for
> visiting the Delta. His declaration filed in
> support of Plaintiffs' Motion (Doc. 114-4)
> evinced a desire to go houseboating some time in
> October, 2010. In opposition to the State
> Defendant's Motion, Mr. Dillon suddenly
> developed an additional interest in visiting the
> Delta at the beginning of May. As noted in the
> Stipulation and Order for the second deposition
> of Mr. Dillon, these newly developed plans could
> not have been discovered at Mr. Dillon's
> December 1, 2009 deposition. Stipulation and
> Order Doc. 158) at 1:7-8. Finally, on May 10,
> 2010, after the close of briefing, plaintiffs
> submitted yet another declaration by Mr. Dillon
> (Doc. 154), allegedly evidencing his visit to
> the Delta on April 30-May 1, and substantiating
> the injury in fact claim in his April 23, 2010
> declaration.
>
> Pursuant to stipulation, on May 27, 2010, the
> State Defendant deposed Mr. Dillon on the issues
> raised by the late-filed declaration. Mr.

64

1
2
       Dillon's deposition testimony was consistent
       with his declaration.

3
4
5
6
7
8
9
10
11
12
13
       The State Defendant recognizes that Mr. Dillon's
       most recent declaration and deposition testimony
       contain testimony creating a potential triable
       issue of material fact as to whether Mr. Dillon
       has been injured by the State Defendant's
       enforcement of the striped bass sport fishing
       regulations. Mr. Dillon's waning interest and
       unrealized plans before the summary judgment
       motions were filed call into question the
       credibility of his recently renewed interest.
       Because the court is precluded, on summary
       judgment, from weighing the evidence or making
       determinations about witness credibility
       (Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
       255 (1986)) and because there is a potential
       triable issue of material fact, the State
       Defendant recognizes that summary judgment on
       Mr. Dillon's standing is not appropriate at this
       time.

14
Doc. 162 at 2-3.

15
16
17
18
19
20
21
22
23
24
25
26
27
28
    This alone does not create a credibility issue that

must be resolved at trial, because even relatively

infrequent recreational use is sufficient to establish

standing. *Ecological Rights Foundation v. Pacific Lumber

Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("recreational

use itself, accompanied by a credible allegation of

desired future use, can be sufficient, <u>even if relatively

infrequent</u>, to demonstrate that environmental degradation

of the area is injurious to that person."); *see also

Sierra Club v. Franklin County Power of Ill., LLC*, 546

F.3d 918, 925 (7th Cir. 2008) (affirming summary judgment

in favor of plaintiff after finding that plaintiff had

standing because she visited area every other year);
*Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 962-63 (7th
Cir. 2005) (plaintiff had standing to challenge a
proposed project although he had visited the project area
only six times over 20 years and planned to return in
"winter or spring").

Mr. Dillon's interest in photographing salmon is a
concrete recreational interest that may be impaired by
State Defendant's actions.

### (3) Aesthetic Interests.

Mr. Dillon also alleges harm to his aesthetic
interests in the Delta.  He claims to have derived a
sense of "appreciation and satisfaction" when he views
the listed species.  Dillon Interrog. Resps. # 3 at 6:1-
2.  At his deposition, Mr. Dillon specifically indicated
his enjoyment in viewing wildife:

> Q.  What are the aesthetic benefits that you
> enjoy?
>
> A.  In addition to those activities already
> listed in the responses to interrogatories,
> there is the –
>
> Q.  Well, "those activities," what are you
> referring to?
>
> A.  Wildlife viewing.  The peace and quiet of
> being near a running river.  Just the atmosphere
> that being in a water environment that supports
> many, many types of flora and fauna is
> aesthetic....

First Dillon Depo. at 60:11-23.

State Defendant argues that standing is not supported by Mr. Dillon's general claim that he has been harmed because the striped bass sportfishing regulations negatively impact his interest in "a biosystem that is intact and healthy," SDUMF No. 33, citing *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009), which in turn relies on *Summers*, 129 S. Ct. at 1149.  *Summers* is more nuanced than State Defendant suggests.  The Supreme Court held:  "While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."  129 S. Ct. at 1149.

Mr. Dillon claims that, through his recreational activities in the Delta, he has gained "significant exposure" to the Sacramento River winter-run chinook salmon, Central Valley spring-run chinook salmon, Central Valley steelhead, and delta smelt.  First Dillon Decl. at ¶3.  This is not entirely accurate.  Mr. Dillon has never seen a steelhead, except perhaps at a hatchery or in a picture, SDUMF #23; he has only ever seen a delta smelt at a salvage facility or in a container on a trawl vessel, SDUMF #25; and he has only ever seen three salmon in the Delta, all of which were dead or dying, SDUMF #11.

But, Mr. Dillon's limited success at viewing the Listed Species is not surprising, given how rare individual members of the Listed Species are in the wild.  Limited exposure to the Listed Species does not defeat his standing.  *See Nat'l Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1162 (W.D. Wash. 2004) (plaintiffs demonstrated injury in fact because they averred that they observe, photograph, and fish for chinook salmon and that the complained of activity limited opportunities for interacting with salmon).

Likewise, Mr. Dillon's reduced exposure to the Delta in recent years as a result of his personal and financial decision to sell his boat does not defeat his claim of injury in fact.  See *Ecological Rights Foundation,* 230 F.3d 1149 ("recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, underline even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person.").

State Defendant asserts that even if Mr. Dillon actually saw a delta smelt in the water, he admits he would not be able to identify it.  SDUMF ## 27-29.  Mr. Dillon also cannot tell one run of salmon from another, and therefore cannot determine whether the three salmon

he saw were among the listed species.  SDUMF ## 24.
While this could jeopardize Mr. Dillon's standing claim
if Mr. Dillon was asserting an interest in studying or
cataloging members of the Listed Species, it is not fatal
to his claim of aesthetic injury.  *See Int'l Ctr for
Tech. v Johanns*, 473 F. Supp. 2d 9, 22 (D.D.C 2007)
(finding that plaintiffs had standing even though they
could not "tell the difference between a genetically-
engineered plant and a resident plant," because
"[p]laintiffs' alleged interest is in viewing native
fauna, and the relevant inquiry is whether injury to that
interest is probably or has occurred, regardless of
whether that interest is visible.").

     The uncontradicted evidence is that, even though his
visits have become less frequent in recent years and his
encounters with the Listed Species have been few and far
between, Mr. Dillon (1) has viewed salmon both in the
Delta and in rivers upstream of the Delta and (2) has
sought to view listed salmon and steelhead on many
occasions.  *See* Dillon Opp'n Decl. ¶¶ 1-2; Dillon
Interrog. Resps. at 5:26-6:2, 7:26-8:1 (Mr. Dillon "has
attempted to have, and intends to continue having
significant and repeated exposure to the" Listed
Species); First Dillon Depo. at 49:3-22, 55:10-14,

103:16-104:13.

3.   **Does Mr. Dillon Retain Concrete Plans to Visit the Delta?**

Mr. Dillon testified at his first deposition that he has standing plans to visit the Delta on a minimum of three days per year, July 4th, Labor Day, and around Christmas.  SDSUF #49.  However, it is undisputed that, despite his previous assertions of intent to travel to the Delta both over the Labor Day weekend and in December 2009, Mr. Dillon visited the Delta only one time in 2009 to photograph western pond turtles and observe other wildlife.  Dillon Supp. Decl. at 147:23-24.  Mr. Dillon explained that his plans changed.  *Id*. at 146:17-19.

Mr. Dillon's testimony at his supplemental Deposition demonstrates that he possesses concrete plans to visit the Delta in the future.  In fact, he had plans to fish on the Sacramento River the day after his supplemental deposition.  Dillon Supp. Depo. 173:14-15.  He also planned on joining some friends on their boat "one day over the three-day [Labor Day] holiday in the neighborhood of Willow Berm," where they would "probably be anchored offshore somewhere, to do some fishing, some wildlife viewing, some photography, hopefully catch a glimpse of an endangered species or two."  *Id*. at 18-21.  Mr. Dillon has also been planning "one-to-two-week

70

houseboating trip around October 2010" with other members of his family and some friends.  *Id.* at 151:10-152:10; 173:22-23.  Although he has not put a deposit down on the houseboat, he has tentatively chosen a rental firm in the central Delta.  *Id.* at 167:15-168:6.  The only reason he has not chosen specific dates for the trip is because he has been waiting to learn the trial date for this case.  *Id.* at 169:4-5.  He also has tentative plans to return to the delta for a "couple of trips" in the spring of 2011 to "view wildlife," 173:24-174:1, but these plans are not yet concrete.

The undisputed evidence establishes that Mr. Dillon has demonstrated injury in fact.  As to this prong of standing, Plaintiffs' motion for summary adjudication is GRANTED.

    4.   <u>Causation & Redress.</u>

        a.   <u>Legal Standard Re: Causation.</u>

The July 16, 2009 Decision summarizes the relevant legal standard:

> The second standing requirement, causation, requires that the injury be "fairly traceable" to the challenged action of the defendant, and not be "the result of the independent action of some third party not before the court."  *Tyler v. Cuomo*, 236 F. 3d 1124, 1132 (9th Cir. 2000). The causation element is lacking where an "injury caused by a third party is too tenuously connected to the acts of the defendant." *Citizens for Better Forestry v. U.S. Dept. of*

*Agric.*, 341 F.3d 961, 975 (9th Cir. 2003).  For the purposes of determining standing, while the causal connection cannot "be too speculative, or rely on conjecture about the behavior of other parties, [it] need not be so airtight ... as to demonstrate that the plaintiffs would succeed on the merits.'"  *Ocean Advocates*, 402 F.3d at 860.

*National Audubon Society v. Davis*, 307 F.3d 835 (9th Cir. 2002), provides guidance.  The plaintiffs in *Davis*, bird enthusiasts, alleged that a California law banning the use of leghold traps to capture or kill wildlife violated the Migratory Bird Treaty Act.  *Id.* at 842-843. Prior to the passage of that California law, federal officials used leghold traps against predators to protect several bird species.  *Id.* at 844.  The Ninth Circuit held that plaintiffs had standing to challenge the leghold trap ban, finding their injury was "fairly traceable" to the proposition because:

> [T]he federal government removed traps in direct response to Proposition 4 (whether under direct "threat of prosecution" or not). Removal of the traps leads to a larger population of predators, which in turn decreases the number of birds and other protected wildlife.

*Id.* at 849.  "This chain of causation has more than one link, but it is not hypothetical or tenuous; nor do appellants challenge its plausibility."  *Id.*

Here, it is Plaintiffs' burden to establish that their theory of causation is at least "plausible."  *Id.  See also Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 867 (9th Cir. 2003) ("A plaintiff who shows that a causal relation is 'probable' has standing, even if the chain cannot be definitively established.").  Plaintiffs do not have to establish causation by a preponderance of the evidence required to prevail on the merits.  *Ocean Advocates*, 402 F.3d at 860 (while the causal connection cannot "be too speculative, or rely on conjecture about the behavior of other parties, [it] need not be

72

so airtight ... as to demonstrate that the
plaintiffs would succeed on the merits.").
Because Plaintiffs are moving for summary
judgment, to prevail, there must be no material
facts that call into question the plausibility
of their theory of causation.

Doc. 85 at 31-34 (footnotes omitted).

        b.   <u>Analysis.</u>

     The July 16, 2009 Decision concluded that Plaintiffs

were not entitled to summary judgment on the causation

prong of standing:

CDFG's Conservation Plan states that by
modifying the striped bass minimum size limits
from 18 to 26 inches, the striped bass
population will increase by almost 210,000 fish.
Conservation Plan at 117.  If true, the nature
and extent of the sport-fishing regulations have
a cognizable impact on the striped bass
population.  CDFG counters that the Conservation
Plan also concluded that CDFG management efforts
that do not include an artificial striped bass
stocking program would result in the long-term
decline of the adult striped bass population to
515,000 adults.  Doc. 65 at 3 (citing
Conservation Plan at 37).  The Conservation Plan
additionally concludes that maintaining the
striped bass population at stable levels
requires much more restrictive sport-fishing
regulations than are presently in force.  *Id.*
(citing Conservation Plan at 117).

Plaintiffs' evidence of a link between higher
striped bass abundance and increased Listed
Species mortality is materially disputed.  For
example, CDFG's Conservation Plan concluded that
a striped bass population of 765,000 adults
maintained through an artificial stocking
program would consume 6 percent of the
Sacramento River winter-run Chinook salmon
population, 3.1 percent of the Central Valley
Spring-run Chinook salmon population, and 5.3
percent of the delta smelt population.

73

Conservation Plan at 45, 56, 70.  Striped bass
predation upon the Listed Species will be
slightly lower in the absence of the stocking
program, but will still be present and will
range from 3.4-4.7 percent of the winter-run,
2.3 percent of the spring-run, and 3.6 percent
of the delta smelt.  *Id.*  DFG reaffirmed these
estimates in its Status Review of the Longfin
Smelt, released January 2009.  Second Rubin
Decl., Doc. 78, Ex. 13 at 28.  These statistics
support Plaintiffs' contention that increased
striped bass populations adversely affect the
Listed Species' abundance.

However, the statistical analyses described in
the Declaration of Matthew L. Nobriga raise
questions about Plaintiffs' assertion that
ending the enforcement of the striped bass
sport-fishing regulations will cause a
measurable increase in the abundance of the
Listed Species.  Nobriga opines that it is
possible that reductions in striped bass
populations will have unintended, negative
effects on Listed Species abundance.
Specifically, Nobriga emphasizes that, while
striped bass prey on delta smelt, they also prey
on one of the delta smelt's primary predators
and competitors, the Mississippi silverslide.
Nobriga Decl. at ¶¶ 7, 10.  Nobriga opines that
allowing depletion of the striped bass
population may actually lead to <u>decreased</u> delta
smelt abundance, because striped bass predation
of Mississippi silverslide would be reduced.
*Id.* at ¶ 10.

Nobriga references research performed by others
contradicting the hypothesis that striped bass
predation had a major influence on salmon
survival.  *Id.* at ¶12.  Nobriga also performed
his own regression analyses of the relationship
between striped bass populations and those of
the Listed Species, evidencing a positive
relationship between striped bass abundance and
winter-run abundance, and no relationship
between striped bass abundance and either spring
run, or delta smelt abundance.  *Id.* at ¶¶ 16-17.

The Nobriga Declaration raises serious questions

about the plausibility of Plaintiffs' causal theory by challenging Plaintiffs' fundamental assertion that there is some, measurable link between increased striped bass abundance and Listed Species mortality.  This is all that is required to successfully oppose Plaintiffs' motion for summary adjudication on the issue of standing based on the extent of the dispute over causation.

*Id.* at 34-36 (footnote omitted).

Plaintiffs maintain that any dispute over whether there is a measurable link between striped bass abundance and Listed Species mortality was "answered conclusively" because Marty Gingras, a CDFG scientist, and Mr. Matthew Nobriga "admit that (1) increasing striped bass abundance increases striped bass predation on the Listed Salmon and (2) that reducing striped bass predation would benefit the populations of the Listed Salmon."  Doc. 116 at 19.

It is undisputed that Mr. Gingras and Mr. Nobriga both stated that the following <u>general</u> facts were true:

> (a) Striped bass prey on winter-run and spring-run.  State Defendant's Response to PSUF #3.
>
> (b) Striped bass predation on winter-run and spring-run increases as the striped bass population increases. State Defendant's Response to PSUF #4.
>
> (c) Striped bass predation is one of a number of factors that contribute to the decline of

winter-run and spring-run.  State Defendant's
Response to PSUF #7.

But, as discussed above, these statements may be
qualified by other evidence in the record.  Most
obviously, State Defendant disputes the <u>significance</u> of
striped bass predation on winter-run and spring-run.
*See, e.g.,* State Defendant's Responses to PSUF #3
(pointing out that Mr. Gingras testified repeatedly that
offering figures for striped bass predation on the listed
Species was speculation, Gingras Depo. 388:23-389:2, and
that Mr. Nobriga similarly stated that trying to make a
predation estimate would be like "pulling numbers out of
the air," Nobriga Depo. 119:13-18).

Additionally, State Defendant materially disputes
each report and expert opinion offered by Plaintiffs in
support of Plaintiffs' estimates of the significance of
striped bass predation on the Listed Species.  For
example, Plaintiffs rely on the expert report of Dr.
Charles H. Hanson, which estimates a striped bass
predation rate of 21% on winter-run.  *See* PSUF #3(L).
State Defendant first point out that Dr. Hanson's report
relies on a report by Dr. David H. Bennett, which State
Defendant maintains is "flawed" and its conclusions
"disputed" as follows:

Bennett's Expert Report is refuted by Botsford's Expert Report. Botsford Expert Report. Among other critical flaws, Bennett has no information on angler behavior (Bennett Dep. 39:16-24, 40:3-6) (Wordham Decl., Exh. J), and did not include density dependence or stock- recruitment into his model. Botsford Expert Report, pp. 7-17. Bennett "did not use accepted method[s]." *Id.* at p. 7. Relying on creel survey data that do not serve as a proper proxy for changes in the striped bass sport fishing regulations, Bennett drew unsupported conclusions about angler behavior. *Id.* at p. 11. As Botsford stated, "It is difficult to say how well so much can be predicted from so little information, especially in the absence of any analysis or statements regarding the precision of the estimates." *Id.* Botsford summarizes his review of Bennett's report by concluding that Bennett's conclusions are without support and that it is impossible to calculate how much striped bass populations might decline if enforcement of the striped bass sport fishing regulations were enjoined:

> From my evaluation it is clear that none of Dr. Bennett's modeling analyses lead to the conclusion that the striped bass population will decline by 60-70%. Furthermore, any such decline cannot be precisely predicted because of the uncertainty in the stock-recruitment relationship at low abundance and the future behavior of fishermen if the regulations were removed.

*Id.*, p. 17. Botsford also points out errors in Bennett's yield-per-recruit calculations, including that they rely on the flawed results of the incorrect earlier calculations, which were based on faulty assumptions. *Id.*, pp. 13-14.

Bennett does not consider himself a modeler. Bennett dep., 17:15-17.) Bennett developed his model himself, without assistance. *Id.* 37:9-19. His model was not peer-reviewed, and did not include density dependence. *Id.*, 44:14-18. Bennett admitted that there are insufficient data to formulate a stock-recruitment model.

77

*Id.*, 40:3-4.

Dr. Bennett conceded he did not have data to calculate a stock-recruitment relationship. *Id.*, 39:16-24, 40:3-6. And Dr. Bennett conceded that stock-recruitment includes density-dependent factors (as well as density-independent factors). *Id.*, 41:2-7. Ultimately, Dr. Bennett's calculation of a 60-70% decline was based "primarily" on his own guess that at that figure "a number of fishermen are not going to be interested in fishing out there." *Id.*, 57:1-4. But Dr. Bennett has absolutely no data to support that guess. It is pure speculation. And even if he did have some data, he has no qualification in interpreting it, as he has never published a peer- reviewed paper on angler behavior. *Id.*, 64:10-65:23.

State Defendant's Response to PSUF #2.

Dr Hanson's conclusion is disputed by Mr. Nobriga, who states:

It is my conclusion that these [Dr. Hanson's] numbers cannot be claimed to have any reasonable scientific support. They were developed using a rudimentary consumption index as if it were actually estimating listed fish consumption. Further, they were developed without regard for uncertainty in the input data and the sensitivity of the results to that uncertainty. Hanson (2009) was certainly aware of this — his report was peppered with terms like "bias," "uncertainty," and "error."

State Defendant's Response to PSUF #3, Doc. 194, Ex. E.

The State Defendant's response continues:

Nobriga pointed out that the food web is much more complex than the old "food chain" model suggested. SUF Response No. 3(L). The San Francisco Estuary is very complex. SUF Response No. 3(L). Using the example of the overbite clam, an invasive species in the Delta, Nobriga demonstrated the unpredictability that this

78

complexity produces. SUF Response No. 3(L).
Nobriga then used both simple and multiple
regression analysis to show that striped bass
predation has no obvious negative effect on the
abundance of the Listed Species. SUF Response
No. 3(L). In fact, 12 of the 20 regressions
produced statistically significant positive
correleations between striped bass populations
and populations of the Listed Species. SUF
Response No. 3(L).

Hanson testified that he is not an expert on the
subject, even if he can be called
"knowledgeable." Hanson Dep., 29:14-23, Wordham
Decl., Exh. C. Hanson's opinion regarding
replacement of striped bass by other predators
(such as largemouth bass and white catfish) is
not an expert opinion, but only his "sense."
Id., 295:12-18.

Hanson testified that striped bass have
coexisted with the Listed Species since the
1800s, and that the effect that striped bass
have had on the Listed Species over that time is
largely unknown. Id., 298:3-14. Hanson testified
that in his expert opinion, there may not be
adequate outflows in the Delta for the recovery
of the Listed Species, whether or not striped
bass are eliminated. Id., 339:23-342:22. In
2008, Hanson stated in a declaration that there
is no evidence that changes in predation
mortality resulted in the observed decline in
salmonids in 2007. Declaration of Charles H.
Hanson Ph.D. in Support of Defendant
Intervenors' Position Regarding Interim
Remedies, May 27, 2008, in Pacific Coast
Federation of Fishermen's Association/Institute
for Fisheries Resources v. Gutierrez, E.D.
Calif., Case No. 1:06-CV-00245 OWW-GSA (Hanson
Decl.), 22:23-26, Wordham Decl., Exh. D. Hanson
further stated that a large number of factors
have been identified, in addition to State Water
Project and Central Valley Project operations,
that affect the populations of Central Valley
salmonids. Id., 30:19-20. He listed many of
these, which included "predation by non-native
invasive species." Id., 30:21- 24. But he also
stated that very little information is available

79

1
2
3
4
5

> on the relative contribution of these and other
> factors on salmonid populations. *Id.*, 30:24-27.
> When he listed actions that could be taken
> during an interim period up to March 2009 to
> benefit both winter-run and spring-run Chinook
> salmon (as well as steelhead), Hanson did not
> include reducing predation by striped bass. *Id.*,
> 45:24-48:26.

6

*Id.*

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

All experts agree that striped bass predation results in mortality of at least 5% of the listed salmonid populations each year.  PSUF ## 3 & 7.  However, this is not equivalent to a finding that the invalidation of the striped bass sportfishing regulations would similarly increase listed salmonid mortality by any measurable quantity.  As discussed above, given that the Section 9 claim in this case focuses on a habitat modification that affects the entire population of the listed species, section 9 requires proof of some population-level effect.  For causation, population-level mortality for the species must be caused by increased striped bass populations resulting from the enforcement of the sportfishing regulations.

23
24
25
26
27
28

For the purposes of standing, a plaintiff need not prove success on the merits.  *See Envtl. Def. Ctr. v. EPA*, 344 F.3d  at 867 ("A plaintiff who shows that a causal relation is 'probable' has standing, even if the chain cannot be definitively established.");  *Ocean*

*Advocates*, 402 F.3d at 860 (while the causal connection cannot "be too speculative, or rely on conjecture about the behavior of other parties, [it] need not be so airtight ... as to demonstrate that the plaintiffs would succeed on the merits."). The summary judgment standard requires that the facts be viewed in a light most favorable to the non-moving party, in this case the State Defendant. Viewed in this light, the facts do not demonstrate that it is probable that State Defendant's conduct has a significant population-level effect on the listed species. To the contrary, as was the case in the first round of summary judgment motions, the evidence, including the Nobriga Declaration, raises a genuine dispute about the plausibility of Plaintiffs' causal theory.[14]

For the same reasons, there are serious factual disputes about the plausibility of Plaintiffs contention that invalidation of the striped bass sportfishing regulations would redress their injury. In the context of Central Delta's CVPIA affirmative defense, Plaintiffs appear to have abandoned their demand to invalidate the

---

[14] NMFS's recent letter to CFGC recommending that the Commission eliminate striped bass sportfishing regulations to "reduce [striped bass] predatory impact and thereby increase survival of native fish" by opening the striped bass season year round and removing minimum size and bag limits, Doc. 160-1, does not change the evidentiary situation on summary judgment. The NMFS letter is certainly relevant, but is not dispositive.

sportfishing regulations.  If this is the case, their theory of redress is even more tenuous.

Plaintiffs' motion for summary adjudication on the causation and redressibility prongs of standing is DENIED.

D.   **Merits.**

1.   **Plaintiffs' Motion for Summary Judgment on Their Section 9 Claim.**

Plaintiffs affirmatively move for summary judgment that State Defendant's enforcement of the striped bass sportfishing regulations violates ESA § 9 by taking of Listed Salmonids without a take permit.  This motion must be denied for the same reasons that the motion for summary adjudication on the standing and redress prongs of standing is denied.  There are disputes of material fact regarding causation (i.e. whether State Defendant's conduct causes harm by habitat modification in violation of ESA § 9's take prohibition).

Plaintiffs' motion for summary judgment on the issue of Section 9 liability is DENIED.

2.   **CVPIA.**

Plaintiffs seek summary judgment that the CVPIA does not provide a legitimate affirmative defense in this case.  Central Delta's CVPIA defense was addressed in

detail in the July 16, 2009 Decision:

> The provisions of the Central Valley Project Improvement Act, Pub.L. 102-575, 106 Stat. 4600, Title 34, 106 Stat. 4706-31 (1992) pertaining to anadromous fish, which are defined to include striped bass, [] are a bar to any action to enforce any inconsistent provisions of the Endangered Species Act.

Doc. 20 at 13. Plaintiffs request summary adjudication to foreclose this affirmative defense, the operative effect of which would be to exempt CDFG's enforcement of striped bass sport-fishing regulations from the take prohibitions under Section 9 of the ESA, 16 U.S.C. § 1538 (a)(1)(B), and the requirement that CDFG obtain an incidental take permit.

The CVPIA contains numerous provisions calling for protection and enhancement of striped bass within the Sacramento-San Joaquin Delta. CVPIA section 3403(a) defines the term "anadromous fish" to include "striped bass," making applicable section 3406(b)(1)'s maintenance and restoration provisions. That section requires the Secretary of Interior to "develop within three years of enactment and implement a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period of 1967-1991." To this end, it is undisputed that FWS has established a doubling goal for striped bass of 2,500,000 fish. McDaniel Decl., Doc. 66-4, at ¶3 & Ex. B (Final Restoration Plan for Anadromous Fish Restoration Program, January 9, 2001) at 9-10. It is also undisputed that this goal has not been achieved. Id. at Ex. C (Anadromous Fish Restoration Program Doubling Graphs for striped bass).

Section 3406(b)(1)(B) provides that "the Secretary is authorized and directed to modify Central Valley Project operations to provide flows of suitable quality, quantity, and timing to protect all life stages of anadromous fish...." Section 3406(b)(1)(D)(2) requires that the Secretary "upon enactment of this title dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the primary

purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title...." This provision has been interpreted to require that the Secretary give primacy to its anadromous fish doubling program in the allocation of the 800,000 acre-foot CVP yield dedication. *See San Luis & Delta Mendota Water Auth. v. U.S. Dept. of the Interior*, --- F. Supp. 2d ---, 2009 WL 1362652 (E.D. Cal. 2009); *Bay Institute of San Francisco v. United States*, 87 Fed. Appx. 637 (9th Cir. Jan. 23, 2004). Because striped bass are included in the statutory definition of "andadromous fish," they are intended and designated beneficiaries of these efforts. CVPIA § 3403(a).

Section 3406(b)(14) is directed specifically to striped bass, requiring the Secretary to "develop and implement a program which provides for modified operations and new or improved control structures at the Delta Cross Channel and Georgiana Slough during times when significant numbers of striped bass eggs, larvae, and juveniles approach the Sacramento River intake to the Delta Cross Channel or Georgiana Slough."

Certain CVPIA provisions require the Secretary to coordinate with state agencies to protect anadromous fish in general and striped bass in particular. For example, Section 3406(b)(21) requires that the Secretary "assist the State of California in efforts to develop and implement measures to avoid losses of juvenile anadromous fish resulting from unscreened or inadequately screened diversions on the Sacramento and San Joaquin rivers, their tributaries, the Sacramento-San Joaquin Delta, and the Suisun Marsh." Similarly, section 3406(b)(18) requires that the Secretary "if requested by the State of California, assist in developing and implementing management measures to restore the striped bass fishery of the Bay-Delta estuary." Such measures must be "coordinated with efforts to protect and restore native fisheries." Id.

Central Delta is correct that "[i]t cannot be reasonably disputed that Congress intended to protect and restore striped bass." Doc. 66 at 5. However, Congress also expressed its intention in CVPIA § 3406(b), that the Secretary "operate the Central Valley Project to meet all obligations under state and federal law, including but not limited to the federal

1    Endangered Species Act...." In light of the fact
     that the CVPIA expressly requires compliance
2    with the ESA, Plaintiffs argue that their ESA
     claims cannot be barred as a matter of law by
3    the CVPIA. Doc. 57-2 at 5-7. Central Delta
     rejoins that the more specific, and more-
4    recently enacted, provisions of the CVPIA
     requiring restoration of the striped bass
5    fishery should prevail over the ESA's earlier-
     enacted, general requirements.
6
     Plaintiffs cite *Morton v. C.R. Mancari*, 417 U.S.
7    535, 550-551 (1974), for the proposition that
     "courts are not at liberty to pick and choose
8    among congressional enactments, and when two
     statutes are capable of coexistence, it is the
9    duty of the courts, absent a clearly expressed
     congressional intention to the contrary, to
10   regard each as effective." *Mancari* and its
     progeny concern the repeal by implication of an
11   earlier, specific provision, by a later-enacted,
     general one. Here, the issue is whether a later,
12   specific provision renders inapplicable an
     earlier-enacted general one. Courts have "a duty
13   to construe statutes harmoniously" whenever
     possible. 2B N. Singer & J. Singer, Sutherland
14   Statutes and Statutory Construction § 53:1 (7th
     ed. 2008).
15
     Central Delta is correct that the CVPIA is the
16   more recent and more specific expression of
     Congressional intent. Central Delta suggests
17   that *Rodgers v. United States*, 185 U.S. 83, 89
     (1902) sets forth the applicable canon of
18   statutory construction:

19        Where there are two acts or provisions, one
          of which is special and particular, and
20        certainly includes the matter in question,
          and the other general, which, if standing
21        alone, would include the same matter and
          thus conflict with the special act or
22        provision, the special must be taken as
          intended to constitute an exception to the
23        general act or provision, especially when
          such general and special acts or provisions
24        are contemporaneous, as the legislature is
          not to be presumed to have intended a
25        conflict.

26   Central Delta ignores the law that a later, more
     specific statute only trumps an earlier general
27   one where the two statutes are in conflict.

28   Can the numerous CVPIA provisions directing the

Secretary of the Interior, in consultation with other federal agencies, to protect and enhance the striped bass population, be harmonized with application of section 9's take prohibition to CDFG's enforcement of the striped bass sport-fishing regulations and more general application of the ESA? On Plaintiffs' motion for summary adjudication on an affirmative defense for which Central Delta has the burden of proof at trial, Plaintiffs must show "an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984. Plaintiffs maintain, and have presented evidence to support their claim, that State Defendant's enforcement of the sport-fishing regulations necessarily take Listed Species, and that lawful application of the ESA to State Defendant's enforcement activities will require elimination of (or substantial modification to) those sport-fishing regulations, which are causing jeopardy to Listed Species. The State rejoins that the current sport-fishing regulations are critical to the maintenance of current striped bass abundance levels. The State's evidence suggests that the continued enforcement of these regulations, and/or the promulgation of more stringent protections, may be necessary to achieve the 2,500,000 striped bass population goal promulgated by the Service.

This presents a material factual dispute over the effects of CDFG's striped bass regulations on the bass and Listed Species populations. The express language and the legislative purpose of the CVPIA do not evince an intent to abrogate application of the ESA. <u>Only after the facts are developed will it be possible to determine if a conflict in operation exists between implementation of the ESA to the sport-fishing regulations and achieving the CVPIA objectives by application of those regulations</u>. Plaintiffs' motion for summary adjudication of Central Delta's CVPIA affirmative defense is DENIED WITHOUT PREJUDICE.

Doc. 85 at 19-26 (emphasis added, footnotes omitted).

In the present motion for summary judgment,

Plaintiffs maintain that Central Delta's CVPIA

affirmative defense should be deemed wholly inapplicable.

To prevail, Plaintiffs must demonstrate either that the

86

affirmative defense fails as a matter of law or there is
an absence of evidence to support its assertion.  *See*
*Soremekun*, 509 F.3d at 984.

As the July 16, 2009 Decision articulated, a later-
enacted, more specific statute trumps an earlier one
insofar as they conflict.  Central Delta maintains that
the CVPIA's striped bass doubling goal, which equates to
a goal of 2,500,000 fish, is just such a later-enacted,
more specific statute that trumps the earlier, more
general ESA.  The statutory picture is more complicated
than Central Delta acknowledges.  The CVPIA protects
anadromous species, defined by the statute to include
striped bass <u>and the Listed Salmonids</u>, by, among other
things, setting a goal of doubling the populations of <u>all</u>
of these species.  In addition, the CVPIA itself
indicates that its provisions should be implemented in
compliance with the ESA.  This presents a unique issue of
statutory interpretation.[15]  As the July 16, 2009 decision

---

[15] *Morton v. Mancari*, 417 U.S. 535 (1974), cited by Central
Delta, is not analogous.  *Mancari* upheld an employment preference
for qualified Native Americans set forth in the Indian
Reorganization Act of 1934 ("Indian Act") against a challenge that
the preference violated general anti-discrimination provisions of
the later-enacted Equal Opportunity Act of 1972 ("EOA").  Morton
does stand for the proposition that "[w]here there is no clear
intention otherwise, a specific statute will not be controlled or
nullified by a general one, regardless of the priority of
enactment."  *Id*. at 550.  Here, Central Delta argues that the later-
enacted, more specific CVPIA should not be controlled or nullified
by the earlier-enacted ESA.  In *Morton*, the Supreme Court concluded
that the later-enacted EOA expressed no intention to nullify the

87

stated:  "The express language and the legislative

purpose of the CVPIA do not evince an intent to abrogate

application of the ESA."  Doc. 85 at 25.  Rather, whether

a conflict in operation exists between implementation of

the ESA to the sport-fishing regulations and achieving

the CVPIA objectives by application of those regulations

is a question of fact.[16]  *Id.* at 25-26.

   Plaintiffs own briefs are equivocal on this factual

issue.  On the one hand, Plaintiffs' point to evidence

suggesting that the goal of doubling the striped bass

population is incompatible with the goal of doubling the

listed salmonid populations.  *See* Independent Peer Review

of the CVPIA, Rubin Decl., Doc. 115, Ex. 47, at 22 ("The

stated goal to increase the production of both native

salmonids and exotic predators/competitors (e.g., striped

bass and shad) is internally inconsistent."); *id.* at 47

("programs that encourage exotic predatory species such

---

Indian Act preference, noting that, three months after enactment of
the EOA, Congress enacted two other Indian preference laws.  In this
light, "[i]t would be anomalous to conclude that Congress intended
to eliminate the long standing statutory preferences in []
employment, as being racially discriminatory, at the very same time
it was reaffirming the right of tribal and reservation-related
private employers to provide Indian preference."  417 U.S. at 548.
Why Central Delta would emphasize this holding is a mystery, as the
simultaneous inclusion of protections for striped bass and salmonids
in the CVPIA suggests an express intent to require protections for
the Listed Salmonids notwithstanding the protections for the striped
bass.
   [16] Central Delta recognizes that when repugnancy between two
acts has been established, "the old law is repealed by implication
only, *pro tanto*, to the extent of the repugnancy."  *United States v.
Borden*, 308 U.S. 188, 199 (1939).

88

as striped bass (e.g., California Fish and Game and the
CVPIA itself) clearly conflict with CVPIA and ESA
mandates to protect and rebuild depressed stocks of
native salmonids ....").  This suggests that enforcement
of the CVPIA's striped bass regulations is incompatible
with the protections afforded the Listed Salmonids under
the ESA.

    The significance of this evidence is in dispute.  As
Central Delta points out "striped bass and the salmonids
co-existed in the Delta for more than a century, and it
has not been shown that [a similar coexistance] cannot be
achieved."  Doc. 125 at 14 (noting that FWS adopted the
Restoration Plan to restore both striped bass and
salmonids pursuant to the direction of the CVPIA).
Central Delta also points out that, despite the opinions
of the review panel, Congress expressed its unconditional
intent to restore <u>both</u> striped bass and salmonids.[17]  At
the same time, there is ample record evidence to support
the proposition that the sportfishing regulations are

_____

    [17] Congress enacted the CVPIA in 1992.  At the time of enactment
the Sacramento River winter run Chinook salmon was already listed as
"threatened" under the ESA.  The CVPIA's legislative history states:

        As a result of these combined factors, the winter-run Chinook
        of the Sacramento River has been reduced from a run of over
        100,000 to fewer than 200 and, in 1989, was declared a
        threatened species under Federal law and an endangered species
        under State law.

H.R. 576, Part 1, 102nd Cong. (June 16, 1992), at 17-19.

necessary to achieve the CVPIA's goal of doubling the striped bass population.[18]

On the other hand, in an attempt to rebut Central Delta's argument that Plaintiffs' request to use the ESA to invalidate the striped bass sportfishing regulations sets up a direct conflict between the CVPIA and the ESA, Plaintiffs insist that they are not seeking to invalidate the CVPIA or even the Defendant's ability to enforce striped bass regulations per se.  Rather, Plaintiffs maintain that they only seek State Defendant's compliance with its ESA obligations, which can be achieved by either securing incidental take authorization from the appropriate federal wildlife agencies (NMFS or U.S. Fish and Wildlife Service) pursuant to section 7 or 10 of the ESA (16 U.S.C. §§ 1536, 1539), or by halting enforcement

---

[18]   The goal for striped bass promulgated by FWS has not been achieved.  Doc. 126, McDaniel Dec. I, Ex. C (Anadromous Fish Restoration Program Doubling Graphs, for striped bass). Since 1992 the average annual abundance of striped bass has not even been half of the target level. *Id*.  A recent FWS review states:

> Illegal fishing may kill thousands of juvenile striped bass, possibly equivalent to the deaths of least 125,000 legal-sized bass each year (Brown 1987).  This level of illegal fishing could equal or exceed the annual legal sport catch of 100,000-200,000 adult striped bass (DFG 1992a).  As discussed previously, healthy fish populations can sustain high levels of fishing mortality, but the precipitous decline in adult striped bass abundance over the past 20 years indicates that the population is unhealthy (Figure 2-VI-31).

Doc. 126, Ex. D (excerpts from Volume 2 of FWS's Working Paper on Restoration Needs, Habitat Restoration Actions to Double Natural Production of Anadromous Fish in the Central Valley California), Vol. 2, p. 2-VIII-23.

of the striped bass sport-fishing regulations.[19]  The ESA affords FWS and NMFS considerable discretion in designing remedial measures that might be imposed as part of any incidental take permit granted to CDFG under ESA § 9.[20] It is possible that the CVPIA's fish doubling regulations are compatible with protections afforded the Listed Salmonids under the ESA.  The current record is insufficient to resolve this question of fact as a matter of law.

Plaintiffs raise two additional, related arguments in an attempt to prove that Central Delta's CVPIA defense should fail as a matter of law.  First, Plaintiffs point out that the CVPIA only authorizes and directs actions by

[19] Central Delta argues that Plaintiffs' attempt to modify its requested relief is disingenuous, because "the whole purpose and theory of their case is to use the ESA to eliminate striped bass regulations to decimate striped bass populations.  Plaintiffs do not seek to control striped bass populations at 2.5 million fish, they seek to bring about a substantial reduction in striped bass well below the 2.5 million level."  Doc. 125 at 15-16.  Plaintiffs' intention is not clear from the record.  Regardless, Central Delta is not moving for summary judgment, so it is not necessary to decide whether the ESA and the CVPIA are inescapably in conflict.  A finding that the two statutes may be in conflict is sufficient to deny Plaintiffs' motion for summary judgment.

[20] Plaintiffs are correct that the federal wildlife agencies have discretion in the design of remedial measures to protect the Listed Salmonids.  However, Plaintiffs' citation of *National Wildlife Federation v. NMFS*, 524 F.3d 917, 929 (9th Cir. 2008) ("*NWF v. NMFS*"), does not support this proposition under the circumstances of this case, as *NWF v NMFS* concerned application of *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), which held that an ESA section 7 consultation applies "to all actions in which there is discretionary involvement or control." This is not a section 7 action and the regulatory provisions at issue in *Home Builders* are not applicable here.

the Secretary of the Interior; it does not purport to authorize or direct any actions by the California Fish and Game Commission or CDFG.  *See* CVPIA § 3406.  But, Congress expressly acknowledged the role of CDFG in maintaining and doubling fish populations.  For example, the Secretary of the Interior is required to coordinate with CDFG to benefit anadromous fish: "As needed to achieve the goals of this program ... Instream flow needs to be determined based on the recommendations of the U.S. Fish and Wildlife Service after consultation with the California Department of Fish and Game."  CVPIA § 3406(b)(1)(B).  Likewise, 800,000 acre feet of water are to be "managed pursuant to conditions specified by the U.S. Fish and Wildlife Service after consultation with the Bureau of Reclamation and the California Department of Water Resources and in cooperation with the California Department of Fish and Game."  § 3406(b)(2)(B); *see also* § 3406(c)(1) (requiring development of a plan to "address fish, wildlife, and habitat concerns in the San Joaquin River... in cooperation with the California Department of Fish and Game....").

Second, Plaintiffs note that the striped bass sport-fishing regulations pre-date the enactment of the CVPIA, suggesting that they could not have been adopted pursuant

92

to the CVPIA's authority and therefore, even if the CVPIA trumps the ESA, this should not shield the striped bass sportfishing regulations from compliance with the ESA. Plaintiffs fail to acknowledge that the regulations are adopted on a triennial basis, and were recently readopted by the California Fish and Game Commission.

In the final analysis, the evidence suggests it is possible, but not certain, that enforcement of the ESA in this case can be harmonized with implementation of the CVPIA.  The current record is insufficient to resolve this mixed question of fact and law on summary judgment.

Plaintiffs' motion for summary judgment on the CVPIA affirmative defense is DENIED.


### IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary adjudication is GRANTED as to the injury-in-fact prong of Article III standing, but denied as to all other aspects of standing.  Plaintiffs' motion for summary judgment is also DENIED as to Section 9 liability and the CVPIA affirmative defense.

State Defendant shall submit a form of order consistent with this memorandum decision within five (5) days from electronic service.

93

1        A further scheduling conference is set for Tuesday,

2   July 27, 2010 at 9:00 a.m. in Courtroom 3 (OWW).   Counsel

3   may appear telephonically.

4

5   SO ORDERD
    DATED: July 21, 2010

6

7                        /s/ Oliver W. Wanger
                         Oliver W. Wanger
8                        United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28