1        UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF CALIFORNIA

3
   COALITION FOR A SUSTAINABLE          1:08-cv-00397 OWW GSA
4  DELTA, *et al.*,
                                        MEMORANDUM DECISION
5           Plaintiffs,                 GRANTING REQUEST FOR
                                        APPROVAL OF CONSENT
6       v.                              DECREE (DOC. 230).

7
   JOHN MCCAMMAN, in his official
8  capacity as the Director of the
   California Department of Fish and
9  Game,

10          Defendant,

11 CENTRAL DELTA WATER AGENCY, *et
12 al.*,

13          Defendant-Intervenors,

14 CALIFORNIA SPORTFISING PROTECTION
15 ALLIANCE, *et al.*,

16          Defendant-Intervenors.

17              I. **INTRODUCTION**

18      On January 29, 2008, the Coalition for a Sustainable

19 Delta, Berrenda Mesa Water District, Lost Hills Water

20 District, Wheeler Ridge-Maricopa Water Storage District

21 and Dee Dillon ("Plaintiffs") filed suit against

22 Defendant John McCamman, in his Official Capacity as

23 Director of the California Department of Fish and Game

24 ("State Defendant" or "DFG"), alleging that State

25 Defendant's enforcement of California's striped bass

26 sport fishing regulations, Cal. Code Regs. tit. 14, §

27

28                        1

5.75, cause a striped bass population that is higher than it otherwise would be in nature in the Sacramento-San Joaquin Delta and associated rivers and tributaries, which causes "take" of Sacramento River winter-run Chinook salmon, Central Valley spring-run Chinook salmon, Central Valley steelhead, and delta smelt (collectively, "Listed Species"), in violation of section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538.  State Defendant disputes that DFG's enforcement of the striped bass sport fishing regulations causes unlawful "take."

On May 29, 2008 and July 24, 2008, respectively, Central Delta Water Agency, South Delta Water Agency, Honker Cut Marine, Inc., Rudy Mussi, and Robert Souza (collectively, "Central Delta Parties"); and the California Sportfishing Protection Alliance, California Striped Bass Association, and the Northern California Council of the Federation of Fly Fishers (collectively, "CSPA") were granted permission to intervene as of right, provided that they strictly limit their participation to issues about which they can provide unique information and/or arguments.  Docs. 32 & 41.  Specifically, the Central Delta Parties argue that the striped bass sport fishing regulations are necessary to achieve the doubling goals for striped bass prescribed by the Central Valley Project Improvement Act ("CVPIA").

1    A July 21, 2010 Memorandum Decision denied

2  Plaintiffs' motion for summary judgment that State

3  Defendant's conduct violated ESA § 9 and that the Central

4  Delta Parties' CVPIA affirmative defense was invalid.

5  Doc. 168.  That decision also rejected Plaintiffs' theory

6  that proof of reasonably certain threat of imminent harm

7  to a single member of any of the Listed Species was

8  sufficient to establish a Section 9 violation in this

9  case.  *Id*. at 6-18.

10

11    Over a period of more than two months, Plaintiffs and

12  State Defendants (collectively, "Moving Parties") engaged

13  in arms-length settlement negotiations.  Defendant-

14  Intervenors claim to have been excluded from the

15  negotiations until late in the process, after a tentative

16  agreement had already been reached.  Defendant-

17  Intervenors declined to sign the settlement and made a

18  counter-offer that was not adopted by the Moving Parties.

19  The Moving Parties now move for the entry of a order

20  approving their Settlement Agreement under the standards

21  applicable to consent decrees.  Doc. 230.  Defendant-

22  Intervenors object to approval.  Docs. 233 & 234.  Moving

23  Parties filed a reply.  Doc. 238.  In response to the

24  Court's request, Defendant Intervenors submitted proposed

25

26  language concerning their participation in further

27  administrative proceedings before DFG and in related

28

regulatory proceedings.  Doc. 248.  State Defendant
advocates the use of alternative language.  Doc. 249.
Plaintiffs joined State Defendant's request.  Doc. 250.

## II. SETTLEMENT AGREEMENT

The Moving Parties entered into a Settlement
Agreement on February 9, 2011 that provides for the stay
of this case subject to certain conditions to enable DFG
to consider a new rule.  First, State Defendant, in
consultation with the National Marine Fisheries Service
("NMFS" or "NOAA Fisheries") and the U.S. Fish and
Wildlife Service ("FWS"), is required to develop a
"Regulatory Proposal" based on the best available
scientific information, to be submitted to the California
Fish and Game Commission ("Commission") with a
recommendation that the Commission modify the striped
bass sport fishing regulation to, among other things,
modify the bag and size limits to "reduce striped bass
predation on the listed species."  *Id*. at ¶ 2(a).  The
Regulatory Proposal must also include an adaptive
management plan designed to determine the effect of any
changes in the regulations to striped bass abundance,
striped bass predation on the listed species,
mesopredator release, and abundance of the listed
species.  *Id*. at ¶ 2(b).

4

Within 30 days following approval of the Settlement Agreement, State Defendant shall solicit input and scientific information from Plaintiffs and Defendant-Intervenors.  *Id*. at ¶ 3.  State Defendant shall then circulate a draft Regulatory Proposal to Plaintiffs and Intervenors within 30 days of the last input meeting. *Id*. at ¶ 4.  Plaintiffs and Intervenors will have 10 days to provide written comments.  *Id*. at ¶ 5.  If Plaintiffs recommend modifications to the Regulatory Proposal, State Defendants then have 30 days to reach agreement on an alternative proposal.  *Id*. at ¶ 6.  If NMFS, FWS, or Plaintiffs object to the final Regulatory Proposal, the stay will be lifted and the Court will set a new pretrial and trial date.  *Id*. at ¶ 7.

If State Defendants and Plaintiffs agree on the Regulatory Proposal, State Defendants shall circulate a draft staff report in support of the Regulatory Proposal within fifteen (15) days of receipt of Plaintiffs' written proposal.  If Plaintiffs object to the content of the report, the stay will be lifted, and the case shall proceed to trial.  *Id*. at ¶ 8.

If Plaintiffs do not object to the drat staff report, State Defendant will recommend at the next public meeting of the Fish and Game Commission that the Commission adopt the Regulatory Proposal.  *Id* at ¶ 9.  A final staff

report will accompany the recommendation. *Id.* The Settlement Agreement provides that the final draft report "shall not differ materially from the draft staff report." *Id.* If Plaintiffs believe the final staff report differs materially from the draft, Plaintiffs shall have 10 days to object, and State Defendants shall have 10 days to revise the report accordingly. *Id.* If the Plaintiffs still believe the final report differs materially from the draft report, the Moving Parties shall jointly request a determination from the Court whether the revisions constitute a material alternation. *Id.* If the Court finds a material alteration and State Defendants refuse to revise the report, Plaintiffs or State Defendants shall notify the Court, and the Court shall lift the stay. *Id.*

If there are no such objections and the Commission takes final action on the Final Regulatory Proposal (by approving, modifying and approving, or rejecting the amended regulation), Plaintiffs shall promptly take all necessary steps to dismiss their First Amended Complaint with prejudice. *Id.*

If the Commission does not take final action within twelve months and Plaintiffs believe State Defendant has not acted in good faith, Plaintiffs may petition the Court to lift the stay. *Id.* at ¶ 11. If the Commission

does not take final action within twenty-one months, the parties will provide notice to the Court, after which the Court shall lift the stay.  State Defendant can seek an extension upon a showing of good cause.  *Id*. at ¶ 12. The Court is not required to approve an extension.

Plaintiffs agree not to participate in or fund any lawsuit against State Defendant based on the same underlying facts and legal theories.  *Id*. at ¶ 14.

The Settlement Agreement also contains the following confidentiality provisions:

> State Defendants, Intervenors, and Plaintiffs agree that all documents, oral statements, and other communications rendered as part of settlement discussions (1) are confidential and shall not be made publicly available prior to the submission of the Final Regulatory Proposal to the Commission except as otherwise required by law and (2) are no longer confidential following submission of the Final Regulatory Proposal to the Commission except as otherwise required by law.  <u>Failure to agree to the confidentiality requirement set forth in this paragraph shall preclude the party that declines to agree with the confidentiality requirement from participating in the meetings described in paragraph 3, from receiving or commenting on the draft Regulatory Proposal described in paragraphs 4 or 5 or any modification of the draft Regulatory Proposal, or receiving the draft staff report described in paragraph 8</u>.

*Id*. at ¶ 16 (emphasis added).  As Defendant-Intervenors refused to sign the Settlement Agreement, they will not be included in any of the scoping meetings described in paragraph 3, nor will they receive or be able to comment

upon the draft Regulatory Proposal and/or draft staff
report.  The settlement agreement does not preclude
Defendant-Intervenors from otherwise participating in the
regulatory process as permitted by state law.

The Settlement Agreement provides that State
Defendant will set aside $1,000,000.00 to support
research projects regarding predation on listed species
in the Delta.  One or more research projects will be
selected by an "independent scientific review panel"
composed of:  Marty Gingras, Charles Hanson, Dennis
Murphy, Pat Coulston, and a fifth member to be determined
jointly by Plaintiffs and the State Defendants.  *Id.* at ¶
17.

### III. <u>STANDARD OF DECISION</u>

"The initial decision to approve or reject a
settlement proposal is committed to the sound discretion
of the trial judge."  *S.E.C. v. Randolph*, 736 F.2d 525,
529 (9th Cir. 1984)(quoting *Officers for Justice v. Civil
Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)).  "This
discretion is not unbridled, however.  Unless a consent
decree is unfair, inadequate, or unreasonable, it ought
to be approved."  *Id.; see also Sierra Club, Inc. v.
Electronic Controls Design, Inc.*, 909 F.2d 1350, 1355
(9th Cir. 1990) ("[A] district court should enter a

proposed consent judgment if the court decides that it is fair, reasonable and equitable and does not violate the law or public policy.").  The Moving Parties and Defendant Intervenors also point to language from *Officers for Justice*, which involved approval of a class action settlement under Federal Rule of Civil Procedure 23:

> [A] court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement <u>is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned</u>. Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.

688 F.2d at 625 (emphasis added).  Although Rule 23 is inapplicable here, the Ninth Circuit has applied the reasoning of *Officers for Justice* to non-class action consent judgments.  *See United States v. State of Or.*, 913 F.2d 576, 586 (9th Cir. 1990)(inquiring into whether the agreement was the product of "fraud or overreaching by, or collusion between, the negotiating parties," as

9

part of approval of Columbia River Fish Management Plan).
The burden is on the party objecting to a settlement.
*Id.* (acknowledging that other circuits impose upon the
objecting party "a heavy burden of demonstrating that the
decree is unreasonable").

Moving Parties cite authority that a court should
afford deference to a government agency settling a matter
within its area of expertise.  For example, the Ninth
Circuit held in *Randolph*, 736 F.2d at 529, that "courts
should pay deference to the judgment of the government
agency which has negotiated and submitted the proposed
judgment."  Moving Parties admit that existing caselaw
refers only to agencies of the federal government, but
suggest, without citing any authority, that "the same
principle can be extended to [] State [agencies]."  Doc.
230-1 at 6.  This assertion is undermined by another of
Plaintiffs' cited cases, *United States v. Cannons Eng'g
Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).  *Cannons*
concerned the approval of a consent decree in a CERCLA
case.  The First Circuit acknowledged the general rule
that "it is the policy of the law to encourage
settlements."  *Id.*

> That policy has particular force where, as here,
> a government actor committed to the protection
> of the public interest has pulled the laboring
> oar in constructing the proposed settlement.
> While the true measure of the deference due

> depends on the persuasive power of the agency's
> proposal and rationale, given whatever practical
> considerations may impinge and the full panoply
> of the attendant circumstances, [citation] the
> district court must refrain from second-guessing
> the <u>Executive Branch</u>.

*Id.* Deference to the settlement preferences of federal

Executive Branch agencies stems in part from a respect

for the balance of powers between the various branches of

the federal government.  Plaintiffs have no authority to

support a rule that a federal court must afford deference

to state agencies.  As Defendant Intervenors point out,

the settling state agency, DFG, is not charged with the

task of implementing either the ESA or the CVPIA.

More generally, "a consent decree must spring from

and serve to resolve a dispute within the court's

subject-matter jurisdiction." *Local No. 93, Intern.*

*Ass'n of Firefighters, AFL-CIO C.L.C. v. City of*

*Cleveland*, 478 U.S. 501, 525 (1986).  "[C]onsistent with

this requirement, the consent decree must come within the

general scope of the case made by the pleadings, and must

further the objectives of the law upon which the

complaint was based."  *Id.* (internal citations and

quotations omitted).

A court may adopt a Consent Decree over the

opposition of non-settling parties.

> It has never been supposed that one party-
> whether an original party, a party that was

11

> joined later, or an intervenor-could preclude
> other parties from settling their own disputes
> and thereby withdrawing from litigation. Thus,
> while an intervenor is entitled to present
> evidence and have its objections heard at the
> hearings on whether to approve a consent decree,
> it does not have power to block the decree
> merely by withholding its consent

*Id.* at 528-529; *see also S. Cal. Edison v. Lynch*, 307

F.3d 794, 806-07 (9th Cir. 2002) ("An intervenor does not

have the right to prevent other parties from entering

into a settlement agreement.").


## IV. DISCUSSION

A.  **The Consent Decree Does Not Require State Defendant to Draft or Promulgate an Unjustified Regulatory Proposal.**

Defendant Intervenors argue that the Settlement

Agreement is not reasonable because it requires a

substantive result that is not supported by the best

available science.  Specifically, Defendant Intervenors

point to Paragraph 2(a) which provides that "State

Defendant shall develop a proposal based upon the best

available scientific information to modify the striped

bass sport fishing regulation to reduce striped bass

predation on the listed species" in the form of a

"Regulatory Proposal" that is to consist of "changes to

title 14, section 5.75(b) and (c) (bag and size limit,

respectively) of the California Code of Regulations to

reduce striped bass predation on the listed species."

12

Settlement Agreement ¶ 2(a) (emphasis added).  Defendant Intervenors argue that this objective "can only be accomplished by a reduction in striped bass numbers." Doc. 233 at 22.

It is unnecessary to delve into the merits of the case when considering approval of a consent decree.  The terms of the Settlement Agreement speak for themselves. The Settlement Agreement calls for State Defendant to develop the described Regulatory Proposal, but State Defendant's failure to satisfy this condition precedent only leaves Plaintiffs the option to proceed with this lawsuit.  Nothing in the Settlement Agreement requires State Defendant to draft, let alone promulgate, such a Regulatory Proposal if doing so would be inconsistent with the best available science or if it otherwise violates the law.  Nothing in the Settlement Agreement requires that the Regulatory Proposal reduce striped bass predation on the listed species by reducing striped bass numbers.

B.   **The Settlement Agreement Does Not Undermine the Federal Interest Embodied in the CVPIA.**

The Central Delta Parties emphasize that nearly twenty (20) years ago in the CVPIA, Pub. L. 102-575, 106 Stat. 4600, Title 34, 106 Stat. 4706-31 (1992), Congress deemed striped bass populations in the Delta worthy of

protection and restoration to a specific level as yet

unattained.  *See* CVPIA sections 3402(a) and 3406(b)(1);

(b)(1)(B);  (b)(8);  (9), (14), (18), (19), and (21);

(c)(1); (e)(1) and (5); (f); and (g)(4) and (7).  The

July 16, 2009 Memorandum Decision reviewed the CVPIA's

treatment of striped bass:

> The CVPIA contains numerous provisions calling
> for protection and enhancement of striped bass
> within the Sacramento-San Joaquin Delta. CVPIA
> section 3403(a) defines the term "anadromous
> fish" to include "striped bass," making
> applicable section 3406(b)(1)'s maintenance and
> restoration provisions. That section requires
> the Secretary of Interior to "develop within
> three years of enactment and implement a program
> which makes all reasonable efforts to ensure
> that, by the year 2002, natural production of
> anadromous fish in Central Valley rivers and
> streams will be sustainable, on a long-term
> basis, at levels not less than twice the average
> levels attained during the period of 1967-1991."
> To this end, it is undisputed that FWS has
> established a doubling goal for striped bass of
> 2,500,000 fish. McDaniel Decl., Doc. 66-4, at ¶3
> & Ex. B (Final Restoration Plan for Anadromous
> Fish Restoration Program, January 9, 2001) at 9-
> 10. It is also undisputed that this goal has not
> been achieved. *Id.* at Ex. C (Anadromous Fish
> Restoration Program Doubling Graphs for striped
> bass).
>
> Section 3406(b)(1)(B) provides that "the
> Secretary is authorized and directed to modify
> Central Valley Project operations to provide
> flows of suitable quality, quantity, and timing
> to protect all life stages of anadromous
> fish...." Section 3406(b)(1)(D)(2) requires that
> the Secretary "upon enactment of this title
> dedicate and manage annually 800,000 acre-feet
> of Central Valley Project yield for the primary
> purpose of implementing the fish, wildlife, and
> habitat restoration purposes and measures
> authorized by this title...." This provision has
> been interpreted to require that the Secretary
> give primacy to its anadromous fish doubling
> program in the allocation of the 800,000 acre-
> foot CVP yield dedication. *See San Luis & Delta
> Mendota Water Auth. v. U.S. Dept. of the*

14

1
2
3
4
5
6
7
8
9
10

*Interior*, --- F. Supp. 2d ---, 2009 WL 1362652
(E.D. Cal. 2009); *Bay Institute of San Francisco
v. United States*, 87 Fed. Appx. 637 (9th Cir.
Jan. 23, 2004). Because striped bass are
included in the statutory definition of
"andadromous fish," they are intended and
designated beneficiaries of these efforts. CVPIA
§ 3403(a).

Section 3406(b)(14) is directed specifically to
striped bass, requiring the Secretary to
"develop and implement a program which provides
for modified operations and new or improved
control structures at the Delta Cross Channel
and Georgiana Slough during times when
significant numbers of striped bass eggs,
larvae, and juveniles approach the Sacramento
River intake to the Delta Cross Channel or
Georgiana Slough."

11
12
13
14
15
16
17
18
19
20

Certain CVPIA provisions require the Secretary
to coordinate with state agencies to protect
anadromous fish in general and striped bass in
particular. For example, Section 3406(b)(21)
requires that the Secretary "assist the State of
California in efforts to develop and implement
measures to avoid losses of juvenile anadromous
fish resulting from unscreened or inadequately
screened diversions on the Sacramento and San
Joaquin rivers, their tributaries, the
Sacramento-San Joaquin Delta, and the Suisun
Marsh." Similarly, section 3406(b)(18) requires
that the Secretary "if requested by the State of
California, assist in developing and
implementing management measures to restore the
striped bass fishery of the Bay-Delta estuary."
Such measures must be "coordinated with efforts
to protect and restore native fisheries." *Id.*

21
22
23
24
25

Doc. 85 at 19-22.  That Decision also concluded that
whether application of the ESA to the sport-fishing
regulations would conflict with Congress' CVPIA
objectives was a highly factual inquiry not amenable to
summary judgment:

26
27
28

Can the numerous CVPIA provisions directing the
Secretary of the Interior, in consultation with
other federal agencies, to protect and enhance
the striped bass population, be harmonized with
application of section 9's take prohibition to

15

CDFG's enforcement of the striped bass sport-fishing regulations and more general application of the ESA? On Plaintiffs' motion for summary adjudication on an affirmative defense for which Central Delta has the burden of proof at trial, Plaintiffs must show "an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984. Plaintiffs maintain, and have presented evidence to support their claim, that State Defendant's enforcement of the sport-fishing regulations necessarily take Listed Species, and that lawful application of the ESA to State Defendant's enforcement activities will require elimination of (or substantial modification to) those sport-fishing regulations, which are causing jeopardy to Listed Species. The State rejoins that the current sport-fishing regulations are critical to the maintenance of current striped bass abundance levels. The State's evidence suggests that the continued enforcement of these regulations, and/or the promulgation of more stringent protections, may be necessary to achieve the 2,500,000 striped bass population goal promulgated by the Service.

This presents a material factual dispute over the effects of CDFG's striped bass regulations on the bass and Listed Species populations. The express language and the legislative purpose of the CVPIA do not evince an intent to abrogate application of the ESA. Only after the facts are developed will it be possible to determine if a conflict in operation exists between implementation of the ESA to the sport-fishing regulations and achieving the CVPIA objectives by application of those regulations. Plaintiffs' motion for summary adjudication of Central Delta's CVPIA affirmative defense is DENIED WITHOUT PREJUDICE.

*Id.* at 24-26.  This was reiterated in the July 21, 2010

Memorandum Decision re Plaintiffs' Motion for Summary

Judgment:

The significance of [the] evidence is in dispute. As Central Delta points out "striped bass and the salmonids co-existed in the Delta for more than a century, and it has not been shown that [a similar coexistance] cannot be achieved." Doc. 125 at 14 (noting that FWS adopted the Restoration Plan to restore both

16

> striped bass and salmonids pursuant to the
> direction of the CVPIA). Central Delta also
> points out that, despite the opinions of the
> review panel, Congress expressed its
> unconditional intent to restore both striped
> bass and salmonids. At the same time, there is
> ample record evidence to support the proposition
> that the sportfishing regulations are necessary
> to achieve the CVPIA's goal of doubling the
> striped bass population.

Doc. 168 at 89-90.

The Central Delta Parties maintain that the federal

interests embodied in the CVPIA are not protected by the

Settlement Agreement.  Moving Parties rejoin that DFG is

not bound by the CVPIA, which governs the actions of the

United States Secretary of the Interior.  CVPIA § 3406(a)

provides:

> (b) Fish and Wildlife Restoration Activities.--
> The Secretary, immediately upon the enactment of
> this title, shall operate the Central Valley
> Project to meet all obligations under state and
> federal law, including but not limited to the
> federal Endangered Species Act, 16 U.S.C. s
> 1531, et seq., and all decisions of the
> California State Water Resources Control Board
> establishing conditions on applicable licenses
> and permits for the project. <u>The Secretary, in
> consultation with other State and Federal
> agencies, Indian tribes, and affected interests,
> is further authorized and directed to</u>:
>
> > (1) Develop within three years of enactment
> > and implement a program which makes all
> > reasonable efforts to ensure that, by the
> > year 2002, natural production of anadromous
> > fish in Central Valley rivers and streams
> > will be sustainable, on a long-term basis,
> > at levels not less than twice the average
> > levels attained during the period of 1967-
> > 1991;

This imposes burdens on the Secretary of the Interior,

17

not DFG, to develop a program to double anadromous fish
populations (which are defined to include striped bass)
by 2002.  However, the CVPIA's requirement of striped
bass population doubling is relevant to whether approval
of this settlement agreement is in the public interest.
The CVPIA expresses Congress' intent to protect and
enhance the striped bass population.  Nevertheless,
nothing in the Settlement Agreement requires State
Defendant to promulgate a regulation that derogates the
CVPIA's goals, nor does the Settlement Agreement preclude
the Central Delta Parties from raising the CVPIA in any
future challenge to a Regulatory Proposal.  The federal
interest in the CVPIA is not per se harmed or advanced by
the Settlement Agreement, which has for its primary
purpose the protection of listed species.

C.   The Settlement Agreement is Otherwise in the Public
     Interest.

     The Agreement serves the public interest by avoiding
protracted litigation and conserving resources.  *See*
*Citizens for a Better Environment v. Gorsuch*, 718 F.2d
1126, 1117 (D.C. Cir. 1983) ("Not only the parties, but
the general public as well, benefit from the saving of
time and money that results from the voluntary settlement
of litigation.").

     The Agreement requires State Defendant to address the

18

issue of predation in a manner that is consistent with the purposes of the ESA and with the conservation and protection of the Listed Species.  *See United States v. Salt River Project Agric. Improvement and Power Dist.*, 2008 WL 5332023, at *3 (D. Ariz. Dec. 22, 2008) (finding Consent Decree served the public interest because it was consistent with the purposes of the Clean Air Act).  The Settlement Agreement ensures that the combined expertise and resources of the State Defendant, NOAA Fisheries, and FWS, the state and federal agencies responsible for protecting wildlife resources (including the Listed Species) in the Delta and tributaries thereto, are brought to bear on the issue of striped bass predation. The Agreement also provides a means for funding and researching predation impacts on one or more fish species listed under the federal and/or California Endangered Species Acts in the Delta and/or the anadromous waters of the Sacramento and San Joaquin river watersheds. Settlement Agreement at ¶¶ 2, 17.

     If this examination results in a recommendation to modify the striped bass sport fishing regulations, Defendant Intervenors may raise their objections to the regulation at that time.  This will also permit a more developed record for future judicial review.

19

**D.   The Makeup of the Science Panel.**

Paragraph 17 of the Settlement Agreement establishes "Independent Scientific Review Panel," charged with the task of selecting research proposals to receive funding from the $1,000,000 set aside by State Defendant. Defendant Intervenors complain that the Panel's membership is not "independent."

Proposed members include Marty Gingras, a DFG employee and State Defendant Rule 30(b)(6) designee at the center of the factual dispute in this case.  For example, Plaintiffs previously argued that certain statements Mr. Gingras made at his deposition concerning the effect of striped bass sport fishing regulations on striped bass populations and the effect of striped bass predation on the Listed Species should absolutely bind State Defendant.  Another DFG employee Pat Coulston is assigned to the panel, along with Plaintiff's expert Charles Hanson, and Dennis Murphy, who co-authored an article on the Endangered Species Act with Plaintiffs' attorney Paul Weiland.  The four members are authorized to pick the fifth Panel member.  Moving Parties maintain that these participants are both qualified and knowledgeable and that Defendant Intervenors' suggestion that they cannot exercise independence has no basis in fact.

20

Defendant Intervenors suggested, as an alternative, that a panel of National Academy of Sciences scientists be used to select research projects.  This is impracticable, as NAS panels are typically impaneled at the request of Congress, a federal agency, or both, with the ultimate goal of producing a report, not of choosing research projects for grant funding.

The law does not arrogate to Defendant Intervenors the authority to choose the composition of Panel members. The DFG and Plaintiffs are adversaries.  They and the Panel must comply with all applicable laws.  The law does not require more.

E.    The Settlement Process Was Not Unfair.

Defendant Intervenors complain that they were excluded from the Settlement Process until the Agreement had been formulated.[1]  Once the Agreement was drafted, Defendant Intervenors were included in discussions.  They articulated five principles that should be implemented.

> (1) The financial commitment by DFG should be utilized to study all predation, inform DFG, and be the basis of any regulatory proposal.  The study should be directed by an independent panel.  The intervenors suggested the National Academy of Sciences.

> (2)  Any regulatory proposal should be

---

[1] Defendant Intervenors also complain that FWS, the agency charged with implementation of the CVPIA, was also excluded from the initial discussions.  This complaint is baseless.  The Settlement Agreement calls for State Defendant to consult with NMFS and FWS in developing their Regulatory Proposal, as is required by law.

1                    consistent with and implement the CVPIA
                     provisions for the doubling of all anadromous
2                    fish populations as defined therein.

3                    3) Full review under the California
                     Environmental Quality Act, California Public
4                    Resources Code section 21000, et seq. ("CEQA")
                     should be a part of the process, with the
5                    inclusion of agreed alternatives.

6                    4) All parties should be equal participants in
                     the process.
7
                     5) There should be reserved jurisdiction by the
8                    Court. Some, but not all, of their concerns were
                     addressed.
9
Doc. 233 at 7; Declaration of Daniel A. McDaniel, Doc.
10
233-1 ¶ 6, Ex. A.  Intervenors proposed revisions to the
11
Settlement Agreement, however only minor changes were
12
adopted.
13

14      The Moving Parties describe the Settlement process

15 very differently.  They explain that a "phased approach"

16 was taken at the behest of Judge Seng, who recommended

17 that Plaintiffs negotiate with State Defendant, followed

18 by involvement of Defendant Intervenors if Plaintiffs and

19 State Defendants are able to reach agreement.  Doc. 239

20 at 6.  According to Moving Parties, this procedure "made

21 sense" because Defendant Intervenors would not waste

22 their time if Plaintiffs and State Defendants were unable

23 to reach agreement.  *Id*.

24
        Defendant Intervenors shall be provided notice and
25
the opportunity to participate in and provide input in
26
the development of the Regulatory Proposal consistent
27

28

with and subject to paragraphs 3, 4, 5, 8, and 16 of the
settlement agreement.[2]  Defendant Intervenors shall
further be provided the opportunity to participate in and
provide input to the California Fish and Game Commission
during the regulatory process, including any proceedings
relating to the Commission's consideration of the
Regulatory Proposal, pursuant to the California
Administrative Procedure Act and Sections 205 and 207 of
the California Fish and Game Code.  Nothing provided
herein shall be construed or implied to require that any
general or specific regulatory proposal be made.

F.   <u>The Settlement Process Was Not Tainted by Collusion.</u>

     The Settlement Agreement embodies a reasonable
compromise by all signatories.  The issues in this case
were hotly disputed.  While the Agreement offers some
relief to Plaintiffs in the form of a procedure to
develop a Regulatory Proposal, none is guaranteed.
Plaintiffs will receive no injunctive or declaratory
relief, nor will they obtain fees.  The Agreement is not
the product of any collusion between Plaintiffs and the
State Defendant.  Rather, it was the product of rigorous,

---

[2] These opportunities to participate are conditioned upon Defendant-
Intervenors' consent to confidentiality terms set forth at paragraph
16 of the Settlement Agreement.  Defendant Intervenors complain that
such restrictions will --- but they are a reasonable requirement to
foster open discussions and in any event are to be lifted upon the
issuance of a Regulatory Proposal.

arms-length negotiations.

## V. <u>CONCLUSION</u>

For the reasons set forth above, the Settlement Agreement is fair, reasonable and equitable and does not violate the law or public policy.  The motion to approve the Settlement Agreement (Doc. 230) is GRANTED.  Moving Parties shall submit a proposed form of order consistent with this memorandum decision within five (5) days following electronic service.

SO ORDERED
Dated: April 5, 2011

                              <u>/s/ Oliver W. Wanger</u>
                         United States District Judge

24